Response Deadline:  February 1, 2011
Hearing Date:  March 3, 2011, at 10:00 a.m.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

|  |  |  |
|---|---|---|
| In re: | : | |
| **DREIER LLP,** | : | |
|  | : | **Chapter 11** |
|  | : | **Case No. 08-15051 (SMB)** |
| Debtor. | : | |
|  | : | |
| **SHEILA M. GOWAN, CHAPTER 11** | : | |
| **TRUSTEE OF DREIER LLP,** | : | |
| Plaintiff, | : | |
| v. | : | |
|  | : | **Adversary Proceeding** |
| **THE PATRIOT GROUP, LLC,** | : | **No. 10-03524 (SMB)** |
| **THE WASHINGTON SPECIAL** | : | |
| **OPPORTUNITY FUND, LLC and THE** | : | |
| **WASHINGTON SPECIAL OPPORTUNITY** | : | |
| **FUND, INC.,** | : | |
| Defendants. | : | |

------------------------------------------------------------- x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE AMENDED COMPLAINT

Dated:  January 11, 2011

Harold S. Novikoff
Emil A. Kleinhaus
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York  10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for Defendants The Patriot Group, LLC,*
*The Washington Special Opportunity Fund, LLC,*
*and The Washington Special Opportunity Fund, Inc.*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................................... 1

BACKGROUND ...................................................................................................................... 5

      A.     The Patriot Group ......................................................................................... 5

      B.     Dreier's fraud on Patriot Group ..................................................................... 5

      C.     The Trustee's allegations against Patriot Group ............................................ 7

      D.     The Trustee's claims ...................................................................................... 10

ARGUMENT ......................................................................................................................... 11

POINT I     THE REPAYMENT OF AN ANTECEDENT DEBT
              IS NOT A FRAUDULENT CONVEYANCE ........................................... 12

POINT II    THE TRUSTEE'S CONSTRUCTIVE FRAUDULENT
              CONVEYANCE CLAIMS SHOULD BE DISMISSED ........................................ 15

      A.     Patriot provided reasonably equivalent value in exchange for the
           repayment of its principal ............................................................................. 16

      B.     Patriot provided reasonably equivalent value in exchange for the
           interest paid on its loan ................................................................................. 18

      C.     Patriot received the challenged payments in "good faith" under
           New York's constructive fraudulent conveyance statute ............................... 21

POINT III  THE TRUSTEE'S INTENTIONAL FRAUDULENT
              CONVEYANCE CLAIMS SHOULD BE DISMISSED ........................................ 22

      A.     The loan repayments to Patriot are not avoidable as intentional
           fraudulent conveyances ................................................................................. 23

      B.     Patriot's "good faith" is not at issue and, in any event, has not
           been plausibly challenged ............................................................................. 24

      C.     The Trustee's claim for attorneys' fees should be dismissed ........................ 29

POINT IV  THE TRUSTEE'S FRAUDULENT CONVEYANCE CLAIMS
              SHOULD BE DISMISSED ON THE ALTERNATIVE GROUND THAT THE
              TRANSFERS TO PATRIOT WERE NOT OF THE DEBTOR'S PROPERTY ...... 30

POINT V    THE TRUSTEE'S EQUITABLE SUBORDINATION
CLAIM SHOULD BE DISMISSED ......................................................................... 32

    A.      No claim exists that could be subordinated ..................................................... 32

    B.      The Trustee has not alleged any facts that support
equitable subordination................................................................................... 32

CONCLUSION..................................................................................................................... 34

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*80 Nassau Assocs.* v. *Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*,
     169 B.R. 832 (Bankr. S.D.N.Y. 1994) ..................................................................... 33

*Andrew Velez Constr., Inc.* v. *Consol. Edison Co. of N.Y., Inc.*
     *(In re Andrew Velez Constr., Inc.)*,
     373 B.R. 262 (Bankr. S.D.N.Y. 2007) ............................................................... 24 n.4

*Armstrong* v. *Collins (In re Armstrong)*,
     2010 WL 1141158 (S.D.N.Y. Mar. 24, 2010) ........................................................ 17

*Ashcroft* v. *Iqbal*,
     129 S. Ct. 1937 (2009) ..................................................................... 11, 27 n.6, 29

*Atlanta Shipping Corp., Inc.* v. *Chem. Bank*,
     818 F.2d 240 (2d Cir. 1987) ................................................................................. 16

*Bear Stearns Sec. Corp.* v. *Gredd* (In re Manhattan Investment Fund Inc.),
     397 B.R. 1 (S.D.N.Y. 2007) ............................................................... 25, 28, 29

*Bell Atlantic Corp.* v. *Twombly*,
     550 U.S. 544 (2007) ....................................................................................... 11, 29

*B.E.L.T., Inc.* v. *Wachovia Corp.*,
     403 F.3d 474 (7th Cir. 2005) ............................................................................ 13, 16

*Benjamin* v. *Diamond (In re Mobile Steel Co.)*,
     563 F.2d 692 (5th Cir. 1977) ............................................................................... 33

*Boston Trading Group, Inc.* v. *Burnazos*,
     835 F.2d 1504 (1st Cir. 1987) ...................................................................... passim

*Breeden* v. *Thomas (In re Bennett Funding Group, Inc.)*,
     1999 Bankr. LEXIS 1843 (Bankr. N.D.N.Y. Apr. 29, 1999) ................................ 21

*Caplin & Drysdale, Chartered* v. *United States*,
     491 U.S. 617 (1989) ............................................................................................. 30

*Carey* v. *Crescenzi*, 923 F.2d 18 (2d Cir. 1991) ...................................................... 30

*Christian Bros. High School Endowment* v. *Bayou No Leverage Fund, LLC*
     *(In re Bayou Group, LLC)*,
     439 B.R. 284 (S.D.N.Y. 2010) ..................................................................... passim

*Cortec Indus., Inc.* v. *Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991) ................................................ 12

*Daly* v. *Deptula (In re Carrozzella & Richardson)*,
  286 B.R. 480 (D. Conn. 2002) ........................................ 20, 21

*DePetris & Bachrach, LLP* v. *Srour*,
  71 A.D.3d 460 (1st Dep't 2010) ........................................ 18

*Feldman* v. *Chase Home Finance (In re Image Masters, Inc.)*,
  421 B.R. 164 (Bankr. E.D. Pa. 2009) .................................. 29

*HBE Leasing Corp.* v. *Frank*,
  48 F.3d 623 (2d Cir. 1995) ........................................ 3, 26 n.5

*IBF Fund Liquidating, LLC* v. *Chadmoore Wireless Group, Inc.*
  *(In re Interbank Funding Corp.)*,
  2007 WL 2907516 (Bankr. S.D.N.Y. Oct. 3, 2007) .................... 18

*In re All-Type Printing, Inc.*,
  274 B.R. 316 (Bankr. D. Conn. 2002),
  *aff'd*, 80 Fed. Appx. 700 (2d Cir. 2003) ............................ 16

*In re DJK Residential LLC*,
  416 B.R. 100 (Bankr. S.D.N.Y. 2009) .................................. 11

*In re Dreier LLP*,
  429 B.R. 112 (Bankr. S.D.N.Y. 2010) ............................ 6, 30, 31

*In re Sunbeam Corp.*,
  284 B.R. 355  (Bank. S.D.N.Y. 2002) .................................. 33

*Irving Trust Co.* v. *Kaminsky*,
  19 F. Supp. 816 (S.D.N.Y. 1937) ...................................... 24

*J. Walter Thompson, U.S.A., Inc.* v. *First BankAmericano*,
  518 F.3d 128 (2d Cir. 2008) .......................................... 26

*Jobin* v. *Ripley (In re M & L Bus. Machine Co.)*,
  198 B.R. 800 (D. Colo. 1996) ......................................... 17

*Kittay* v. *Atl. Bank of N.Y. (In re Global Serv. Group LLC)*,
  316 B.R. 451 (Bankr. S.D.N.Y. 2004) .................................. 33

*Lawson* v. *Ford Motor Co. (In re Roblin Indus., Inc.)*,
  78 F.3d 30 (2d Cir. 1996) ............................................. 3

*Liquidation Trust* v. *Daimler AG (In re Old CarCo LLC*
   *(f/k/a Chrysler LLC))*,
   435 B.R. 169 (Bankr. S.D.N.Y. July 27, 2010) ....................................................... 11

*Lustig* v. *Weisz & Assocs. Inc. (In re Unified Commercial Capital Inc.)*,
   260 B.R. 343 (Bankr. W.D.N.Y. 2001) ........................................................ 18, 19, 20

*Lustig* v. *Weisz & Assocs. Inc. (In re Unified Commercial Capital Inc.)*,
   2002 WL 32500567 (W.D.N.Y. June 21, 2001) ........................................... 20 & n.3

*Nordberg* v. *Sanchez (In re Chase & Sanborn Corp.)*,
   813 F.2d 1177 (11th Cir. 1987) ................................................................................ 24

*O'Connell* v. *Arthur Andersen LLP (In re AlphaStar Ins. Group, Ltd.)*,
   383 B.R. 231 (Bankr. S.D.N.Y. 2008) ...................................................................... 32

*Official Comm. of Unsecured Creditors of Hydrogen, L.L.C.* v. *Blomen*
   *(In re Hydrogen, L.L.C.)*,
   431 B.R. 337 (Bankr. S.D.N.Y. 2010) ...................................................................... 33

*Pani* v. *Empire Blue Cross Blue Shield*,
   152 F.3d 67 (2d Cir. 1998) ................................................................................. 27 n.6

*Pashaian* v. *Eccelston Props.*,
   88 F.3d 7785 (2d Cir. 1996) .................................................................................... 22

*Pereira* v. *Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*,
   301 B.R. 801 (Bankr. S.D.N.Y. 2003), *vacated on other grounds*,
   2009 WL 1810112 (S.D.N.Y. Jun. 25, 2009) ..................................................... 2, 16

*Picard* v. *Merkin (In re Bernard L. Madoff Inv. Secs., LLC)*,
   2010 WL 4643102 (Bankr. S.D.N.Y. Nov. 17, 2010) ............................................. 25

*Procter & Gamble Distribution Co.* v. *Sherman*,
   2 F.2d 165 (S.D.N.Y. 1924) .................................................................................... 18

*Sharp Int'l Corp.* v. *State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*,
   403 F.3d 43 (2d Cir. 2005) .............................................................................. passim

*Sharp Int'l Corp.* v. *State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*,
   281 B.R. 506 (Bankr. E.D.N.Y. 2002) ..................................................................... 14

*Sharp Int'l Corp.* v. *State Street Bank and Trust Co. (In re Sharp Int'l Corp.)*,
   302 B.R. 760 (Bankr. E.D.N.Y. 2003) ..................................................................... 14

*Silverman* v. *Actrade Capital Inc. (In re Actrade Fin. Techn. Ltd.)*,
   337 B.R. 791 (Bankr. S.D.N.Y. 2005) ..................................................................... 26

*Tekinsight.com, Inc.* v. *Stylesite Marketing, Inc.*
  *(In re Stylesite Marketing, Inc.)*,
  253 B.R. 503 (S.D.N.Y. 2000)...................................................................... 17

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..........................................................................11-12

*Ultramar Energy, Ltd.* v. *Chase Manhattan Bank, N.A.*,
  191 A.D.2d 86 (1st Dep't 1993) .................................................................. 15

*United States* v. *One Silicon Valley Bank Account, 3300355711, In the*
  *Amount of One Hundred Thirteen Thousand Nine Hundred Fifty-Two &*
  *62/100 Dollars ($113,952.62)*,
  549 F. Supp. 2d 940 (W.D. Mich. 2008) ................................................... 31

*United States* v. *Parcel of Land*,
  507 U.S. 111 (1993)....................................................................................... 30

*United States* v. *Pelullo*,
  178 F.3d 196 (3d Cir. 1999) ......................................................................... 31

*United States* v. *Timley*,
  507 F.3d 1125 (8th Cir. 2007) ..................................................................... 30

*United States* v. *United States Currency in the Amount of $228,536.00*,
  895 F.2d 908 (2d Cir. 1990) .................................................................30-31

*Yak* v. *Bank Brussels Lambert*,
  252 F.3d 127 (2d Cir. 2001) ........................................................................ 12

## **Statutes and Rules**

11 U.S.C. § 101(5)(A)..................................................................................... 17

11 U.S.C. § 101(12) ........................................................................................ 17

11 U.S.C. § 502(h) ................................................................................... 10, 32

11 U.S.C. § 510(c) .............................................................................. 10, 32-33

11 U.S.C. § 541 ............................................................................................... 31

11 U.S.C. § 544(b) ............................................................................... 4, 30, 32

11 U.S.C. § 547 ............................................................................................... 12

11 U.S.C. § 548(a) ............................................................................... passim

11 U.S.C. § 548(c) ............................................................................... passim

11 U.S.C. § 548(d) ............................................................................................... 16

11 U.S.C. § 550(b) ............................................................................................... 27

18 U.S.C. § 981 .................................................................................................... 30

26 U.S.C. § 7301 .................................................................................................. 30

N.Y. Debt. & Cred. Law § 270 ............................................................................ 16

N.Y. Debt. & Cred. Law § 272 ...................................................................... 15, 21

N.Y. Debt. & Cred. Law § 273 ...................................................................... 10, 15

N.Y. Debt. & Cred. Law § 274 ...................................................................... 10, 15

N.Y. Debt. & Cred. Law § 275 ...................................................................... 10, 15

N.Y. Debt. & Cred. Law § 276 .................................................................... passim

N.Y. Debt. & Cred. Law § 278 .......................................................... 25, 27 & n.6

Fed. R. Bankr. P. 7008 ........................................................................................... 1

Fed. R. Bankr. P. 7009 ............................................................................... 1, 11, 24

Fed. R. Bankr. P. 7012 ..................................................................................... 1, 24

Fed. R. Civ. P. 9(b) .............................................................................................. 11

Fed. R. Civ. P. 12(b)(6) .............................................................................. 11, 27 n.6

N.Y. U.C.C. § 1-201(b)(20) ................................................................................. 26

 N.Y. U.C.C. § 2-103(1)(j) ................................................................................... 26

## **Other Authorities**

5 *Collier on Bankruptcy* ¶ 547.01 (16th ed. 2010) ..................................................... 12

1 G. Glenn, *Fraudulent Conveyances and Preferences*
    (rev. ed. 1940) ..............................................................................................2-3, 12

Paul Sinclair, *The Sad Tale of Fraudulent Transfers*,
    28 Am. Bankr. Inst. J. 16 (Apr. 2009). .......................................................... 25

Paul Sinclair, *The Sad Tale of Fraudulent Transfers (Part II)*,
    28 Am. Bankr. Inst. J. 44 (May 2009) ............................................................ 26

Paul Sinclair & Brendan McPherson, *The Sad Tale of Fraudulent Transfers:*
   *Part III*, 29 Am. Bankr. Inst. J. 1 (Apr. 2010)  .................................................................. 19 n.2

Defendants The Patriot Group, LLC ("Patriot"), The Washington Special Opportunity Fund, LLC and The Washington Special Opportunity Fund, Inc. (collectively, "Patriot Group") respectfully submit this memorandum of law in support of their motion, pursuant to Rules 7008, 7009 and 7012(b) of the Federal Rules of Bankruptcy Procedure, to dismiss with prejudice the claims asserted in the Amended Complaint dated November 24, 2010 (the "Amended Complaint") filed by Sheila M. Gowan as trustee (the "Trustee") for Dreier LLP ("DLLP").

## PRELIMINARY STATEMENT

Marc Dreier defrauded twelve different investment firms, including Patriot, into making loans. The loans were fraudulently marketed by Dreier as promissory notes being sold by a Dreier client, Solow Realty and Development Corp. ("Solow"), when in fact the loans were used to benefit Dreier and his law firm. Some of Dreier's victims, including Patriot, were repaid the amounts they loaned, along with contractual interest, in accordance with the terms of their loan documents. Other lenders were not repaid. By this action, the Trustee seeks to recover the amounts received by Patriot in repayment of its loan as a fraudulent conveyance.

The Trustee does not allege that Patriot is liable to the Trustee because it knew about or participated in Dreier's fraud. Instead, the Trustee's basic theory is that Patriot, prior to funding its $15 million loan, was faced with "red flags" that it did not adequately investigate. On that basis, the Trustee alleges that Patriot lacked "good faith" and should have to return both principal and contractual interest to DLLP.

Although the basic theory of the Amended Complaint is the same as in the Original Complaint, the alleged supporting facts have changed significantly. In the Original Complaint, the Trustee alleged that Patriot was faced with "red flags" — beyond those facing

other Dreier victims — because the CEO of Solow, Steven Cherniak, told Jonathan Kane of

Patriot, prior to the loan closing, "that he was unaware of any proposed transactions between

Solow and the Patriot Group."  Orig. Compl. ¶ 37.  As demonstrated in Patriot's original motion

to dismiss, however, that allegation was based on a facially egregious distortion of a document

that *undermines* the Trustee's claim of bad faith — namely, an email from the *real* Steven

Cherniak to Kane in which Cherniak, the *real* CEO of Solow, apologized to Kane for appearing

confused when they spoke and advised Kane to deal with Marc Dreier.

      In the Amended Complaint, the Trustee has walked away from her allegation

regarding what Cherniak supposedly told Kane, and has disclosed the content of the email sent

"from Cherniak's real email account," in which Cherniak told Kane that he had "spoken with

Marc Dreier" and urged Kane to "please call Marc."  Am. Compl. ¶ 38.  Although this

communication from the *real* Cherniak should put to rest all allegations of "red flags," the

Trustee nevertheless persists in alleging that Patriot Group acted in bad faith, based on new and

different "red flags" that can only be described as absurd.  For example, the Trustee now says

that Kane — even after being told by the *real* CEO of Solow to deal with Dreier on the note

transaction — should have suspected that Dreier was not acting for Solow because different

emails from Cherniak had different phone and fax numbers in the signature block.  *Id.* ¶ 39.

      The fundamental flaw in the Trustee's case, before even coming to the utter

implausibility of her claim of bad faith, is that it ignores the basic distinction between a

preference and a fraudulent conveyance.  "If there is in our law one point which is more

ungrudgingly accepted than others, it is that the preferential transfer does not constitute a

fraudulent conveyance."  *Pereira* v. *Dow Chem. Co.* (*In re Trace Int'l Holdings, Inc.*), 301 B.R.

801, 805 (Bankr. S.D.N.Y. 2003) (Bernstein, J.), *vacated on other grounds*, 2009 WL 1810112

(S.D.N.Y. Jun. 25, 2009) (quoting 1 G. Glenn, *Fraudulent Conveyances and Preferences* § 289,

at 488 (rev. ed. 1940)).  The basic object of preference law is to ensure "equality of distribution among creditors of the debtor."  *Lawson* v. *Ford Motor Co. (In re Roblin Indus., Inc.)*, 78 F.3d 30, 40 (2d Cir. 1996) (quoting H.R. Rep. No. 595, 95th Cong., 1st Sess. 177-78 (1977)).   In contrast, "[t]he basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors."  *Sharp Int'l Corp.* v. *State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54 (2d Cir. 2005) (emphasis in original) (quoting *HBE Leasing Corp.* v. *Frank*, 48 F.3d 623, 634 (2d Cir. 1995) (quoting *Boston Trading Group, Inc.* v. *Burnazos*, 835 F.2d 1504, 1509 (1st Cir. 1987))).  The Second Circuit, accordingly, has held that a transfer that is "at most a preference between creditors" is neither an intentional nor a constructive fraudulent conveyance.  *Sharp*, 403 F.3d at 56.

It is indisputable that DLLP owed a debt to Patriot by virtue of having defrauded Patriot into making a loan.  As a result, it is likewise indisputable that — in repaying the loan made by Patriot at maturity in accordance with its terms — DLLP satisfied "*some* of [its] creditors."  *Sharp*, 403 F.3d at 54.  The Amended Complaint, accordingly, alleges nothing more than a textbook preference, and yet — because the payments at issue were made outside the 90-day preference period — attempts to recover based on a fraudulent conveyance theory.  Under *Sharp* and other case law, the Trustee's claims to recover both principal and contractual interest paid to Patriot should be dismissed.

It is no answer for the Trustee to assert that Patriot supposedly did not act in "good faith."  Good faith is not an issue in connection with the Trustee's constructive fraudulent conveyance claim under federal law.  Likewise, under *Sharp*, there is no question that Patriot acted in good faith for purposes of New York's constructive fraudulent conveyance statute, because for purposes of that statute, "a mere preference between creditors does not constitute bad faith."  403 F.3d at 54.  *See* Point II, *infra*.  Moreover, under *Sharp*, the Trustee's intentional

fraudulent conveyance claims are also subject to dismissal without regard to a good faith defense, because the Trustee has not alleged a *prima facie* case.  *See* Point III, *infra*.

The lower court decisions that have required Ponzi scheme victims to prove their "good faith," aside from being unpersuasive in their attempts to distinguish *Sharp*, are also readily distinguishable.  Here, unlike in cases involving the redemption of equity interests, Patriot did nothing more than receive repayment of a loan at maturity, together with contractual interest.  It makes no sense to allege that Patriot would have deliberately ignored "red flags" when it *funded* the $15 million loan:  doing so would have put Patriot at risk of a total loss. Moreover, even under the "good faith" test applied in cases that depart from *Sharp*, the Amended Complaint on its face defeats the Trustee's claim, as it:  (a) shows that the "red flags" supposedly presented to Patriot were no different than those presented to other fraud victims, which the Trustee has conceded provide a "slim" basis for relief; and (b) admits that Patriot received an email from Solow's *real* CEO prior to the funding of the loan that directed Patriot to deal with Dreier.  In light of that email, as well as other allegations in the Amended Complaint, the notion that Patriot acted in bad faith is wholly implausible.

Additionally, and in the alternative, the Amended Complaint should be dismissed because it fails to allege any transfer of "an interest of the debtor in property," as required by sections 548(a) and 544(b) of the Bankruptcy Code.  The criminal forfeiture order obtained by the United States government had the effect of divesting DLLP — as of the time of Dreier's criminal conduct — of all property rights in the account from which Patriot was allegedly paid. The Trustee, accordingly, has no power to avoid the transfers made from that account.

Finally, the Trustee's equitable subordination claim should be dismissed on the basis that Patriot does not have an outstanding claim to be subordinated and, in any event, the

Amended Complaint does not allege that Patriot engaged in any kind of misconduct that would justify subordination of its claim.

## BACKGROUND[1]

### A.    The Patriot Group

Patriot is a Delaware limited liability corporation with its principal place of business in Connecticut.  Am. Compl. ¶ 7.  Washington Special Opportunity Fund, LLC ("Washington LLC") is also a Delaware limited liability corporation.  *Id*. ¶ 8.  Washington Special Opportunity Fund, Inc. ("Washington Inc.") is a Cayman Islands exempted company.  *Id*. ¶ 9.  Patriot manages the investments of Washington LLC and Washington Inc.  *Id*. ¶ 10.

At the time of the relevant events, Jonathan Kane was president of Patriot and an officer of Washington LLC and Washington Inc.  *Id*. ¶ 24.  Kane was the Patriot officer responsible for the Solow investment.  *Id*. ¶ 26.

### B.    Dreier's fraud on Patriot Group

This Court is familiar with the basic facts relating to Dreier's fraud.  In a nutshell, Marc Dreier held himself out as Solow's lawyer in order to sell promissory notes (the "Notes") that were supposedly being issued by Solow.  In that role, Dreier delivered a variety of falsified documents to potential investors, including financial statements and forged audit opinion letters on the letterhead of Berdon LLP, an established accounting and auditing firm.  Am. Compl. ¶ 17.  Dreier deposited the proceeds of the note sales into a DLLP account (the "5966 Account"),

---

[1] The facts recited here are drawn from the Amended Complaint, documents relied upon in the Complaint, and documents subject to judicial notice.  Allegations in the Amended Complaint are accepted as true only for purposes of this motion to dismiss.

which he used to repay other defrauded lenders, to fund his lifestyle, and to subsidize his law firm's operations.  *See In re Dreier LLP*, 429 B.R. 112, 118 (Bankr. S.D.N.Y. 2010).

Jonathan Kane of Patriot was introduced to the note program by Adrian Kingshott, who arranged for Kane and others from Patriot to meet with Dreier on June 18, 2007. Am. Compl. ¶¶ 24-25, 28.  On August 14, 2007, after Patriot and its counsel had obtained financial statements and other documents from Dreier — and after Kane had communicated by email and phone with Steven Cherniak, Solow's actual CEO — Patriot agreed to purchase $15 million of Notes with a one-year maturity and an interest rate of 11%.  *Id.* ¶ 42.  Patriot then wired $15 million into the 5966 Account.  *Id.*

On November 14, 2007, Patriot received an interest payment of $412,500 from the 5966 Account.  On February 14, 2008, Patriot received a second interest payment of $412,500 from the 5966 Account.  On May 14, 2008, Patriot received a third interest payment of $412,500 from the 5966 Account.  On August 14, 2008, Patriot received a fourth interest payment of $412,500 from the 5966 Account, along with the repayment of $15 million in principal.  *Id.* ¶¶ 47-51.  The Complaint alleges that "Patriot may have transferred to Washington LLC and Washington Inc. the funds transferred to it by [Dreier] as repayment of principal and payment of 'interest.'"  *Id.* ¶ 10.  None of the transfers to Patriot alleged in the Amended Complaint were made within the 90-day period prior to DLLP's chapter 11 filing.

The Amended Complaint does not allege that principal and interest under the Notes purchased by Patriot were repaid other than in accordance with the terms and maturity dates set out in the loan agreement.  Nor does the Amended Complaint allege that Patriot took any affirmative steps to obtain repayment on the Notes prior to maturity.

**C.        The Trustee's allegations against Patriot Group**

Prior to bringing the Original Complaint on August 24, 2010, the Trustee had the benefit of extensive discovery from Patriot under Bankruptcy Rule 2004, including production of Patriot's emails and other internal documents relating to Marc Dreier and the Notes.  *See* Am. Compl. ¶ 15.  In light of that extensive discovery, as well as the Trustee's access to DLLP's files and Dreier himself, *id.*, the Amended Complaint is most noteworthy for what it does *not* allege: putting aside conclusory assertions for which no factual support is pleaded and that are entitled to no weight, the Amended Complaint does not allege that Patriot participated in, or that anyone at Patriot had knowledge of, Dreier's fraud.

Instead, the Amended Complaint attempts to show that Patriot was on "inquiry notice" of the fraud before its decision to fund the loan, and yet for some reason funded the loan anyway.  Specifically, the Amended Complaint asserts that the documents transmitted to Patriot by Dreier contained supposed "irregularities," including provisions under which:  (a) investors were required to deal with Dreier, as Solow's lawyer, rather than with Solow employees; (b) investors were permitted to rely upon instructions from individuals who identified themselves as officers of Solow; and (c) investors were directed to wire their loans into the 5966 Account, which was an escrow account in the name of Solow's law firm, DLLP.  Am. Compl. ¶¶ 17-23, 29.  The Amended Complaint further alleges that the 11% contractual interest rate paid to Patriot over one year was "above-market."  *Id*. ¶¶ 16, 19.

The Trustee, however, has already admitted that these very same "red flags," which would have been apparent to *anyone* who received the documents created by Dreier, support only a "slim" argument that investors in the Notes were on inquiry notice of fraud.  *See* Declaration of Emil A. Kleinhaus, Ex. 1 (Gowan Decl.) ¶ 19.  In justifying a settlement with GSO Capital Partners LP ("GSO") — under which the Trustee agreed to accept *nothing* to

release claims for the over $130 million paid to GSO outside the preference period — the

Trustee explained:

> This is not to say that I do not believe that there are "red flags" in the
> documents and other communications that should have given GSO
> pause; rather, my conclusion was that *those facts standing alone (many*
> *of which are equally applicable to every other hedge fund that invested*
> *in the fraud) do not present a compelling case that GSO was on inquiry*
> *notice of the fraud.*

*Id.* (emphasis added).

In the Amended Complaint, the Trustee strains to identify "facts" that are *not*

equally applicable to every other purchaser of the Notes, but in doing so only confirms that

Patriot had even *less* reason to suspect fraud than other victims.  In the Original Complaint, the

Trustee alleged, "on information and belief," that Kane placed a call to "the real Cherniak" to

follow up on written responses that Cherniak had given to due diligence questions that Kane had

sent to an email address provided by Dreier.  According to the Original Complaint, "Cherniak

told Kane" on that call "that he was unaware of any proposed transactions between Solow and

the Patriot Group."  Orig. Compl. ¶¶ 33-37.

In the Amended Complaint, the Trustee has dropped her allegations about what

was supposedly said on the call.  Now, after describing a due diligence email sent by Kane to

Cherniak at the address provided by Dreier, as well as the response to that email, *see* Am.

Compl. ¶¶ 33-36, the Trustee alleges that Kane emailed Cherniak at his "real" email address and

asked Cherniak to call him.  *Id.* ¶ 37.  Kane and the real Cherniak then spoke by phone, after

which Cherniak sent an email to Kane, from his "real email account," stating as follows:

> *I apologize for appearing confused when we spoke.  I was not aware of*
> *the details.*
>
> *I've since spoken to Marc Dreier and he said everything is fine.*
>
> *If you need anything further, please call Marc.*

Kleinhaus Decl. Ex. 2 (PG00400) (emphasis added), quoted in Am. Compl. ¶ 38.

The Trustee alleges, quite implausibly, that this email from the *real* CEO of Solow, which directed Kane to speak with Dreier regarding the transaction, was somehow a "red flag" for Kane. *Id.* The Trustee also alleges, just as implausibly, that Kane was on notice of fraud because "the email from Cherniak's real email address included a signature block with different telephone and fax numbers than the signature block on the dummy email address." *Id.* ¶ 39. Even assuming that this would have been a "red flag" to anyone who noticed it, which is quite a stretch, there is no allegation that anyone at Patriot noticed this discrepancy or otherwise assumed the detective role that the Amended Complaint would impose on lenders.

In addition, in an effort to make up for the total lack of plausible allegations of "inquiry notice" and inadequate diligence, the Trustee quotes an email from Jonathan Kane to a colleague, which was not included in the Original Complaint, in which Kane, in response to an email from a colleague saying that he had released the wire, jokingly remarked: "Just hope I don't see Marc Dreier on a flight to Colombia anytime soon." *Id.* ¶ 43.

Ultimately, the Amended Complaint asks the Court to draw the wholly implausible inference that Patriot, despite suspecting fraud, assumed the risk of losing its entire investment for the opportunity to receive, for one year, 11% interest on a $15 million loan. But the Amended Complaint does not allege facts that support this inference. Rather, the only inference that can reasonably be drawn even from the Trustee's version of the facts is that, despite conducting due diligence, Patriot was an innocent victim of Dreier's fraud. Indeed, as summarized above, Patriot was reassured by the *real* CEO of Solow that Dreier was acting for him. *Id.* ¶ 38.

### D.    The Trustee's claims

The Amended Complaint asserts five causes of action.  Count I alleges that the repayments to Patriot were intentional fraudulent conveyances under section 548(a)(1)(A) of the Bankruptcy Code.  *Id*. ¶¶ 54-59.  Count I further alleges that "Patriot Group knew or should have known of" Dreier's fraud, and thus did not act in "good faith" for purposes of 11 U.S.C. § 548(c).  *Id*. ¶ 58.

Count II alleges that the repayments to Patriot were constructively fraudulent conveyances under section 548(a)(1)(B) of the Bankruptcy Code.  *Id*. ¶¶ 60-68.  As it must, Count II thus alleges that DLLP did not receive "reasonably equivalent value" for those transfers.  *Id*. ¶ 63.  Count II also specifically challenges Patriot Group's "good faith" under section 548(c) of the Bankruptcy Code.  *Id*. ¶ 67.

Count III alleges that the payments to Patriot were intentional fraudulent conveyances under section 276 of the New York Debtor and Creditor Law ("DCL").  *Id*. ¶¶ 69-75.  In addition to seeking avoidance of the relevant payments, Count III seeks attorneys' fees from Patriot Group.  *Id*. ¶ 75.

Counts IV, V and VI then allege that the same payments were constructive fraudulent conveyances under sections 273, 274 and 275 of the DCL.  *Id*. ¶¶ 76-96.  Each of those counts alleges that Patriot Group did not act in "good faith" for purposes of the DCL, because "Patriot Group was aware or should have been aware of" Dreier's fraud.  *Id*. ¶¶ 81, 88, 95.

Finally, Count VII seeks equitable subordination, under 11 U.S.C. § 510(c), of the claim that Patriot would have under 11 U.S.C. § 502(h) in the event that it returns the payments that it received to satisfy its loan.  *Id*. ¶¶ 97-100.

## ARGUMENT

In *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 563 (2007), the Supreme Court held that its previous formulation of the notice-pleading standard in *Conley* v. *Gibson* "ha[d] earned its retirement," and reformulated the basic test to determine whether a plaintiff has stated a valid claim.  Under the now-controlling test, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft* v. *Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  "To show facial plausibility, the Claimant must plead 'factual content that allows the court to draw the reasonable inference that the [defendant] is liable for the misconduct alleged.'"  *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) (quoting *Iqbal*, 129 S. Ct. at 1949); *see also Liquidation Trust* v. *Daimler AG (In re Old CarCo LLC (f/k/a Chrysler LLC))*, 435 B.R. 169, 177 (Bankr. S.D.N.Y. July 27, 2010) (granting motion to dismiss fraudulent conveyance claims because the plaintiff failed to allege "sufficient facts . . . to suggest that the legally vulnerable conduct is plausible").

Rule 9(b) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7009, further requires that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  "As 'actual intent to hinder, delay, or defraud' constitutes fraud," actual intent fraudulent transfer claims "must be pled with specificity, as required by Fed. R. Civ. P. 9(b)."  *Sharp*, 403 F.3d at 56; *accord In re Old CarCo LLC*, 435 B.R. at 191.

In assessing whether to dismiss a complaint, courts are entitled to consider not only the complaint, but also "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  *Tellabs, Inc.* v. *Makor Issues*

*& Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).  A court may likewise consider documents that are

"integral to the complaint," *Cortec Indus., Inc.* v. *Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir.

1991), including documents relied upon in bringing suit, *e.g.*, *Yak* v. *Bank Brussels Lambert*, 252

F.3d 127, 130-31 (2d Cir. 2001).

**POINT I**

**THE REPAYMENT OF AN ANTECEDENT DEBT
IS NOT A FRAUDULENT CONVEYANCE.**

The fundamental principle that requires dismissal of the Trustee's avoidance

claims is that the repayment of an antecedent debt, at least to a creditor that is not an insider and

that did not participate in the debtor's fraud — the circumstances present here — is not a

fraudulent conveyance.  Section 547 of the Bankruptcy Code, which governs preferential

transfers, serves a different purpose than section 548 of the Code and the fraudulent conveyance

provisions of New York law.  "A preference involves payment of a debt that violates the

bankruptcy principle of equal distribution among all creditors.  A fraudulent conveyance is a

transfer beyond the reach of *all* creditors of property that would and should be property of the

estate and distributable among all creditors."  5 *Collier on Bankruptcy* ¶ 547.01 (16th ed. 2010)

(emphasis added).

No fewer than three federal appellate courts, including the Second Circuit, have

strongly reaffirmed this fundamental distinction between a preference and a fraudulent

conveyance.  In *Boston Trading Group, Inc.* v. *Burnazos*, 835 F.2d 1504 (1st Cir. 1987), now-

Justice Breyer explained that, unlike the preference statute in the Bankruptcy Code, "the intent of

fraudulent conveyance statutes is not to provide equal distribution of the estates of debtors

among their creditors," *id*. at 1509 (quoting 1 G. Glenn, *Fraudulent Conveyances and*

*Preferences*, § 289, at 488 (rev. ed. 1940)).  Rather, fraudulent conveyance law is "a set of legal

-12-

(not equitable) doctrines designed for very different purposes," *id.* at 1508, and its applicability is limited to cases in which the debtor either diverts assets from *all* creditors or transfers assets to insiders, *id*. at 1509. Fraudulent conveyance law, therefore, does *not* extend to the repayment of valid debts: "The basic object of fraudulent conveyance law is to see that the debtor uses his limited assets to satisfy *some* of his creditors; it normally does not try to choose among them." *Id*. at 1509 (emphasis in original).

Applying these principles, the First Circuit in *Boston Trading* held that the repayment of a debt to a non-insider was not subject to avoidance as a constructive or intentional fraudulent conveyance, despite the creditor's knowledge that it was being repaid with the proceeds of a fraud. 835 F.2d at 1510-11. In explaining its decision, the Court noted that it had "found no modern case (nor any reference in any modern case, treatise or article to any case in the past 400 years) that has found a fraudulent conveyance in such circumstances," which the Court did not find surprising, since "[f]raudulent conveyance law is basically concerned with transfers that 'hinder, delay or defraud' creditors; it is not ordinarily concerned with how such debts were created." *Id*. at 1510.

Similarly, in *B.E.L.T., Inc.* v. *Wachovia Corp*., 403 F.3d 474, 477 (7th Cir. 2005), the Seventh Circuit held that "a preference among creditors," absent insider dealing, is not subject to avoidance as a fraudulent conveyance. In *B.E.L.T.*, a bank extended credit to a corporation that was engaged in fraud, and it was repaid after it suspected that "mischief was afoot." *Id*. at 476. While noting that "[a] trustee in bankruptcy could have avoided some or all of the preferential transfer," Judge Easterbrook explained that the transfer was not avoidable as a fraudulent conveyance, because "in the end this is nothing but a preference." *Id.* at 477-78.

In *Sharp*, the Second Circuit likewise held that a payment that discharges an antecedent debt, absent insider dealing or participation in fraud by the defendant, is not a

-13-

fraudulent conveyance.  *Sharp* involved a "massive fraud" perpetrated by Sharp's principals on Sharp's creditors.  Between 1997 and 1999, at a time when State Street Bank was Sharp's largest creditor, Sharp's principals "reported fictitious sales and revenues and falsely inflated Sharp's accounts receivable to the extent that fraudulent or nonexistent transactions comprised three quarters of the accounts receivable balance included in Sharp's financial statements."  *Sharp Int'l Corp.* v. *State St. Bank and Trust Co*., 281 B.R. 506, 510 (Bankr. E.D.N.Y. 2002).  During this period, State Street began to suspect fraud, and it ultimately obtained information regarding Sharp's customers that confirmed its suspicions.  *Id*. at 510-11.  State Street thus demanded that Sharp repay its debt, which Sharp did by defrauding new lenders.  *Id*. at 512.  Sharp subsequently filed for bankruptcy, and its trustee sought to recover the repayment to State Street as a fraudulent conveyance.  The Bankruptcy Court granted State Street's motion to dismiss, *see id*. at 517-23, and the district court affirmed, *see Sharp Int'l Corp*. v. *State St. Bank and Trust Co.*, 302 B.R. 760 (Bankr. E.D.N.Y. 2003).

Like the lower courts, the Second Circuit held that Sharp's payment to State Street was not a fraudulent conveyance.  In dismissing the trustee's constructive fraud claim under New York law, the Court explained that "[t]he decisive principle in this case is that a mere preference between creditors does not constitute bad faith," and concluded that "even the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance."  403 F.3d at 54.  As in *Boston Trading*, the Second Circuit reached this result despite the defendant's alleged knowledge of the debtor's fraudulent scheme:

> "[A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another.  It is of no significance that the transferee has knowledge of such insolvency.  Nor is the transfer subject to attack by reason of knowledge on the part of the transferee that the transferor is preferring him to other creditors, even by virtue of a secret agreement to that effect."

-14-

*Id.* at 54-55 (quoting *Ultramar Energy, Ltd.* v. *Chase Manhattan Bank, N.A.*, 191 A.D.2d 86, 90-91 (1st Dep't 1993)).  The Court went on to conclude that the complaint also failed to allege facts to support an *intentional* fraudulent conveyance claim, explaining that "[t]he $12.25 million payment was at most a preference between creditors" and, as a result, "did not 'hinder, delay, or defraud either present or future creditors.'"  *Id.* at 56 (quoting DCL § 276).

As explained further below, whether the Trustee relies on a theory of constructive fraudulent conveyance or intentional fraudulent conveyance, the Trustee's claims cannot survive scrutiny under *Sharp* and the long line of cases on which that decision is based.

## POINT II

## THE TRUSTEE'S CONSTRUCTIVE FRAUDULENT CONVEYANCE CLAIMS SHOULD BE DISMISSED.

Under section 548(a)(1)(B) of the Bankruptcy Code, a conveyance can be constructively fraudulent only if the debtor "received less than a reasonably equivalent value in exchange for such transfer."  11 U.S.C. § 548(a)(1)(B)(i).  Similarly, under the DCL, a conveyance can be constructively fraudulent only if it is made without "fair consideration."  *See* DCL §§ 273, 274 and 275.  The DCL further provides that "[f]air consideration is given for property . . . [w]hen in exchange for such property . . . as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied."  DCL § 272(a).

Here, with respect to both the repayment of principal to Patriot and the payment of contractual interest under the terms of the Notes, the Trustee has failed to state a constructive fraudulent conveyance claim under the Bankruptcy Code or New York law.

**A.      Patriot provided reasonably equivalent value in exchange
for the repayment of its principal.**

As a matter of law, the repayment of an antecedent debt constitutes an exchange
for "reasonably equivalent value," because the payment operates to reduce that debt on a dollar-
for-dollar basis.  *See* 11 U.S.C. § 548(d)(2)(A) (defining "value" as, among other things
"satisfaction or securing of a present or antecedent debt of the debtor").  This black-letter law,
*i.e.*, that "[r]epayment of an antecedent loan comes within the 'reasonably equivalent value'
rule," is "just another way of saying that preferential transfers differ from fraudulent
conveyances."  *B.E.L.T.*, 403 F.3d at 478.

Accordingly, courts in this Circuit have repeatedly dismissed constructive
fraudulent conveyance claims aimed at avoiding the repayment of a debt.  *See, e.g.*, *In re All-
Type Printing, Inc.*, 274 B.R. 316, 324 (Bankr. D. Conn. 2002), *aff'd*, 80 Fed. Appx. 700 (2d Cir.
2003) (holding that payments of benefits to a former employee were not avoidable because they
were "dollar-for-dollar satisfaction" of antecedent debts); *Pereira*, 301 B.R. at 806-07 (granting
summary judgment on a fraudulent conveyance claim on the basis that the challenged transfer
was on account of an antecedent debt), *vacated on other grounds*, 2009 WL 1810112 (S.D.N.Y.
Jun. 25, 2009).  As recognized by the Second Circuit, moreover, only "[o]ne exception has been
recognized by the New York courts to the rule that the repayment of an antecedent debt
constitutes fair consideration:  where 'the transferee is an officer, director, or major shareholder
of the transferor.'"  *Sharp*, 403 F.3d at 54 (quoting *Atlanta Shipping Corp., Inc.* v. *Chem. Bank*,
818 F.2d 240, 249 (2d Cir. 1987)).

The repayment to Patriot of the $15 million in Notes at maturity was plainly a
repayment of an antecedent debt.  New York law defines "debt" broadly to include "any legal
liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or
contingent."  DCL § 270.  The Bankruptcy Code similarly defines "debt" to mean "liability on a

claim," 11 U.S.C. § 101(12), and "claim" is defined to include a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." 11 U.S.C. § 101(5)(A).  Here, Patriot made a loan that was repaid at the time of the loan's maturity.  *See* Am. Compl. ¶¶ 41, 48.  Patriot thus had a "right to payment," and DLLP's repayment of the loan discharged an antecedent debt.

That Dreier defrauded Patriot into making the loan only supports the conclusion that the repayment to Patriot discharged a valid debt.  Under New York law, "a party fraudulently induced to enter into a contract has two general avenues; rescind the contract, return any consideration and seek restitution, or affirm the contract and seek damages." *Tekinsight.com, Inc.* v. *Stylesite Mktg., Inc. (In re Stylesite Mktg., Inc.)*, 253 B.R. 503, 511 (Bankr. S.D.N.Y. 2000).  Accordingly, numerous courts have held "that a defrauded investor in a Ponzi scheme gives 'value' to the debtor in the form of a dollar-for-dollar reduction in the investor's restitution claim against the Ponzi scheme."  *Jobin* v. *Ripley (In re M & L Bus. Mach. Co.)*, 198 B.R. 800, 810 n. 4 (D. Colo. 1996) (collecting cases); *accord, e.g.*, *Armstrong* v. *Collins (In re Armstrong)*, 2010 WL 1141158, at *22 (S.D.N.Y. Mar. 24, 2010).  Here, therefore, Patriot had a legitimate common law claim against DLLP, as well as Dreier, that was discharged by the repayment of its principal.

DLLP also owed a "debt" to Patriot as a result of Dreier's false representation that he was acting as Solow's lawyer.  "Under the doctrine of implied warranty of authority, a person who purports to make a contract, representation, or conveyance to or with a third party on behalf of another person, lacking power to bind that person, gives an implied warranty of authority to the third party and is subject to liability to the third party for damages for loss caused by breach of that warranty, including loss of the benefit expected from performance by the principal."

*DePetris & Bachrach, LLP* v. *Srour*, 71 A.D.3d 460, 462 (1st Dep't 2010); *see also IBF Fund*

*Liquidating, LLC* v. *Chadmoore Wireless Group, Inc. (In re Interbank Funding Corp.)*, 2007 WL

2907516, at *6 (Bankr. S.D.N.Y. Oct. 3, 2007) ("The damages resulting from Moore's breach of

the implied warranty of authority include . . . all injury resulting from his want of power. . . .").

Here, as a result of Dreier's conduct as a supposed agent of Solow's, Patriot extended $15

million to DLLP and expected to be repaid that amount plus contractual interest.  Thus, the

repayment of $15 million to Patriot plainly discharged an antecedent debt owed by DLLP, and

the claims to recover that amount should be dismissed.

**B.      Patriot provided reasonably equivalent value in exchange for
         the interest paid on its loan.**

Patriot also provided "value" to DLLP in exchange for the 11% interest it was

paid on its loan over a one-year period.  As Judge Learned Hand explained, "in modern financial

communities a dollar today is worth more than a dollar next year, and to ignore the interval as

immaterial is to contradict well-settled beliefs about value."  *Procter & Gamble Distribution Co.*

v. *Sherman*, 2 F.2d 165, 166 (S.D.N.Y. 1924) (Hand, J.).  To conclude that Patriot did not give

"value" to DLLP in exchange for the contractual interest it was paid would improperly deprive

Patriot of compensation for DLLP's use of its money.

Multiple decisions from courts in this Circuit strongly support the conclusion that

a lender to a fraudulent business provides "value" in exchange for the interest paid on its loan.

In *Lustig* v. *Weisz & Assocs. Inc. (In re Unified Commercial Capital Inc.)*, 260 B.R. 343 (Bankr.

W.D.N.Y. 2001), lenders received 12% per year in contractual interest on loans made to a

business alleged to be a Ponzi scheme.  After the scheme collapsed, the trustee brought

constructive fraudulent conveyance claims against the lenders to recover those interest payments

under section 548(a) of the Bankruptcy Code and the DCL.  In rejecting the trustee's claims, the

Bankruptcy Court concluded, as a matter of law, that a fraudulent enterprise receives "value" when it discharges its obligation to pay "reasonable contractual interest." *Id.* at 353. The Court reasoned that it "makes no sense" to treat lenders to a Ponzi scheme any differently from other creditors that unknowingly facilitate the debtor's fraud, such as creditors that supply "utilities, space, supplies and labor." *Id.*[2]

In rejecting out-of-circuit cases that do not attribute "value" to interest paid by a fraudulent business, the Bankruptcy Court concluded that those cases ignore "the universally accepted fundamental commercial principle that, when you loan an entity money for a period of time in good faith, you have given value and are entitled to a reasonable return." *Id.* at 351. The Court also soundly rejected the "equitable" rationale used by some courts in depriving creditors of contractual interest:

> If Congress chooses to enact a statute that reallocates the risks and redistributes the losses occasioned by a bankrupt entity having engaged in a "Ponzi" scheme beyond that provided for in Section 547(b) . . ., that is what Congress can and perhaps should do. In the absence of such an enactment by Congress, I do not feel that the existing partial solution advanced by many courts in this developing area of law, *which is to unfortunately and inappropriately utilize the fraudulent conveyance statutes as a super preference statute*, and then only to recover contractual interest received by innocent investor lenders who have also recovered their principal, is any better, more fair or more just than leaving those innocent investors who received interest payments more than ninety days before the petition where they were.

---

[2]  *See also* Paul Sinclair & Brendan McPherson, *The Sad Tale of Fraudulent Transfers: Part III*, 29 Am. Bankr. Inst. J. 1, 46 (Apr. 2010) ("There would seem to be little logical basis for treating an investor who received a 10 percent per annum contractual interest payment differently from the payment on a credit card that charges 24 percent per annum interest on the Ponzi operator's monthly bill.").

*Id*. at 354 (emphasis added).  On appeal, the District Court in *Lustig* v. *Weisz & Assocs. Inc. (In re Unified Commercial Capital)* affirmed the Bankruptcy Court's decision.  The District Court reasoned that "[i]t is simply incorrect to say that the perpetrator of a Ponzi scheme does not receive 'value' when an innocent victim 'invests' money with him.  The simple fact is that the use of funds for a period of time has value." *In re Unified Commercial Capital*, 2002 WL 32500567, at *6 (W.D.N.Y. June 21, 2002).  The Court went on to explain that, in cases involving fabricated "profits" on equity investments, "there may be some logic to such a distinction between transfers of principal and of amounts in excess of principal." *Id*. at *8. However, in a case involving a "commercially reasonable rate of interest on what amounted to a loan," the Court found no basis to distinguish between the repayment of principal and the payment of interest on such principal. *Id*. at *8-9.[3]

In *Daly* v. *Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480 (D. Conn. 2002), the Court likewise rejected a claim to recover contractual interest payments as constructive fraudulent conveyances.  In that case, the defendants invested in a Ponzi scheme that promised and paid fixed annual interest rates of between 8% and 15%.  Affirming the decision of the Bankruptcy Court, the District Court concluded that the interest payments were *not* avoidable under section 548(a)(2)(B) of the Bankruptcy Code or New York law, because the payment of interest satisfied a debt owed to the defendants. *Id*. at 491.  That the debtors were

---

[3] In a recent decision from this District, *Christian Brothers High School Endowment* v. *Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284 (S.D.N.Y. 2010), the Court also distinguished between interest payments paid by a fraudulent business and "fictitious profits" on equity interests, which were "not promised to [the defendants] when they initially invested" in shares of the debtor, *id*. at 337.  The Court thus concluded that *Unified Commercial Capital* and similar decisions were not controlling in a case involving fabricated profits on equity investments. *Id*.

engaged in a fraudulent scheme, the District Court held, did not erase their having received

"reasonably equivalent value" for the interest payments:

> Regardless of the Debtor's business, legitimate or otherwise, so long as
> the Debtor received "reasonably equivalent value" in exchange for its
> transfer of property, there has been no diminution in the Debtor's estate
> and the remaining creditors have not been damaged by the transfer . . . .
> [H]ere, there was an extinguishment of a debt, such that those
> investors/creditors no longer have a claim against the Debtor's estate,
> which could diminish any recovery by the remaining creditors.

*Id.* (citation omitted); *see also Breeden* v. *Thomas* (*In re Bennett Funding Group, Inc.*), 1999

Bankr. LEXIS 1843, at *31-32 (Bankr. N.D.N.Y. Apr. 29, 1999) (concluding that a lender to a

Ponzi scheme gave value in exchange for interest payments because the lender was entitled to

prejudgment interest against the debtor on its fraudulent inducement claim).

  Here, as in the cases discussed above, the fact that DLLP was participating in a

fraud does not mean that it did not derive value from the use of Patriot's money, nor does it mean

that DLLP did not have a debt to Patriot that was discharged by the interest payments to Patriot.

## C. Patriot received the challenged payments in "good faith" under New York's constructive fraudulent conveyance statute.

  As noted above, the definition of "fair consideration" in the DCL, unlike the

Bankruptcy Code's definition of "reasonably equivalent value," includes a "good faith"

requirement — *i.e.*, that the transferee "in good faith" conveyed property of equivalent value to

the transferor.  *See* DCL § 272.  The Amended Complaint also fails to plead this element.

  The Second Circuit construed the "good faith" requirement in *Sharp*, and held that

"a mere preference between creditors does not constitute bad faith" under New York law.  403

F.3d at 54.  It made no difference, according to the Second Circuit, that State Street was alleged to

have known that the funds borrowed to repay it had been fraudulently obtained:

> [T]o find a lack of "good faith" where the transferee does not participate
> in, but only knows that the debtor created the other debt through some
> form of [ ] dishonesty is to void the transaction because it amounts to a kind
> of "preference" — concededly a most undesirable kind of preference, one
> in which the claims of alternative creditors differ considerably in their
> moral worth, but a kind of preference nonetheless.

*Id*. at 55 (quoting *Boston Trading*, 835 F.2d at 1512); *see also id*. at 54 ("bad faith does not

appear to be an articulable exception to the broad principle that 'the satisfaction of a preexisting

debt qualifies as fair consideration for a transfer of property'" (quoting *Pashaian* v. *Eccelston

Props.*, 88 F.3d 77, 85 (2d Cir. 1996))).  Accordingly, the Second Circuit held as a matter of law

that State Street had received Sharp's loan repayment in good faith, and thus had provided "fair

consideration" for that payment.  *See id*. at 54-56.

In the present case, as in *Sharp*, the Amended Complaint includes no allegations

that Patriot Group "participated in" Dreier's fraud.  *Id*.  Indeed, the Amended Complaint does not

allege that Patriot Group even knew about the fraud, as was alleged in *Sharp*.  Thus, it follows *a

fortiori* from *Sharp* that Patriot Group acted in "good faith" and, accordingly, that the Trustee's

constructive fraudulent conveyance claims under New York law should be dismissed.

## POINT III

## THE TRUSTEE'S INTENTIONAL FRAUDULENT CONVEYANCE CLAIMS SHOULD BE DISMISSED.

The Trustee also seeks to recover the repayments to Patriot as intentional

fraudulent conveyances under section 548(a)(1)(A) of the Bankruptcy Code and section 276 of

the DCL.  *See* Counts I, III.  Those claims are likewise subject to dismissal under *Sharp* and the

principles on which that decision is based.

A.      **The loan repayments to Patriot are not avoidable as intentional
fraudulent conveyances.**

The settled principle that a preferential repayment of a creditor is not avoidable as

a fraudulent conveyance governs claims of intentional fraud just as it governs claims of

constructive fraud.   As explained in *Boston Trading*, "to find an *actual intent to defraud*

*creditors* when . . . an insolvent debtor prefers a less worthy creditor, would tend to deflect

fraudulent conveyance law from one of its basic functions (to see that an insolvent debtor's

limited funds are used to pay some worthy creditor), while providing it with a new function

(determining which creditor is the more worthy)."  835 F.2d at 1511 (emphasis added).

In *Sharp*, as in *Boston Trading*, the debtor satisfied its debt to the defendant with the

proceeds of an ongoing fraud.   The Second Circuit nonetheless held that the complaint failed to

state a claim of intentional fraudulent conveyance:

> [T]he intentional fraudulent conveyance claim[] fails for the independent
> reason that Sharp inadequately alleges fraud with respect to the
> transaction that Sharp seeks to void, *i.e.*, Sharp's $12.25 million payment
> to State Street. . . .   The fraud alleged in the complaint relates to the
> manner in which Sharp obtained new funding from the Noteholders, not
> Sharp's subsequent payment of part of the proceeds to State Street.  The
> $12.25 million payment was at most a preference between creditors
> and did not "hinder, delay, or defraud either present or future creditors."

*Sharp*, 403 F.3d at 56 (quoting DCL § 276) (citations omitted).

The Second Circuit's decision in *Sharp* dismissing the trustee's intentional

fraudulent conveyance claim has deep roots in the law:

> Under the Statute of Elizabeth a transfer by an insolvent debtor to pay or
> to secure an antecedent debt *has never been treated as a transfer to*
> *hinder, delay or defraud creditors*, although it is self-evident that other
> creditors are necessarily hindered and delayed by such a transfer.  Such
> transfers are preferences and may be successfully assailed only under
> section 60b of the Bankruptcy Act (as amended, 11 U.S.C.A. § 96(b)) or
> under state legislation relative to preferences.

*Irving Trust Co.* v. *Kaminsky*, 19 F. Supp. 816, 818 (S.D.N.Y. 1937) (emphasis added) (citations omitted).   As explained in *Irving Trust*, the "words 'hinder, delay, or defraud' in section 276" of the DCL, which are derived from the Statute of Elizabeth, "do not embrace mere preferences." *Id*.  The same words in section 548(a)(1) of the Bankruptcy Code also, by definition, do not embrace preferences.  *See, e.g.*, *Nordberg* v. *Sanchez (In re Chase & Sanborn Corp.)*, 813 F.2d 1177, 1181 (11th Cir. 1987) (explaining that "[f]raudulent transfers are avoidable" under section 548 only when "they diminish the assets of the debtor to the detriment of *all creditors*" (emphasis added)).

Once again, therefore, *Sharp* controls this case.  Here, as in *Sharp*, the crux of the Amended Complaint is that a debtor conducting a large-scale fraud preferred some of its creditors over others.  *Sharp* dictates that the Trustee's intentional fraudulent conveyance claims should be dismissed under Bankruptcy Rules 7009(b) and 7012 for failure to allege that the transfers at issue hindered, delayed or defrauded creditors.[4]

**B.     Patriot's "good faith" is not at issue and, in any event, has not been plausibly challenged.**

In responding to this Motion, the Trustee can be expected to invoke cases from this District holding that, where the debtor conducted a "Ponzi scheme," each transfer by the debtor is deemed to have been made in fraud of creditors.  *See Christian Bros. High Sch. Endowment* v. *Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 327-29

---

[4]  The Trustee's intentional fraudulent conveyance claim under *New York* law should also be dismissed on the basis that the Complaint fails to allege facts showing fraudulent intent on the part of Patriot Group.  "Under the New York statute, unlike a claim under Bankruptcy Code § 548(a)(1)," the plaintiff "must plead fraudulent intent of both the transferor and the transferee under § 276."  *Andrew Velez Constr., Inc.* v. *Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.)*, 373 B.R. 262, 276 (Bankr. S.D.N.Y. 2007) (collecting cases).

(S.D.N.Y. Sept. 17, 2010); *Bear Stearns Sec. Corp.* v. *Gredd (In re Manhattan Inv. Fund Inc.)*, 397 B.R. 1, 9-11 (S.D.N.Y. 2007); *Picard* v. *Merkin (In re Bernard L. Madoff Inv. Sec., LLC)*, 2010 WL 4643102, at *6 (Bankr. S.D.N.Y. Nov. 17, 2010).  Those cases, however, pose no barrier to dismissal of this Amended Complaint.

Under *Bayou*, *Gredd* and *Picard*, an investor in a Ponzi scheme can escape liability for transfers made by the debtor only by sustaining a defense under 11 U.S.C. § 548(c), which permits a transferee to retain a fraudulent conveyance to the extent it took the conveyance "for value and in good faith."  *See Bayou*, 439 B.R. at 308-09; *Gredd*, 397 B.R. at 22; *Picard*, 2010 WL 4643102, at *7.  Moreover, those cases have concluded that "good faith" is lacking if the defendant (1) "was on inquiry notice" of fraud by virtue of "red flags" and (2) was not "diligent in its investigation" of the red flags.  *Gredd*, 397 B.R. at 22; *accord*, e.g., *Bayou*, 439 B.R. at 314-17.

For multiple reasons, the decisions in *Bayou*, *Gredd* and *Picard* have no bearing on this motion to dismiss the Amended Complaint.  *First*, those decisions are at odds with *Sharp* and, as one commentator has said, "with decades of tradition interpreting fraudulent transfer law since its inception in the Statute of Elizabeth, 13 Eliz., ch. 5 (1570)."  Paul Sinclair, *The Sad Tale of Fraudulent Transfers*, 28 Am. Bankr. Inst. J. 16, 16 (Apr. 2009).  Under long-established case law, as adopted in *Sharp*, the repayment of a debt to a non-insider, including by a business engaged in fraud, is not avoidable as an intentional fraudulent conveyance.  *See* Point III.A, *supra*.  Accordingly, there is no need for Patriot to demonstrate its "good faith" under section 548(c) of the Bankruptcy Code or under section 278 of the DCL, which provides a defense to transferees that gave "fair consideration" (defined to include good faith).

*Second*, the *Bayou* decision is not persuasive in the distinction that it draws between the fraudulent conveyance provisions of the DCL, which were construed in *Sharp*, and

section 548 of the Bankruptcy Code.  *See Bayou*, 439 B.R. at 303.  While the Bankruptcy Code

is plainly different from New York law in its treatment of *preferences*, there is no sound basis to

distinguish here between New York's and the Bankruptcy Code's treatment of fraudulent

conveyances.  Rather, as explained by Judge Gropper, "[a]lthough *Sharp* only directly addressed

pleading under the DCL, there is no reason why its reasoning should not be applicable to claims

of intentional fraudulent conveyance under the Bankruptcy Code as well, especially as the

Federal and State statutes are structured similarly, and there is no difference in burden of proof."

*Silverman* v. *Actrade Capital, Inc. (In re Actrade Fin. Techns. Ltd.)*, 337 B.R. 791, 809 (Bankr.

S.D.N.Y. 2005).[5]

      *Third*, although there is no need to reach the issue, the *Bayou* and *Gredd* decisions

"stray far from the well-established standards defining good faith in fraudulent transfer cases."

Paul Sinclair, *The Sad Tale of Fraudulent Transfers (Part II)*, 28 Am. Bankr. Inst. J. 44, 67 (May

2009).  The term "good faith" is used in multiple areas of the law.  For example, it appears in the

Uniform Commercial Code, where it is defined as "honesty in fact and the observance of

reasonable commercial standards of fair dealing."  *E.g.*, N.Y. U.C.C. §§ 1-201(b)(20); 2-

103(1)(j).  Consistent with this definition, in *J. Walter Thompson, U.S.A., Inc.* v. *First

BankAmericano*, 518 F.3d 128 (2d Cir. 2008), the Second Circuit concluded that the U.C.C.'s

standard of good faith "does not impose a standard of care but, rather, a standard of *fair dealing*,"

---

[5] The Second Circuit has stated that "[u]nlike the Bankruptcy Code, the [Uniform Fraudulent Conveyance Act] is a set of legal rather than equitable doctrines, whose purpose is not to provide equal distribution of a debtor's estate among creditors, but to aid specific creditors who have been defrauded by the transfer of a debtor's property."  *HBE Leasing Corp.* v. *Frank*, 48 F.3d 623, 634 (2d Cir. 1995), quoted in *Bayou*, 2010 WL 3839277, at *12.  In the next sentence, however, the Second Circuit made clear that it was referring to the Bankruptcy Code's treatment of *preferences*, as the Court stated that under the DCL, "even the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance."  *Id.*

*id.* at 139  (emphasis in original) (rejecting claim against bank that mistakenly honored altered check because, even if the bank were negligent, the absence of "dishonesty" or unfair dealing precluded any finding of bad faith).

Neither the Bankruptcy Code nor New York law provides any basis to depart from this established, and plain, meaning of the term "good faith" and conflate it with "inquiry notice" and diligent investigation.  Indeed, both the Bankruptcy Code and the DCL use the words "good faith" side by side with the words "without knowledge," *see* 11 U.S.C. § 550(b)(1) (precluding recovery from a subsequent transferee that takes "for value . . ., in good faith, and without knowledge of the voidability of the transfer"); DCL § 278(1) (precluding recovery from a transferee to the extent it gave fair consideration "without knowledge of the fraud") — demonstrating that even *actual* knowledge of fraud is different from, and not tantamount to, lack of good faith.  Under any appropriate definition, a showing of dishonesty or unfair dealing should be a prerequisite to a finding of bad faith.  Indeed, that is precisely what *Sharp* held in the context of constructive fraud, when it concluded that — absent participation by a creditor in the debtor's fraud — a "mere preference between creditors does not constitute bad faith."  *See Sharp*, 403 F.3d at 54.  Here, since the Amended Complaint does not allege that Patriot participated in or even had knowledge of Dreier's fraud, Patriot could not have acted in bad faith.[6]

---

[6] Although section 548(c) of the Bankruptcy Code and DCL § 278 are affirmative defenses, dismissal is nevertheless warranted, since they are apparent from the Amended Complaint. *See Pani* v. *Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998) ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) without resort to summary judgment procedure, if the defense appears on the face of the complaint."); *cf. Ashcroft* v. *Iqbal*, 129 S. Ct. 1937 (2009) (directing dismissal of complaint that failed to state a "plausible" claim for relief in the face of a qualified immunity defense).

*Finally*, even under the flawed approach to "good faith" used in cases such as *Bayou* and *Gredd*, the Amended Complaint does not plead plausible allegations of bad faith. Importantly, unlike a case like *Bayou*, this case does not involve the voluntary redemption of an equity interest; rather, it involves the passive receipt of a loan repayment at the time of its maturity. Accordingly, any allegations of "inquiry notice" must address the period *before* the loan was even funded. In other words, the Trustee would need to show that, contrary to all common sense, Patriot parted with $15 million despite being faced with unresolved "red flags" indicating that it was lending into a Ponzi scheme.

The Amended Complaint, however, does not plead facts that plausibly support the claim that Patriot ignored "red flags" for the opportunity to earn an 11% interest rate on $15 million for one year. To the contrary, the Trustee's allegations of "red flags" are for the most part applicable to *every* hedge fund that invested in the fraud — and thus, by the Trustee's own admission, insufficient to sustain a compelling claim. *See supra* pp. 7-8.

Moreover, to the extent the Trustee alleges facts that are specific to Patriot, those facts undermine, rather than support, any allegation of bad faith. Most importantly, the Trustee now acknowledges that Jonanthan Kane of Patriot received an email from the "real email account" of Solow's CEO in which the CEO apologied for "appearing confused," stated that he "was not aware of the details," and told Kane to "call Marc." Am. Compl. ¶ 38. Although the Trustee tries to spin this email as a "red flag," on the basis that Kane had received an email the day before in which Cherniak (in reality, Dreier) answered due diligence questions, *id*., the Trustee's allegations in this regard are quite strained. The far more plausible, and less convoluted, conclusion to be drawn from Cherniak's email is that Patriot — probably alone among Dreier victims — was reassured by *Solow itself* about the note program and Dreier's role,

and thus can hardly be said to have been on "inquiry notice" of fraud or to have conducted an inadequate investigation.

   The Trustee's further allegation that Patriot should have realized that "the email from Cherniak's real email address included a signature block with different telephone and fax numbers than the signature block on the dummy email address," Am. Compl. ¶ 39, is equally weak. Even under *Gredd* and *Bayou*, the question of "good faith" is measured based on what is "reasonable under the circumstances," *Gredd*, 397 B.R. at 23, not on hindsight. The notion that Patriot, prior to funding a loan, had a duty to compare numbers at the bottom of different emails lacks any support in law or common sense.

   In sum, after *Iqbal* and *Twombly*, Patriot should not have to defend itself against allegations of bad faith that rest on facially implausible "red flags" that ignore communications to Patriot from the *real* CEO of Solow. Thus, even if this Court distinguishes *Sharp* and reaches the issue of good faith, the intentional fraudulent conveyance claims should be dismissed. *See generally Feldman* v. *Chase Home Fin. (In re Image Masters, Inc.)*, 421 B.R. 164, 181-82 (Bankr. E.D. Pa. 2009) (dismissing intentional fraudulent conveyance claim on "good faith" grounds where the Complaint failed to allege that the defendants were "part of or aware of the artifice and scheme concocted by" the debtor and contained only conclusory, implausible allegations that the defendants "should have known" about the debtor's fraud).

## C.  The Trustee's claim for attorneys' fees should be dismissed.

   The Trustee's claim to recover attorneys' fees under section 276-a of the DCL lacks any foundation and should be dismissed. That provision permits recovery of attorneys' fees only when a transfer is "made by the debtor *and received by the transferee* with actual intent as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." DCL § 276-a (emphasis added). Accordingly, on its face, section 276-a requires an

"explicit finding of actual intent to defraud" by *both* the transferor and the transferee.  *Carey* v.

*Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).  The Amended Complaint does not allege any facts

showing that Patriot received transfers  from DLLP with the actual intent to defraud creditors.

Accordingly, the Trustee's claim for recovery of attorneys' fees should be dismissed.

## POINT IV

### THE TRUSTEE'S FRAUDULENT CONVEYANCE CLAIMS
### SHOULD BE DISMISSED ON THE ALTERNATIVE GROUND THAT THE
### TRANSFERS TO PATRIOT WERE NOT OF THE DEBTOR'S PROPERTY.

Section 548(a)(1) of the Bankruptcy Code provides that a trustee may avoid a

transfer of an "interest of the debtor in property."  11 U.S.C. § 548(a)(1).  Likewise, section

544(b) of the Code, which permits the trustee to stand in the shoes of a creditor in asserting state

law claims, authorizes avoidance only of an "interest of the debtor in property."  11 U.S.C.

§ 544(b).  Here, federal forfeiture laws divested DLLP of any interest in the property in the 5966

Account at the time Dreier committed his criminal acts.  Accordingly, the transfers made to

Patriot were not transfers of an "interest of the debtor in property."

Numerous federal statutes explicitly prescribe forfeiture for the proceeds of illicit

activity in violation of criminal and civil laws.  *See, e.g.*, 18 U.S.C. § 981 (providing for the

forfeiture of proceeds derived from various forms of fraud); 26 U.S.C. § 7301 (authorizing the

forfeiture of property connected to tax evasion).

"Under the relation-back doctrine, title to forfeited property automatically vests in

the Government at the time of the defendant's criminal act."  *In re Dreier LLP*, 429 B.R. at 126

(citing *United States* v. *Parcel of Land*, 507 U.S. 111, 128-29 (1993); *Caplin & Drysdale,*

*Chartered* v. *United States*, 491 U.S. 617, 627 (1989); *United States* v. *Timley*, 507 F.3d 1125,

1130 (8th Cir. 2007)); *accord United States* v. *United States Currency in the Amount of*

*$228,536.00*, 895 F.2d 908, 916 (2d Cir. 1990).  Based on the relation-back doctrine, courts have recognized that assets seized by the government are *not* "property of the estate" under the Bankruptcy Code prior to their seizure.  For example, in *United States* v. *One Silicon Valley Bank Account, 3300355711, In the Amount of One Hundred Thirteen Thousand Nine Hundred Fifty-Two & 62/100 Dollars ($113,952.62)*, 549 F. Supp. 2d 940, 957-58 (W.D. Mich. 2008), bankruptcy trustees challenged the government's seizure of property on the basis that the property seized was "property of the estate" under section 541 of the Bankruptcy Code.  The Court rejected the trustees' arguments, holding instead that the government's interest in the seized assets vested as of the date of the predicate criminal acts.  Thus, the debtor ceased to have an interest in the seized assets prior to the commencement of the bankruptcy.  *Id.* at 958 ("As a consequence of the preliminary order of forfeiture [and under the relation-back doctrine] title in the Seized Assets vested in the government as of the date of the predicate criminal acts.").  Similarly, in *United States* v. *Pelullo*, 178 F.3d 196 (3d Cir. 1999), the Third Circuit held that upon an order of forfeiture, the defendant had been divested of its interest in property and, thus, it was not property of the bankruptcy estate in a chapter 11 case, *see id*. 201-03.

The preliminary order of forfeiture signed by Judge Rakoff in this matter on July 13, 2009 extends to "'[a]ny and all funds in [the 5966 Account] held at JP Morgan Chase in the name of Dreier LLP.'"  *In re Dreier LLP*, 429 B.R. at 118 (quoting forfeiture order).  "Hence, it also included all property traceable to the 5966 Account."  *Id*.  Thus, this Court also recognized that, "[u]nder the relation-back doctrine, the forfeited funds never became LLP's property, and hence, the payment of the forfeited funds by LLP to GSO," which occurred in 2008, "did not involve a transfer of LLP's property that would be subject to avoidance."  *Id*. at 127.

The same logic applied in the context of the GSO settlement applies with full force to the Trustee's claims against Patriot Group.  The Amended Complaint explicitly alleges

that the money transferred to Patriot came from the 5966 Account.  Am. Compl. ¶¶ 47-49, 51,

55.  Taking this allegation at face value, the inescapable conclusion is that DLLP had no right to,

or interest in, the funds transferred to Patriot, because those funds — by virtue of Judge Rakoff's

order of forfeiture — had automatically vested in the U.S. government.  Consequently, the

Trustee has no viable claim under section 548(a) or 544(b) of the Bankruptcy Code.

## POINT V

### THE TRUSTEE'S EQUITABLE SUBORDINATION
### CLAIM SHOULD BE DISMISSED.

The Trustee's claim for equitable subordination should also be dismissed.  Patriot

has not filed a claim that is capable of subordination and, in any event, the Amended Complaint

fails to allege facts that would support such subordination.

**A.     No claim exists that could be subordinated.**

Since Patriot was repaid on its loan, it did not file a claim against the DLLP

estate, and it will not have a "springing claim" under 11 U.S.C. § 502(h) unless the Trustee

succeeds in avoiding payments that it received.  As demonstrated above, however, the Trustee

has failed to state a fraudulent conveyance claim against Patriot Group.  Accordingly, there is no

claim — and there will be no claim — to which this Court could apply its powers of equitable

subordination.  *See O'Connell* v. *Arthur Andersen LLP (In re AlphaStar Ins. Group, Ltd.)*, 383

B.R. 231, 276 (Bankr. S.D.N.Y. 2008) ("If a creditor has not filed a claim, there is nothing to

subordinate nor any case or controversy to resolve.").

**B.     The Trustee has not alleged any facts that support equitable
         subordination.**

Section 510(c) of the Bankruptcy Code allows courts, "under principles of

equitable subordination," to "subordinate for purposes of distribution all or part of an allowed

claim to all or part of another allowed claim."  11 U.S.C. § 510(c).  Courts may order equitable

subordination if (1) the claimant engaged in inequitable conduct and (2) the inequitable conduct

caused injury to other creditors or gave an unfair advantage to the claimant.  *See, e.g., Official*

*Comm. of Unsecured Creditors of Hydrogen, L.L.C.* v. *Blomen (In re Hydrogen, L.L.C.)*, 431

B.R. 337, 360 (Bankr. S.D.N.Y. 2010) (citing *Benjamin* v. *Diamond (In re Mobile Steel Co.)*,

563 F.2d 692, 700 (5th Cir. 1977)).

        Because Patriot is not alleged to have been an "insider" of DLLP, the Trustee

must allege a heightened degree of misconduct to succeed on her claim:

> When a non-insider or non-fiduciary is involved, courts have required
> that a claimant's conduct be egregious and severely unfair to other
> creditors before its claim will be equitably subordinated.  The conduct
> required has been described as "substantial misconduct tantamount to
> fraud, misrepresentation, overreaching or spoilation [*sic*]."  Few cases
> find that non-insider, non-fiduciary claimants meet this standard.

*In re Sunbeam Corp.*, 284 B.R. 355, 364  (Bank. S.D.N.Y. 2002) (citations omitted) (quoting *80*

*Nassau Assocs.* v. *Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.)*, 169 B.R. 832, 838-39

(Bankr. S.D.N.Y. 1994)).

        Here, the Amended Complaint is devoid of any allegations that Patriot engaged in

fraud or wrongful conduct of any kind.  At most, the Complaint attempts to allege that Patriot did

not conduct sufficiently exhaustive due diligence prior to making its loan.  That allegation,

however, is insufficient to support an equitable subordination claim.  *See Kittay* v. *Atl. Bank of*

*N.Y. (In re Global Serv. Group LLC)*, 316 B.R. 451, 462 (Bankr. S.D.N.Y. 2004) ("an allegation

that a lender knew or should have known that the loan would render the debtor insolvent is

insufficient to equitably subordinate the lender's claim").

## CONCLUSION

For the reasons stated above, the Amended Complaint should be dismissed with prejudice.

Dated:  January 11, 2011

Respectfully submitted,

*Of counsel:*

WACHTELL, LIPTON, ROSEN & KATZ

Emil A. Kleinhaus

By: /s/ Harold S. Novikoff
       Harold S. Novikoff

51 West 52nd Street
New York, NY  10019
Telephone:  (212) 403-1000
Facsimile:   (212) 403-2000

*Attorneys for Defendants The Patriot Group, LLC,
The Washington Special Opportunity Fund, LLC
and The Washington Special Opportunity Fund,
Inc.*