DIAMOND McCARTHY LLP
Attorneys for Sheila M. Gowan,
Chapter 11 Trustee for Dreier LLP
620 Eighth Avenue, 39th Floor
New York, New York 10018
Tel:  (212) 430-5400
Fax:  (212) 430-5499
Howard D. Ressler, Esq.
Stephen T. Loden, Esq.
J. Benjamin King, Esq.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
                                                             :
**In re:**                                                    :
                                                             :
      **DREIER LLP,**                            :        **Chapter 11**
                                                             :
          **Debtor.**                       :        **Case No. 08-15051 (SMB)**
                                                             :
_____       :
                                                             :
**SHEILA M. GOWAN, CHAPTER 11**              :
**TRUSTEE FOR DREIER LLP,**                   :
          **Plaintiff,**                  :
    **v.**                                    :        **Adv. Pro. No.: 10-3524 (SMB)**
                                                             :
**THE PATRIOT GROUP, LLC,**                   :
**THE WASHINGTON SPECIAL**                    :
**OPPORTUNITY FUND, LLC and THE**             :
**WASHINGTON SPECIAL OPPORTUNITY**            :
**FUND, INC.,**                               :
          **Defendants.**                 :
-------------------------------------------------------------x

**TRUSTEE'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION**
**TO DISMISS THE AMENDED COMPLAINT**

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

FACTUAL BACKGROUND...................................................................................................4

ARGUMENT .....................................................................................................................7

I .   THE TRUSTEE HAS STATED VALID CLAIMS FOR
CONSTRUCTIVE FRAUDULENT CONVEYANCE...........................................7

   A.   The Repayment Of An Antecedent Debt May
Constitute A Constructively Fraudulent Transfer.......................................8

   B.   Patriot Provided Reasonably Equivalent Value
In Exchange For The Repayment Of Its Principal....................................11

   C.   Patriot Did Not Provide Reasonably Equivalent Value,
Or Fair Equivalent Value, In Exchange For The Transfers
Of Purported Interest..................................................................................13

   D.   Patriot Did Not Receive Its Transfers From DLLP In "Good Faith"
Under New York's Constructively Fraudulent Conveyance Statute .........16

II.   THE AMENDED COMPLAINT SATES VALID CLAIMS
FOR INTENTIONAL FRAUDULENT CONVEYANCE...................................17

   A.   The Repayment Of An Antecedent Debt May
Constitute An Intentionally Fraudulent Transfer.......................................18

   B.   Patriot Cannot Establish Its Good Faith From
The Face Of The Amended Complaint.......................................................22

   C.   The Trustee Need Not Plead Patriot's Fraudulent Intent
Under DCL § 276.......................................................................................25

   D.   The Amended Complaint Alleges Sufficient Facts To
Satisfy The Actual Intent Requirement Of DCL § 276-a .........................26

III.   DLLP TRANSFERRED ITS PROPERTY TO PATRIOT ..................................27

   A.   Trustee Can Pursue Her Avoidance Action Because Funds
Deposited In Account 5996 Were Property of DLLP.................................27

   B.   The Relation-Back Doctrine Does Not Apply To Funds That

Were Not In Account 5996 When Forfeiture Order Was Signed ..............28

C.     The Coordination Agreement Demonstrates That The Relation-Back
Doctrine Does Not Apply To The Patriot Transfers ..................................30

D.     The Relation-Back Doctrine Will Not Block The Trustee's
Fraudulent Transfer Actions As A Matter Of Law ...................................32

IV.     THE AMENDED COMPLAINT STATES A CLAIM
FOR EQUITABLE SUBORDINATION ..............................................................34

A.     The Trustee Has Timely Raised
Her Equitable Subordination Claim ..........................................................34

B.     The Trustee Has Stated a Claim For Equitable Subordination. .................34

CONCLUSION ...........................................................................................................35

## **TABLE OF AUTHORITIES**

**Page**

*ASARCO LLC v. America's Mining Corp.*, 396 B.R. 278 (Bankr. S.D. Tex. 2008) .........21

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) ...........................................................................25

*Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.*
    *(In re Bayou Group, LLC)*, 396 B.R. 810 (Bankr. S.D.N.Y. 2008),
    *aff'd in relevant part*, 439 B.R. 284 (S.D.N.Y. 2010) ............................................25

*Bear Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*,
    397 B.R. 1 (S.D.N.Y. 2007).......................................................................... 20-21

*B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474 (7th Cir. 2005) ......................................19

*Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504 (1st Cir. 1987) ............... 9-10, 19

*Christian Bros. High School Endowment v. Bayou No Leverage Fund, LLC*
    *(In re Bayou Group, LLC)*, 439 B.R. 284 (S.D.N.Y. 2010) .......................... passim

*Counihan v. Allstate Insurance Co.*, 25 F.3d 109 (2d Cir. 1994) ................................ 32-33

*Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.)*,
    275 B.R. 641 (Bankr. M.D. Fla. 2002) ..................................................................19

*Daly v. Deptula (In re Carrozzella & Richardson)*,
    286 B.R. 480 (D. Conn. 2002) ........................................................................14, 15

*DePetris & Bachrach, LLP v. Srour*, 71 A.D.3d 460 (N.Y. App. Div. 2010)...................12

*Donnell v. Kowell*, 533 F.3d 762 (9th Cir. 2008) .............................................................13

*Drenis v. Haligiannis*, 452 F.Supp.2d 418 (S.D.N.Y. 2006).......................................18, 19

*Feldman v. Chase Home Fin. (In re Image Masters, Inc.)*,
    421 B.R. 164 (Bankr. E.D. Pa. 2009) ...................................................................25

*Geron v. Schulman (In re Manshul Constr. Corp.)*, No. 97 Civ. 8851 (JGK), *et al.*,
    2000 WL 1228866 (S.D.N.Y. Aug. 30, 2000).....................................................26

*Golden Buddha Corp. v. Canadian Land Co. of Am., N.V.*
    931 F.2d 196 (2d Cir. 1991) .................................................................................23

*Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.),*
 310 B.R. 500 (Bankr. S.D.N.Y. 2002) ............................................................ 22-23

*HBE Leasing Corp. v. Frank*, 61 F.3d 1054 (2d Cir. 1995) ...................................10, 17, 26

*IBF Fund Liquidating, LLC v. Chadmoore Wireless Group, Inc.*
 *(In re Interbank Funding Corp.)*, Adv. No. 07-1482,
 2007 WL 2907516 (Bankr. S.D.N.Y. Oct. 3, 2007) ................................................12

*In re Adelphia Committees Corp.*, 365 B.R. 24 (Bankr. S.D.N.Y. 2007).........................35

*In re Coated Sales, Inc.*, 119 B.R. 452 (Bankr. S.D.N.Y. 1990) .......................................34

*In re Dreier LLP*, 429 B.R. 112 (Bankr. S.D.N.Y. 2010)..........................12, 27, 29, 30, 31

*In re Dreier LLP*, Nos. 10 Civ 4758 (DAB), 10 Civ. 5669 (DAB)
 2010 WL 3835179 (S.D.N.Y. Sept. 10, 2010)................................................. 27-28

*In re Enron Creditors Recovery Corp.*, 376 B.R. 442 (Bankr. S.D.N.Y. 2007)...............34

*In re Tronox, Inc.*, 429 B.R. 73 (Bankr. S.D.N.Y. 2010).................................................34

*In re Unified Commercial Capital, Inc.*,
 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ..........................................................22, 23

*Irving Trust Co. v. Kaminsky*, 19 F. Supp. 816 (S.D.N.Y. 1937) ....................................20

*Jobin v. McKay (In re M&L Business Mach. Co., Inc.),*
 84 F.3d 1330 (10th Cir. 1996) ..................................................................................22

*Le Café Crème, Ltd. v. Le Roux (In re Le Café Crème, Ltd.),*
 244 B.R. 221 (Bankr. S.D.N.Y. 2000)....................................................................26

*La Vigna e v. AtriCure, Inc.*, 594 F. Supp. 2d 471 (S.D.N.Y. 2009) ...............................23

*Levine v. AtriCure, Inc.*, 594 F. Supp. 2d 471 (S.D.N.Y. 2009) ......................................23

*Lustig v. Weisz & Assocs. Inc. (In re Unified Commercial Capital, Inc.),*
 260 B.R. 343 (Bankr. W.D.N.Y. 2001) ..........................................................14, 15

*McHale v. Boulder Cap. LLC (In re 1031 Tax Group, LLC),*
 439 B.R. 47 (Bankr. S.D.N.Y. 2010)....................................................... 18, 19-20

*Morse v. Howard Park Corp.*, 272 N.Y.S.2d 16 (Sup. Ct. 1966)...............................16, 24

*Noland v. Morefield (In re Nat'l Liquidators, Inc.)*,
    232 B.R. 915 (Bankr. S.D. Ohio 1998)...................................................................14

*Nordberg v. Sanchez (In re Chase & Sarborn Corp.)*,
    813 F.2d 1177 (11th Cir. 1987) .........................................................................20

*Ortiz v. Guitian Music Bros., Inc.*, No. 07-CIV-3897, 2009 WL 2252107
    (S.D.N.Y. July 28, 2009) ...................................................................................23

*Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998) ..............................23

*Picard v. Merkin (In re Bernard L. Madoff Inv. Sec., LLC)*, 440 B.R. 243
    (Bankr. S.D.N.Y. 2010) ............................................................................... *passim*

*Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615
    (Bankr. S.D. Ohio 2006).............................................................................15, 19

*SEC v. Forte*, Civ. Nos. 09-63, 09-64, 2010 WL 939042
    (E.D. Pa. Mar. 17, 2010)............................................................................13, 14

*Sec. Investors Prot. Corp. v. Statton Oakmont, Inc.*,
    234 B.R. 293 (Bankr. S.D.N.Y 1999)...................................................................26

*Scholes v. Lehmann*, 56 F.3d 750 (7th Cir. 1995)...........................................13, 14

*Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*,
    403 F.3d 43 (2d Cir. 1995)............................................................................. *passim*

*Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.*,
    337 B.R. 791 (Bankr. S.D.N.Y. 2005)............................................................ 10-11

*Sisler v. Security Pac. Bus. Cred., Inc.*, 201 A.D.2d 216 (1st Dep't 1994).......................12

*Stettin v. Adler (In re Rothstein Rosenfeldt Adler, P.A.)*,
    No. 10-02612, 2010 WL 5173796 (Bankr. S.D. Fla. Dec. 14, 2010)....................19

*United States v. Dreier*,
    682 F. Supp. 2d 417 (S.D.N.Y 2010)...................................................................30

*United States v. Emerson*,
    128 F.3d 557 (7th Cir. 1997) .............................................................................29

*United States v. Harris*,
    246 F.3d 566 (6th Cir. 2001) .............................................................................29

*United States v. Lavin*, 942 F.2d 177 (3rd Cir. 1991).........................................29

*United States v. One Silicon Valley Bank Account,*
    549 F. Supp. 2d 940 (W.D. Mich. 2008) ................................................32

*United States v. Orozco-Prada*, 636 F. Supp. 1537 (S.D.N.Y. 1986) ..............................16

*United States v. Pelullo*, 178 F.3d 196 (3d Cir. 1999).....................................................32

*United States v. Tabor Court Realty Corp.*, 803 F.2d 1288 (3d Cir. 1986).....................16

*United States v. Timley*, 507 F.3d 1125, 1130 (8th Cir. 2007) ..........................................32

## STATUTES AND RULES

11 U.S.C. § 502(h) ............................................................................................................34

11 U.S.C. § 510(c) ............................................................................................................34

11 U.S.C. § 548(a) ....................................................................................................*passim*

11 U.S.C. § 548(c) ....................................................................................................*passim*

21 U.S.C. § 853(c) ....................................................................................................*passim*

N.Y. Debt. & Cred. Law § 272 ................................................................................*passim*

N.Y. Debt. & Cred. Law § 273 ................................................................................*passim*

N.Y. Debt. & Cred. Law § 274 ................................................................................*passim*

N.Y. Debt. & Cred. Law § 275 ................................................................................*passim*

N.Y. Debt. & Cred. Law § 276 ................................................................................*passim*

N.Y. Debt. & Cred. Law § 276-a ..............................................................................*passim*

N.Y. Debt. & Cred. Law § 278 ................................................................................*passim*

## OTHER AUTHORITIES

Restatement (Third) of Agency § 6.10 ...........................................................................12, 13

2 Moore's Federal Practice § 12.34[4][b] (3d ed. 2010) ..................................................23

Sheila M. Gowan (the "Trustee"), chapter 11 Trustee for Dreier LLP ("DLLP"),

respectfully submits this memorandum of law in opposition to the motion to dismiss the

Amended Complaint filed by defendants The Patriot Group, LLC, The Washington

Special Opportunity Fund, LLC, and The Washington Special Opportunity Fund, Inc.

(collectively, "Patriot") [Dkt. # 13].

<b><u>PRELIMINARY STATEMENT</u></b>

Patriot repeatedly claims in its Memorandum of Law in Support of Defendants'

Motion to Dismiss the Amended Complaint ("Pat. Br.") that a repayment of an

antecedent debt cannot be a fraudulent transfer, unless the transferee is an insider or a

participant in the transferor's fraudulent scheme.  Patriot misstates the law.  Multiple

courts, including courts in the Second Circuit, have held to the contrary.  *See infra* §§ I,

II.

Patriot argues that a repayment of an antecedent debt may not be an **intentionally**

fraudulent transfer because the transferor could not have intended to defraud all creditors.

At worst, Patriot argues, the transferor merely preferred one creditor over the rest, and

thus the intent necessary under intentionally fraudulent transfer statutes is not present.

While Patriot's argument may bear weight in other contexts, where the transferor made

the transfers at issue in the course of a Ponzi scheme, Patriot's argument does not hold

up.  Transfers made pursuant to a Ponzi scheme, by their very nature, perpetuate the

Ponzi scheme.  Without the schemer's transfers to scheme investors (like Marc Dreier's

transfers to Patriot), the scheme will be found out and the scheme will collapse.  For this

reason, multiple courts—including this Court—have recognized the Ponzi scheme

presumption—the presumption that a Ponzi schemer acts with the actual intent to defraud

creditors when the schemer makes transfers that perpetuate the scheme. Here, Marc Dreier caused DLLP to make transfers to Patriot, which transfers were made in the course of his Ponzi scheme and perpetuated the scheme. *See infra* § I.

Patriot argues that a claim for **constructively** fraudulent transfer may never be had where the transferor repaid an antecedent debt (unless the transferee was an insider or a participant in the transferor's fraud) because the transferee necessarily acted in good faith. Where the transferee received the transfers in good faith, the transferee will have an affirmative defense against the fraudulent transfer claim to the extent the transferee gave value in return for transfer. However, Patriot takes far too broad a view of "good faith." A transferee's good faith is not established simply because the transfer repaid an antecedent debt. Multiple courts in the Second Circuit have recognized that, where the transferee was on inquiry notice of the transferor's scheme at the time the transferee invested in the fraudulent scheme, the transferee lacks good faith under the fraudulent transfer statutes. Any other rule would effectively sanction investments in Ponzi schemes. *See infra* § II.

Thus, Patriot's principal argument—that the Trustee's fraudulent transfer claims (both intentionally fraudulent and constructively fraudulent) fail because DLLP repaid an antecedent debt when it made its transfers to Patriot—is meritless. But even if it had any merit, it would only apply to the extent the Trustee seeks to recover the $15 million principal Patriot was repaid by Marc Dreier pursuant to his Ponzi scheme. Patriot's argument has no application to the Trustee's claims to recover the $1.65 million in profit DLLP transferred to Patriot because DLLP did not owe Patriot that $1.65 million. DLLP

was not a signatory to the fake notes Patriot bought, and thus DLLP did not extinguish an antecedent debt when it paid Patriot its $1.65 million profit.

Patriot also argues that it lacked inquiry notice when it made its initial investment in Marc Dreier's Ponzi scheme. As detailed herein, the Trustee has alleged a series of red flags that should have caused Patriot to investigate further into the legitimacy of the notes Marc Dreier sold. That Patriot was put on inquiry notice by these red flags is confirmed by an email from the Patriot executive who spearheaded Patriot's investment, in which the executive wrote, immediately after Patriot's investment: "Just hope I don't see Marc Dreier on a plane to Columbia anytime soon." Patriot thus invested in Marc Dreier's Ponzi scheme with deep suspicions about its legitimacy, yet Patriot did not take reasonable steps to investigate. The Trustee need only set forth a plausible claim for relief to satisfy the notice pleading requirements of the Federal Rules, and the Trustee's allegations plainly meet that standard. *See infra* at 4-7, 23-24.

Finally, Patriot argues that the Trustee can bring no claims at all under the Bankruptcy Code because the funds Marc Dreier transferred from DLLP were not property of the DLLP estate. Instead, Patriot argues, the money it received was property of the federal government because, when Marc Dreier forfeited the funds in DLLP's accounts to the federal government, he retroactively forfeited funds that had long ago been transferred out of DLLP's accounts. However, not only is it illogical that Marc Dreier would forfeit funds he no longer owned or controlled, but also the forfeiture orders do not encompass previously transferred funds. Marc Dreier forfeited the property he controlled at the time of the forfeiture orders, not property he did not control at the time.

The forfeiture orders and the contemporaneous statements by the federal government make this clear. *See infra* § III.

For these reasons, and those expressed herein, this Court should deny Patriot's Motion.

## FACTUAL BACKGROUND

Marc S. Dreier operated a Ponzi scheme involving the sale of fictitious notes, supposedly issued by a DLLP client, Solow Realty and Development Corp. ("Solow"), to investors—primarily hedge funds—and the use of the proceeds of the sales of notes to later investors to pay the principal and interest due earlier investors (the "Note Fraud"). *See* Am. Cmplt. ¶¶ 15-23. Patriot was an early investor, and it received a complete return of its $15 million principal investment, plus $1.65 million in profit. *See id.* ¶¶ 42, 51.

All the investors in the Note Fraud were aware of facts that should have caused them to inquire further about the nature and illegitimacy of the supposed Solow note program, and some investors—such as Patriot—were aware of additional red flags. The following facts should have led Patriot to inquire further regarding the legitimacy of the transaction:

- The transaction was orchestrated by Marc Dreier, Solow's attorney at DLLP. *See id.* ¶ 30. It is highly unusual for an attorney to manage a company's financing program, let alone a company's outside attorney, and, in particular, a company's outside litigation counsel.

- Marc Dreier delivered fake Solow financial statements to Patriot for its review in considering whether to purchase Solow notes. The financial statements had glaring irregularities. Some potential investors demanded to speak with Solow's supposed auditor, but Patriot did not. *Id.* ¶ 32

- The notes carried an above-market interest rate of 11%. *See id.* ¶ 53. The fake financial statements given to Patriot showed that Solow had $1.56 ***billion*** in net income for the year ending December 31, 2006. *Id.* ¶ 31. There is no legitimate business reason for "Solow," which had access to so much liquidity from its own

operations, to pay 11% interest in return for the relatively small amount of credit ($15 million) that Patriot extended.  *Id.* ¶¶ 31, 53

- To explain why Solow would issue small amounts of expensive debt while having so much access to liquidity on hand, Marc Dreier explained that Solow allowed him to manage the note program as a way for Marc Dreier to build his law practice and client relationships.  *See id.* ¶ 31.  No reasonable investor would have accepted this explanation.

- The contract agreements Patriot signed accompanying the notes directed Patriot to send any notices only to Marc Dreier.  While transaction documents may require a copy to counsel, it is unusual, if not unheard of, for documents to direct communications only to counsel.  *See id.* ¶¶ 20, 29.

- Patriot made its investment in the Note Fraud into DLLP's Attorney Trust Account, and all of the transfers Patriot received came from DLLP's Attorney Trust Account.  *See id.* ¶ 22.  It is extremely unusual—if not unheard of—for note payments to be made via an attorneys' trust account.

- Before providing Patriot with information regarding the supposed investment, Marc Dreier required Patriot to agree that it would not contact Solow, except with the express written consent of Marc Dreier.  *See id.* ¶ 29.  Marc Dreier's isolation of Patriot from Solow should have been a red flag to Patriot regarding the legitimacy of the transaction.

These facts demonstrate that Patriot should have doubted the legitimacy of the investment Marc Dreier offered.  Indeed, Patriot's conduct and internal statements at the time of the transaction confirm that Patriot had such doubts.  Patriot's investment was arranged by Jonathan Kane ("Kane"), president of Patriot.  *See id.* ¶ 24.  Kane, formerly of Goldman, Sachs & Co., is a highly experienced investment banker and transaction advisor.  *Id.* ¶ 26.  Prior to Patriot's purchase of its $15 million fake Solow note, Kane asked Marc Dreier to provide him with contact information for Steven Cherniak ("Cherniak"), the real CFO of Solow.  *Id.* ¶ 33.  Marc Dreier gave Kane a fake email address—SMCherniak@ezsolow.com—that directed emails to Marc Dreier, not Cherniak.  *Id.*

Kane emailed Cherniak at the fake email address, inquiring about Solow's financial condition.  *Id.* ¶ 34.  Kane received a detailed response later the same day from the fake email address.  *Id.* ¶ 36.  "Cherniak's" email concluded:  "Hope this has been helpful.  Appreciate your interest in this program."  *Id.*  This email was authored by Marc Dreier, not Cherniak.  *Id.*

The following day—August 14, 2007—Kane forwarded the fake Cherniak message to Cherniak at his real email address.  *Id.* ¶ 37.  Marc Dreier did not give Cherniak's real email address to Kane.  Thus, Kane took affirmative steps to find Cherniak's real email address, bypassing the information provided by Marc Dreier.  *Id.*  In his email to Cherniak at Cherniak's real email address, Kane asked Cherniak to call him.  *Id.*

Later on August 14, 2007, Kane spoke on the telephone with the real Cherniak.  *Id.* ¶ 38.  Not surprisingly, Cherniak was confused by Kane's call.  *Id.*  Kane received an email later that day from Cherniak's real email address in which Cherniak wrote:  "I apologize for appearing confused when we spoke.  I was not aware of the details.  I've since spoken with Marc Dreier and he said everything is fine.  If you need anything further, please call Marc."  *Id.*  It is completely implausible that, on August 13, the day before, Cherniak could have sent Kane a detailed email regarding Solow and noting his appreciation for Patriot's interest in the note program, yet the next day be confused when Kane telephoned him to discuss the note program.  *Id.*

In addition, the email from Cherniak's real email address contained a signature block with entirely different telephone and fax numbers than those that appeared in the signature block on the fake email address.  *Id.* ¶ 39.

Moreover, Patriot's internal communications demonstrate that it had doubts regarding the legitimacy of its investment in the supposed Solow notes. On August 14, 2007, shortly after Patriot wired its $15 million investment in the Note Fraud to DLLP's attorney trust account, Dan Harrington, the head of Patriot's real estate financing group, emailed Kane expressing "Congrats" because Patriot was "the lender to a new something or other, weighing in at an 11.0% interest rate." *Id.* ¶ 43. Kane responded: "***Just hope I don't see Marc Dreier on a flight to Colombia anytime soon***." *Id.* (emphasis added).

Pursuant to its investment in the Note Fraud, Patriot received the following transfers from DLLP:

- November 14, 2007: $412,500 as purported interest.
- February 14, 2008: $412,500 as purported interest.
- May 14, 2008: $412,500 as purported interest.
- August 14, 2008: $15,412,500 as purported interest and return of principal.

## ARGUMENT

## I.    THE TRUSTEE HAS STATED VALID CLAIMS FOR CONSTRUCTIVE FRAUDULENT CONVEYANCE

The Trustee has brought claims against Patriot for constructive fraudulent conveyance under both the Bankruptcy Code and New York's Debtor & Creditor Law ("DCL"). The Trustee seeks the recovery of both principal repaid to Patriot and the interest Patriot received on the fake Solow notes.

Section 548(a) sets forth the elements of the Trustee's *prima facie* case for constructively fraudulent transfer. 11 U.S.C. § 548(a)(1)(B) provides, in relevant part:

> (a)(1)   The trustee may avoid any transfer . . . of an interest of the debtor in property . . . that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> . . .

(B) (i) received less than a reasonably equivalent value in
exchange for such transfer or obligation . . . .

To establish her claims for constructively fraudulent conveyance under the DCL,

the Trustee must demonstrate that the transfers from DLLP were made without "fair

consideration."  DCL §§ 273, 274, 275.  Fair consideration has three elements:

(1)     the transferee must convey property in exchange for the transfer, or
the transfer must discharge an antecedent debt;

(2)     what the transferee exchanges for the transfer must be of "fair
equivalent" value to the property transferred by the debtor; and

(3)     the transferee must make the exchange in "good faith."

*See Sharp Int'l Corp. v. State Street Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d

43, 53-54 (2d Cir. 2005).   All three of these elements must be present for fair

consideration to exist.  *See* DCL § 272(a) ("Fair consideration is given for property . . .

[w]hen in exchange for such property . . . as a fair equivalent therefore, and in good faith,

property is conveyed or an antecedent debt is satisfied.").    Thus, the Trustee need only

demonstrate that any one of these elements does not exist to prove a lack of fair

consideration.

## A.     The Repayment Of An Antecedent Debt May Constitute A Constructively Fraudulent Transfer

Patriot argues that the repayment of an antecedent debt may not constitute a

constructively fraudulent transfer, unless the transfer was to an insider or a participant in

the debtor's fraud.   *See* Pat. Br. at 12-15.  Patriot is correct as to the Trustee's

constructively fraudulent transfer claims under the Bankruptcy Code.  Under 11 U.S.C. §

548(a)(1)(B)(i), the Trustee may only recover to the extent that Patriot did not provide

reasonably equivalent value.  To the extent DLLP's transfers to Patriot extinguished an

**Trustee's Opposition to Motion to Dismiss**          8
**the Amended Complaint**
262700

antecedent debt, Patriot provided reasonably equivalent value in return for the exchange. However, as to those transfers that did not extinguish an antecedent debt or otherwise provide reasonably equivalent value, the Trustee may recover the transfer as constructively fraudulent transfers.

However, the DCL's constructively fraudulent transfer provision allows the Trustee to recover all of its transfers to Patriot, even if Patriot provided fair equivalent value in return for a portion of them, because, as discussed above, the Trustee can show a lack of "fair consideration" by demonstrating *either* a lack of fair equivalent value *or* a lack of good faith. Thus, under the plain language of the DCL, if the Trustee can prove that Patriot lacked good faith in its receipt of the transfers from DLLP, the Trustee can recover the total transfers, even if the transfers extinguished a pre-existing debt.

Patriot's argument that a claim for constructively fraudulent transfer may not be had where the transfer extinguished an antecedent debt is based on two cases—*Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504 (1st Cir. 1987), and *Sharp Int'l Corp. v. State Street Bank & Trust Co.*, 403 F.3d 43 (2d Cir. 2005)—which held that constructive fraud claims failed because the plaintiffs failed to establish that the transferees lacked "good faith" in receiving payment for their antecedent debts. Those courts held that the transferees' knowledge that the transferor obtained the funds used to make the transfers from illegitimate sources was not sufficient to show a lack of good faith. *See Sharp*, 403 F.3d at 54-56; *Boston Trading*, 835 F.2d at 1511-12. Patriot argues that these cases demonstrate that no matter what knowledge the transferee had of the transferor's wrongdoing, so long as the transferee did not participate in the wrongdoing, the transferee did not lack good faith and thus cannot be liable for a constructively fraudulent

transfer.[1]  Patriot's analysis of these cases is unsound.  These cases acknowledge that where the transferee knew that its original investment might support a scheme to defraud creditors, the plaintiff could establish that the transferee lacked good faith, even though the transfer repaid an antecedent debt.  *See Sharp*, 403 F.3d at 55; *Boston Trading*, 835 F.2d at 1512.

Moreover, the Second Circuit recognizes that even when the transfer satisfied an antecedent debt, a plaintiff can establish a lack of good faith by showing the defendant's constructive knowledge of the debtor's scheme; actual knowledge is not required.  In construing the "good faith" element of "fair consideration" under the DCL, the Second Circuit in *HBE Leasing Corp. v. Frank*, wrote:

> We believe that where, as here, a transferee has given equivalent value in exchange for the debtor's property, the statutory requirement of "good faith" is satisfied if the transferee acted without either actual *or constructive* knowledge of any fraudulent scheme.

48 F.3d 623, 636 (2d Cir. 1995) (emphasis added); *see also Sharp*, 403 F.3d at 55 (distinguishing *HBE Leasing* on grounds that the transferee in *HBE Leasing* had constructive knowledge "that funds advanced might not be used for legitimate corporate purposes," whereas in *Sharp* it was "undisputed" that the transferee's original loan was "made in good faith"); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs., Ltd.*,

---

[1] Patriot's analysis would only apply to the Trustee's claims under New York's DCL.  As discussed above, the DCL's constructively fraudulent transfer statutes require the Trustee to prove a lack of "fair consideration," and one of the elements of fair consideration is good faith.  *See supra* at 8.  *Sharp* interpreted the DCL's constructively fraudulent transfer statutes, and *Boston Trading* interpreted Massachusetts' constructively fraudulent transfer statutes, which, like the DCL, required proof of a lack of fair consideration, one of the elements of which is good faith.  *See Boston Trading,* 835 F.2d at 1507. *Boston Trading* and *Sharp* held that the plaintiffs there failed to demonstrate a lack of good faith. However, the Trustee need not prove a lack of fair consideration, or a lack of good faith, to establish a *prima facie* case for constructive fraudulent transfer under 11 U.S.C. § 548(b).  Under the Bankruptcy Code, good faith only comes into play as an affirmative defense.  That said, as noted above, the Trustee's ability to recover constructively fraudulent transfers under the Bankruptcy Code is limited by the reasonably equivalent value Patriot gave in return for the transfers.

337 B.R. 791, 805-06 (Bankr. S.D.N.Y. 2005) (holding that, under the DCL, where the trustee had "alleged that the debt repaid [to the transferee] was incurred in connection with transactions that were, at a minimum, irregular, [the trustee] ha[d] thus adequately alleged that Actrade had 'actual or constructive knowledge of [a] fraudulent scheme' in connection with the incurrence of the debt." (quoting *HBE Leasing*)).    Thus, a transferee's lack of good faith under the DCL can be established by demonstrating that the transferee had constructive knowledge of the fraudulent scheme at the time of the transferee's original investment.  *See Picard v. Merkin (In re Bernard L. Madoff Inv. Sec., LLC)*, 440 B.R. 243, 265 (Bankr. S.D.N.Y. 2010) ("[T]he Trustee need not show participation to demonstrate a lack of good faith [under New York law]; a showing of constructive knowledge is sufficient.").

As set forth above, the Trustee has made substantial allegations demonstrating Patriot's constructive knowledge of the Note Fraud, and the holdings of *Sharp* and *Boston Trading* with respect to "good faith" do not apply.

### B.    Patriot Provided Reasonably Equivalent Value In Exchange For The Repayment Of Its Principal

The Trustee does not dispute that Patriot provided "reasonably equivalent value" under the Bankruptcy Code or "fair equivalent" value under the DCL in exchange for the repayment of its principal because the repayment of principal extinguished a common law claim, such as restitution, that Patriot may have had against DLLP.  *See* Pat. Br. at 16-18.  Thus, under the Bankruptcy Code's constructively fraudulent transfer statute, the Trustee may only recover the interest or profits DLLP paid.  However, as discussed above, the Trustee may still recover the principal repayments under the DCL's

constructively fraudulent transfer statute if the Trustee can establish that Patriot lacked good faith.

Although the Trustee does not dispute that Patriot provided reasonably equivalent (or fair equivalent) value for the repayment of principal, to the extent Patriot argues that the fake Solow notes **contractually obligated** DLLP to repay Patriot, Patriot is wrong. DLLP was not a party to the notes. Patriot ostensibly made a loan to Solow, not to DLLP. DLLP cannot be liable on notes it did not and never obligated itself to repay.

Patriot claims that DLLP owed a debt to Patriot for breach of an implied warranty of authority and that Patriot could have recovered "benefit of the bargain" damages for that breach. *See* Pat. Br. at 17-18. DLLP is not liable for breach of an implied warranty of authority. Liability for breach of an implied warranty of authority may arise when an agent purports to contract "with a third party **on behalf of another person**." *DePetris & Bachrach, LLP v. Srour*, 71 A.D.3d 460, 462 (N.Y. App. Div. 2010) (emphasis added); *see also IBF Fund Liquidating, LLC v. Chadmoore Wireless Group, Inc. (In re Interbank Funding Corp.)*, Adv. No. 07-1482, 2007 WL 2907516, at *6 (Bankr. S.D.N.Y. Oct. 3, 2007) (same; quoting Restatement (Third) of Agency § 6.10 (2006)). Marc Dreier did not purport to contract on behalf of Solow, to sign the fake notes for Solow, or to sign the fake notes as an agent of Solow. Rather, he forged the signature of a Solow executive— Steve Cherniak.

Moreover, neither Marc Dreier nor DLLP could be liable for a breach of implied warranty of authority if Patriot knew or should have known that Marc Dreier lacked authority to bind Solow to the notes. *See* Restatement (Third) Agency § 6.10(3); *Sisler v. Security Pacific Business Credit, Inc.*, 201 A.D.2d 216, 614 N.Y.S.2d 985, 988-89 (N.Y.

App. 1994).   The Amended Complaint does not establish that Patriot believed Marc

Dreier had authority to bind Solow.   Whether Patriot believed Marc Dreier lacked this

authority is a question of fact.   *See* Restatement (Third) Agency § 6.10 cmt. c ("It is a

question of fact whether a third party knew that a person purporting to act as an agent

lacked actual authority. The circumstances surrounding the transaction, including

inferences that a reasonable person would draw from facts known to the third party, are

relevant to establishing the third party's knowledge."). Here, the Trustee has alleged facts

demonstrating that Patriot was, at least, on inquiry notice that Marc Dreier lacked actual

authority to bind Solow.

> ### C.    Patriot Did Not Provide Reasonably Equivalent Value, Or Fair Equivalent Value, In Exchange For The Transfers Of Purported Interest

Patriot received payments of Ponzi scheme profits in the form of interest

payments on the fake Solow notes it purchased.   Marc Dreier primarily used the proceeds

of sales of fake notes to later note purchasers to pay off earlier investors.   *See* Am. Cmplt.

¶ 17.   Multiple courts have recognized that payments to Ponzi scheme participants in

excess of their original investments are avoidable as fraudulent transfers.[2]   The principal

rationale for these holdings is that the Ponzi scheme participant "provided no value in

exchange for the fictitious profits they received"   *In re Bayou Group, LLC*, 439 B.R. at

337; *see also Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) (reasoning that Ponzi

---

[2] *See, e.g., Christian Brothers High School Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 337 (S.D.N.Y. 2010) ("[V]irtually every court to address the question has held unflinchingly 'that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers.'") (citation and quotation omitted*); see also Donnell v. Kowell*, 533 F.3d 762, 771 (9th Cir. 2008) ("[T]he general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers."); *SEC v. Forte*,  Civ. Nos. 09-63, 09-64, 2010 WL 939042, at *5 (E.D. Pa. Mar. 17, 2010).

scheme investors cannot retain fictitious profits because "[t]he paying out of profits to [the Ponzi scheme investor] not offset by further investments by him conferred no benefit on the [entities involved in the Ponzi scheme] but merely depleted their resources faster"); *Noland v. Morefield (In re Nat'l Liquidators, Inc.),* 232 B.R. 915, 919 (Bankr. S.D. Ohio 1998) ("The Trustee has established that the Debtor received less than a reasonably equivalent value, because all that the Debtor received in return for the transfers was the use of the Defendants' money to run the 'ponzi' scheme.").

The cases cited by Patriot—*Unified Commercial Capital* and *Carrozzella*— provide little support for the argument that Patriot provided value in exchange for the transfers of interest it received. In those cases, the debtor operating a Ponzi scheme was itself obligated to pay a reasonable contractual interest rate,[3] and so, when the debtor paid the interest due, it discharged an antecedent debt. The *Carrozzella* court wrote:

> In this case, the Debtor paid the Defendants the agreed upon interest for use of the Defendants' money over time. The interest rates were reasonable, and there is no suggestion in the record that Defendants were anything but innocent investors. There is nothing to suggest that they were aware that the Debtor was operating a Ponzi scheme. This was not the typical "too-good-to-be-true" investment scheme. In exchange for the interest paid to the Defendants, the Debtor received a dollar-for-dollar forgiveness of a ***contractual debt***. This ***satisfaction of an antecedent debt*** is "value," Conn. Gen.Stat. § 52-552d(a), and in this case "reasonably equivalent value."

*Daly v. Deptula (In re Carrozzella & Richardson)*, 286 B.R. 480, 491 (D. Conn. 2002) (emphasis added); *see also id.* at 492 ("There is nothing in the statute to support a finding that the Debtor did not receive 'reasonably equivalent value' by virtue of the satisfaction

---

[3] The rate Patriot was paid was not reasonable in light of Solow's apparent liquidity. *See* Am. Cmplt. ¶¶ 31, 53. In addition, the LIBOR rate on a one-year note in August 2007, when Patriot first invested in the Note Fraud, was 5.65%, far less than the 11% rate payable on the fake Solow note Patriot purchased. *See* Libor Rates History, *available at* http://www.wsjprimerate.us/libor/libor_rates_history.htm.

of the debt owing to the investors, in return for its payment of contractual interest to Defendants, simply because the Debtor was engaged in a Ponzi scheme."); *see also Lustig v. Weisz & Assoc. Inc. (In re Unified Commercial Capital, Inc.)*, 260 B.R. 343, 350 (Bankr. W.D.N.Y. 2001) ("Unified Commercial [the transferor] had a contractual obligation under the Account Agreement to pay the Interest to Associates [the transferee]."); *Rieser v. Hayslip* (*In re Canyon Systems Corp.)*, 343 B.R. 615, 644-46 (Bankr. S.D. Ohio 2006) (distinguishing *Carrozzella* and *Unified Commercial*).

Here, DLLP's payment of interest did not extinguish an antecedent debt because DLLP did not owe Patriot any interest payments. DLLP was not a signatory to the fake notes, and the fake notes were not enforceable against DLLP. Thus, Patriot did not provide reasonably equivalent value in return for DLLP's payment of Ponzi scheme profits.

Patriot argues that, regardless of whether DLLP's transfers extinguished an antecedent debt, Patriot did provide a benefit to DLLP in that DLLP was able to use the money it received from Patriot for some period of time. However, as noted above, many courts have held that an investment in a debtor's Ponzi scheme provides no benefit to the debtor because the payment merely prolongs the life of the Ponzi scheme. Here, the Amended Complaint alleges that the proceeds of the fake note sales went primarily to repay earlier note purchasers. *See* Am. Cmplt. ¶¶ 15, 23. Certainly Patriot cannot demonstrate based on the allegations in the Amended Complaint that its investment was used for any purpose other than prolonging and perpetuating Marc Dreier's note fraud, and Patriot cannot establish that its purchase of fake notes provided any benefit to DLLP.

Moreover, the proper inquiry is not whether Patriot's investment provided any benefit to DLLP, but rather whether Patriot provided any value in exchange for the specific transfers at issue—the transfers of interest to Patriot. One of the key cases upon which Patriot relies—*Carrozzella*—holds that in assessing whether the Ponzi scheme investor provided value to the debtor in exchange for its transfer, "the proper focus of a fraudulent transfer inquiry is on the transfer itself, not the overall business practices of the debtor." *Id.* at 490. Here, when focusing on the specific transfers at issue, DLLP received nothing in exchange for its transfers of interest to Patriot. DLLP did not owe Patriot any interest, DLLP did not extinguish any debt by paying Patriot interest, and DLLP received no benefit from paying Patriot interest supposedly owed by Solow.[4] Any benefit DLLP may have received from the temporary use of Patriot's money—as opposed to the payment of interest—is irrelevant.

### D. Patriot Did Not Receive Its Transfers From DLLP In "Good Faith" Under New York's Constructively Fraudulent Conveyance Statute

Patriot argues that the Trustee fails to allege that Patriot lacked "good faith" under New York's constructive fraudulent conveyance statute. *See* Pat. Br. at 21-22. In making this argument, Patriot ***does not contest*** that it was on inquiry notice of the illegitimate nature of the fake Solow notes. Instead, Patriot argues that the "good faith" element of DCL's "fair consideration" requirement may never be met when the debtor's transfer discharged a debt owed to some creditor (as opposed to a non-creditor), so long as the creditor did not participate in the debtor's fraud. Patriot essentially restates the

---

[4] Patriot suggests that DLLP owed Patriot interest because Patriot was entitled to prejudgment interest on a fraudulent inducement claim against DLLP, and thus DLLP received value when it paid off the prejudgment interest due Patriot. *See* Pat. Br. at 21. An identical argument was recently rejected. *See In re Bayou Group,* 439 B.R. at 337-38 ("This novel argument, unsupported by any case law, is unpersuasive. The pre-judgment interest remedy does not provide an independent cause of action that accrues to Appellants' benefit at the moment of redemption.").

<u>**Trustee's Opposition to Motion to Dismiss**</u>    16
<u>**the Amended Complaint**</u>
262700

same argument it made in Argument Section I of its brief as it relates to constructively fraudulent transfers.

As discussed above, *see supra* at 11-13, Patriot's definition of "good faith" under the DCL is far too circumscribed.  Beyond proof of actual participation in the fraud, a plaintiff may demonstrate a lack of good faith by showing that the transferee had constructive knowledge of the fraudulent nature of the transaction. "Constructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such inquiry." *HBE Leasing*, 48 F.3d at 636.

*In re Sharp* does not, as Patriot claims, require proof of actual participation in the fraud to establish a lack of good faith.  In *Sharp*, it was "undisputed" that the transferee bank had no reason to know of the transferor's fraud at the time the initial loan was made. 403 F.3d at 55.  Thus, to prove "bad faith," the *Sharp* court required the trustee to show "participat[ion] in" the fraud since there was no dispute that transferee bank "made [the loan] in good faith long before the fraudulent transfer." *Id.* at 55-56.  Unlike *Sharp*, however, Patriot had constructive knowledge of the fraudulent scheme at the time it invested in the Note Fraud, *see supra* at 4-7, and thus the Trustee need not show participation to demonstrate lack of good faith.  *See also In re Madoff*, 440 B.R. at 265 (distinguishing *Sharp*, on a similar basis, where the trustee "alleged that [the transferees] were not 'innocent' *at the time they invested with* [the debtor]") (emphasis in original).

## II.    THE AMENDED COMPLAINT STATES VALID CLAIMS FOR INTENTIONAL FRAUDULENT CONVEYANCE

Under 11 U.S.C. § 548(a), the Trustee "may avoid ***any transfer***" made by the debtor "with actual intent to hinder, delay, or defraud any entity to which the debtor was

or became . . . indebted." Under DCL § 276, the Trustee may avoid "*[e]very conveyance*

*made* . . . with actual intent . . . to hinder, delay, or defraud either present or future

creditors." Here, the Trustee alleges that Marc Dreier transferred DLLP property—funds

contained in Account 5966—to Patriot with actual intent to hinder, delay or defraud

creditors. *See* Am. Cmplt. ¶ 57, 73. Because Marc Dreier operated a Ponzi scheme, and

because the transfers to Patriot were made as a part of that Ponzi scheme, actual intent to

defraud creditors is presumed. *See McHale v. Boulder Cap. LLC (In re 1031 Tax Group,

LLC)*, 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010) (Glenn, J.) ("If the Ponzi scheme

presumption applies, actual intent for purposes of section 548(a)(1)(A) is established 'as

a matter of law.'") (citation omitted); *see also Drenis v. Haligiannis*, 452 F. Supp. 2d

418, 429 (S.D.N.Y. 2006) (discussing Ponzi scheme presumption of actual intent to

defraud in context of DCL § 276). The Trustee has thus properly alleged a claim for

intentional fraudulent transfer.

### A.    The Repayment Of An Antecedent Debt May Constitute An Intentionally Fraudulent Transfer

Patriot argues that the repayment of an antecedent debt may not constitute an

intentionally fraudulent conveyance because the transferor did not intend to harm all

creditors; so long as he repaid a valid antecedent debt, he merely preferred one creditor

over another, which is not actionable as a fraudulent conveyance. Thus, Patriot argues,

the Trustee's claims for intentionally fraudulent transfer, under both the DCL and the

Bankruptcy Code, fail. *See* Pat. Br. at 12-15, 23-24. Patriot is wrong. Many cases, as

discussed below, reject this proposition and hold that, at least where the transfers were

made pursuant to a Ponzi scheme, the recipients of transfers made to repay antecedent

debts may be liable under both the Bankruptcy Code's and the DCL's intentionally fraudulent transfer statutes.

Patriot's argument is predicated on a misreading of three inapposite cases— *Boston Trading, Sharp, and B.E.L.T., Inc. v. Wachovia Corp.*, 403 F.3d 474 (7th Cir. 2005). These cases all deal with situations where the plaintiff brought intentionally fraudulent transfer claims to recover transfers made to repay a pre-existing debt, and those courts held, under the facts of those cases, that the plaintiffs could not establish the "actual intent" to defraud creditors element of the state statutes at issue. *See Boston Trading*, 853 F.2d at 1510-11; *Sharp*, 403 F.3d at 56; *B.E.L.T.*, 403 F.3d at 478.

Here, the transfers to Patriot were made as part of a Ponzi scheme, *see* Am. Cmplt. ¶¶ 1, 15, 52, 65 and thus the Ponzi scheme presumption applies. According to that presumption, where transfers were made as part of a Ponzi scheme, the debtor's actual intent to defraud other scheme participants is presumed. *See, e.g., In re 1031 Tax Group,* 439 B.R. at 72; *Cuthill v. Greenmark, LLC (In re World Vision Entertainment, Inc.)*, 275 B.R. 641, 656 (Bankr. M.D. Fla. 2002) ("Every payment made by the debtor to keep the [Ponzi] scheme on-going was made with the actual intent to hinder, delay or defraud creditors, primarily the new investors."); *Stettin v. Adler (In re Rothstein Rosenfeldt Adler, P.A.)*, No. 10-02612, 2010 WL 5173796, at *5 (Bankr. S.D. Fla. Dec. 14, 2010); *Drenis*, 452 F. Supp. 2d at 429; *Rieser*, 343 B.R. at 637.

The Ponzi scheme presumption applies in cases brought under 11 U.S.C. § 548 and DCL § 276. *See Drenis*, 452 F. Supp. 2d at 429. Moreover, the presumption applies where the plaintiff seeks to recover transfers of Ponzi scheme profits and the return of principal. *See In re 1031 Tax Group*, 439 B.R. at 54, 72 (holding that the Ponzi scheme

presumption applies to transfers that repaid loans); *In re Bayou Group, LLC*, 439 B.R. at

290, 304-06 (S.D.N.Y. 2010) (applying Ponzi scheme presumption where redemption

payments transferred to scheme investors included both principal and profit); *In re*

*Madoff,* 440 B.R. at 255.

Patriot received its transfers as part of a Ponzi scheme, and thus there can be no

serious dispute that the Ponzi scheme presumption applies.   Accordingly, the intent

elements of the Trustee's intentionally fraudulent transfer claims are met, even though

$15 million worth of the transfers to Patriot extinguished a pre-existing debt.

*Sharp, Boston Trading,* and *B.E.L.T.* do not control because those cases (unlike

this one) did not involve Ponzi schemes.[5]   The transfer at issue in *Sharp* was the

"repayment of a bona fide debt" that was antecedent to the debtor's fraud.  403 F.3d at

55.  By contrast, in a Ponzi scheme, the transfers sought to be avoided here occurred as

***part of*** the fraud.  Indeed, in *Sharp* the Second Circuit stated that: "[t]he fraud alleged in

the complaint relates to the manner in which [the debtor] ***obtained new funding*** from

[investors], ***not*** [the debtor's] ***subsequent payment*** of part of the proceeds to State Street

[Bank]."  403 F.3d at 51 (emphasis added).  Unlike the transfers in *Sharp,* the transfers

sought to be avoided here both established and furthered the fraud.  Furthermore, the

Second Circuit in *Sharp* did not hold that the repayment of an antecedent debt could

never constitute a fraudulent transfer; it just held that the repayment of an antecedent debt

did not constitute a fraudulent transfer under the facts of that case.  *See Bear Stearns Sec.*

*Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 10 (S.D.N.Y. 2007) ("All

---

[5] *See Irving Trust Co. v. Kaminsky*, 19 F. Supp. 816 (S.D.N.Y. 1937); *Nordberg v. Sanchez (In re Chase & Sarborn Corp.)*, 813 F.2d 1177, 1181 (11th Cir. 1987).

the [Second] Circuit held [in *Sharp*] was that [the debtor] failed to establish that the challenged transaction—the repayment of an earlier loan—was fraudulent").[6]

Patriot argues that the decisions holding that the Ponzi scheme presumption establishes the transferor's intent to defraud (presumably including this Court's decision in *In re 1031 Tax Group*) are wrong because they are inconsistent with *Sharp*. *See* Pat. Br. at 25. Not only is Patriot arguing against substantial contrary caselaw, but also the Ponzi scheme presumption is completely consistent with *Sharp*. *Sharp* held that the plaintiff did not state a claim for a fraudulent transfer when the only fraud associated with the transfer was the origin of the funds used to make the transfer. *See Sharp,* 403 F.3d at 56 ("The fraud alleged in the complaint relates to the manner in which Sharp obtained new funding from the Noteholders, not Sharp's subsequent payment of part of the proceeds to [the transferee].").  In the context of a Ponzi scheme, however, the transfers to scheme investors are fraudulent not only because of the origin of the funds, but also because those transfers perpetuate the scheme.  Without the payments of principal and interest (or profits) to the scheme participants, the perpetrator's scheme will be discovered and stopped.  For this reason, transfers pursuant to a Ponzi scheme demonstrate "actual [fraudulent] intent" because "transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors." *In re Manhattan Inv. Fund,* 397 B.R. at 8.

---

[6] *ASARCO LLC v. America's Mining Corp.*, 396 B.R. 278, 390 n.128 (Bankr. S.D. Tex. 2008) ("In *Sharp*, the Court never implied that an intent to prefer a certain creditor precluded a claim that there was actual intent to defraud other creditors.").

**B.    Patriot Cannot Establish Its Good Faith Defense From The Face Of The Amended Complaint**

Patriot argues that this Court should dismiss the Trustee's claims based on its affirmative defenses under DCL § 278 and section 548(c) of the Bankruptcy Code.  *See* Pat. Br. at 25-29.  Patriot argues that to establish its "good faith," Patriot need only show that it did not participate in the Note Fraud, *see id.* at 27, and Patriot argues that its good faith is apparent from the face of the Amended Complaint.  *Id.* at 28-29.  Patriot is wrong on both counts.

*First,* multiple courts have recognized that transferees lack "good faith" where they were on inquiry notice that their transfers were made as part of a scheme to defraud creditors.  *See In re Bayou Group, LLC*, 439 B.R. at 310 & n. 23 (listing numerous cases).  Patriot's argument that the definition of "good faith" from the Uniform Commercial Code should define good faith under the DCL and the Bankruptcy Code has likewise been rejected.  *See Jobin v. McKay (In re M&L Business Mach. Co., Inc.)*, 84 F.3d 1330, 1338 (10th Cir. 1996).  Indeed, in the face of the mountain of authority holding that inquiry notice defeats a good faith defense under the DCL and the Bankruptcy Code, Patriot fails to cite a single contrary case.

*Second,* because Patriot's good faith defense is an affirmative defense, Patriot cannot obtain dismissal at this stage of the litigation.  The *Madoff* court explained why a transferee cannot obtain dismissal of a fraudulent transfer claim based on a good faith defense:

> [T]he transferee bears the burden of establishing its good faith under section 548(c) of the Code as an *affirmative defense* that "may be raised and proved by the transferee at trial." *Gredd v. Bear, Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 310 B.R. 500, 508 (Bankr.

S.D.N.Y. 2002).  Given that a defendant carries the burden of proving an affirmative defense, "[a] motion to dismiss is usually not the appropriate vehicle to raise affirmative defenses." *Ortiz v. Guitian Music Bros., Inc.*, No. 07-CIV-3897, 2009 WL 2252107, at *2 (S.D.N.Y. July 28, 2009). . . .

The Moving Defendants further contend that if section 548(c) of the Code indeed constitutes an affirmative defense, it should nevertheless be considered at this early stage of the proceedings because it has been established on the face of the Complaint itself.  The Moving Defendants' argument relies upon a limited exception to the general rule, which provides that a litigant can "plead itself out of court by unintentionally alleging facts (taken as true) that establish an affirmative defense." . . .  [T]his doctrine has been applied to dismiss complaints establishing only clear-cut, complete affirmative defenses such as absolute immunity or the statute of limitations; "defenses that require a factual review to be established ... should not support a dismissal." 2 Moore's Fed. Prac. § 12.34[4][b], at 100 (3d ed. 2010).  The element of good faith under section 548(c) of the Code, bearing upon a transferee's motivations, is "indisputably a factual question" that "may not be determined on the face of [a] complaint." *La Vigna v. Lipshie (In re Wise)*, 173 B.R. 75, 78-79 (Bankr. E.D.N.Y.1994); *see Golden Buddha Corp. v. Canadian Land Co. of Am., N.V.*, 931 F.2d 196, 201-02 (2d Cir. 1991).

*Madoff*, 440 B.R. at 256-57 (some citations omitted).  Here, whether Patriot was on inquiry notice of the Note Fraud is indisputably a factual question, and thus, ***even if the Trustee had pleaded no inquiry notice facts at all,*** dismissal based on Patriot's affirmative defense would not be appropriate.[7]

Even if it were appropriate to consider Patriot's affirmative defense, the Trustee has amply pleaded that Patriot was on, at least, inquiry notice of the Note Fraud.  Courts

---

[7] *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998), is an "unexceptional" decision that merely recognizes that "a litigant may plead itself out of court by unintentionally alleging facts (taken as true) that establish an affirmative defense."  *Levine v. AtriCure, Inc.*, 594 F. Supp. 2d 471, 474 (S.D.N.Y. 2009).  Obviously, the Amended Complaint does not allege facts establishing Patriot's affirmative defense.

have held that transferees who "do not make appropriate inquiries are charged with 'the knowledge [that] ordinary diligence would have elicited,'" although others have required "a more active avoidance of the truth."  *Id.*; *see also Morse v. Howard Park Corp.*, 272 N.Y.S.2d 16, 22 (N.Y. Sup. Ct. 1966) ("One who has reasonable grounds for suspecting or inquiring ought to suspect, ought to inquire, and the law charges him with the knowledge which the proper inquiry would disclose.") (citation omitted).[8]  The facts alleged above demonstrate that Patriot knew there were reasons to doubt the legitimacy of the supposed Solow note transaction, yet Patriot did not take reasonable steps to investigate and, in fact, consciously failed to resolve obvious red flags.  *See supra* at 4-7. When Patriot's Jonathan Kane wrote, with respect to Patriot's initial investment in the Note Fraud, "Just hope I don't see Marc Dreier on a flight to Columbia anytime soon," he confirmed that Patriot suspected that the supposed Solow note program was illegitimate. Had Patriot taken reasonable steps to allay it suspicion, it would have discovered that the supposed Solow note program was, in fact, a fraud.[9]  Patriot argues that the more reasonable inference to draw from the facts pleaded by the Trustee is that Patriot was an

---

[8] The district court in *In re Bayou Group, LLC*, 439 B.R. 284 (S.D.N.Y. 2010), provided an extensive analysis of the "good faith" element of the 11 U.S.C. § 548(c) defense.  The district court held that the good faith inquiry requires a two-part test: (1) "whether the transferee had information that put it on inquiry notice that the transferor was insolvent or that the transfer might be made with a fraudulent purpose," *id.* at 310, and (2) "whether *diligent* inquiry would have discovered the fraudulent purpose of the transfer." *id.* at 311 (emphasis in original) (internal quotation marks and citation omitted).  The first part of the test focuses on whether the transferee "'reasonably should have known . . . of the fraudulent intent underlying the transfer.'"  *Id.* at 310 (citation omitted).  These inquiries are considered from the standpoint of an objective, reasonable person in the class or category of the transferee (*i.e.,* for the standpoint of a hedge fund manager).  *Id.* at 311.

[9] Moreover, Patriot's affirmative defense cannot require dismissal because it cannot operate as a complete bar to the Trustee's intentional fraudulent transfer claims.  "Affirmative defenses permitting dismissal must 'bar the award of any remedy.'"  *Madoff*, 440 B.R. at 257 n.14 (quoting 5B Wright & Miller, Fed. Prac. & Proc. Civ. § 1357 (3d ed. 2010)).  Even if established, the good faith defenses under Bankruptcy Code § 548(c) and DCL § 278 only allow the transferee to retain its interest to the extent it gave value (or "fair consideration").  *See* 11 U.S.C. § 548(c) (limiting defense to the extent the transferee gave value); DCL § 278 (limiting defense to transferees who gave "fair consideration"); DCL § 272 (defining "fair consideration" to require proof of "fair equivalent value").

innocent investor that had done all it reasonably should under the circumstances. *See* Pat.

Br. at 28-29.  While Patriot will have an opportunity to make its argument to the fact-

finder in this case, the question before the Court now is whether the Trustee has stated a

plausible claim to relief. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).  Clearly, the

Trustee has done so.[10]

### C.    The Trustee Need Not Plead Patriot's Fraudulent Intent under DCL § 276

Patriot argues that the Trustee's actual fraudulent conveyance claim must fail

because the Trustee did not allege Patriot's actual fraudulent intent.  *See* Pat. Br. at 24

n.4.  But DCL § 276 does not require proof of Patriot's fraudulent intent.  The statute

reads:

> Every conveyance made and every obligation incurred with
> actual intent, as distinguished  from intent presumed in
> law, to hinder, delay, or defraud either present or  future
> creditors, is fraudulent as to both present and future
> creditors.

The statute addresses "[e]very conveyance made . . . with actual intent."  It is the

***transferor***, of course, who makes the transfer, not the transferee.  The statute is not

limited to "[e]very conveyance made ***and received***."  *See Bayou Accredited Fund, LLC v.*

*Redwood Growth Partners, L.P. (In  re Bayou Group, LLC)*, 396 B.R. 810, 826 n.5

(Bankr. S.D.N.Y. 2008) ("The statute itself makes this clear.  Section 276 is concerned

only with a '***conveyance made*** . . . with intent,' and only a transferor can be said to have

'made' a conveyance.  There is no reference in this provision to the transferee or the

---

[10]  The allegations of inquiry notice in *Feldman v. Chase Home Fin. (In re Image Masters, Inc.)*, 421 B.R.
164 (Bankr. E.D. Pa. 2009), were far thinner than the detailed allegations in the Amended Complaint.  *See
id.* at 182.

transferee's intent.") (emphasis added), *aff'd in relevant part*, 439 B.R. 284 (S.D.N.Y. 2010).

In helpful contrast, DCL § 276-a, which follows on the heels of § 276, is explicit in requiring proof of the transferee's fraudulent intent.  That section permits the recovery of attorneys' fees where a "conveyance is found to have been made by the debtor ***and received by the transferee*** with actual intent" (emphasis added) to defraud creditors.  Similar language is noticeably absent from DCL § 276.  Thus, the plain language of DCL § 276 dictates that it is the transferor's intent, and not the transferee's, that is relevant, as many courts have recognized.[11]

### D.    The Amended Complaint Alleges Sufficient Facts To Satisfy The Actual Intent Requirement Of DCL § 276-a

Patriot argues that the Trustee's claim for attorneys' fees under DCL § 276-a should be dismissed because the Trustee did not plead an actual intent to defraud by Patriot.  *See* Pat. Br. at 29-30.  Patriot is wrong because the Trustee did plead sufficient facts to state a plausible claim that Patriot acted with actual intent.  *See supra* at 4-7.  The Trustee should be allowed to pursue full discovery on this claim so she can prove at trial her entitlement to attorneys' fees based on Patriot's actual knowledge of Marc Dreier's fraudulent scheme.

---

[11] *See e.g.*, *Sharp*, 403 F.3d at 56; *HBE Leasing*, 61 F.3d at 1059 n.5 ("The 'good faith' in [DCL] § 272 is the good faith of the transferee . . . . By contrast, to prove actual fraud under [DCL] § 276, a creditor must show intent to defraud on the part of the transferor"); *Le Café Crème, Ltd. v. Le Roux (In re Le Café Crème, Ltd.)*, 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000) (stating that, under DCL § 276, "[i]t is the intent of the transferor and not that of the transferee that is dispositive"); *Geron v. Schulman (In re Manshul Constr. Corp.)*, No. 97 Civ. 8851 (JGK), *et al.*, 2000 WL 1228866, at *46 (S.D.N.Y. Aug. 30, 2000) ("It is not necessary under DCL § 276 to show fraudulent intent on the part of the transferee.") (citing *Sec. Investors Prot. Corp. v. Statton Oakmont, Inc.*, 234 B.R. 293, 318 (Bankr. S.D.N.Y 1999) ("The intent of the transferee only becomes relevant as an affirmative defense if the defendant is not the initial transferee.")).

## III.    DLLP TRANSFERRED ITS PROPERTY TO PATRIOT

Marc Dreier caused DLLP to transfer hundreds of millions of dollars from a DLLP account ("Account 5966") to participants in his Ponzi scheme. *See id.* ¶¶ 47-51. Some of the participants in the scheme (including Patriot) received a complete repayment of their investments, together with a profit, while others lost tens of millions of dollars. Those participants who received full repayment and a profit only did so because they left the scheme prior to its collapse, either through luck or knowledge of the nature of Marc Dreier's scheme.   Through her avoidance actions against Patriot and other scheme participants, the Trustee seeks to recover funds transferred out of Account 5966 so they may be equitably and ratably distributed amongst DLLP's creditors, including participants in the Ponzi scheme who never received full repayment, let alone profit.

### A.    The Trustee Can Pursue Her Avoidance Action Because Funds Deposited In Account 5996 Were The Property of DLLP

Patriot argues that the Trustee cannot pursue any avoidance actions against any Ponzi scheme participant, no matter how much they profited, and no matter how inequitable the result, because Marc Dreier transferred money out of Account 5966 that was "not of the debtor's property." *See* Pat. Br. at 30-32.   According to Patriot, federal forfeiture law divested DLLP of any interest in Account 5996 at the time Marc Dreier committed his criminal acts.   But Patriot's argument is at odds with Judge Bernstein's prior determination that DLLP acquired title to money stolen through fraud by Marc Dreier and deposited in Account 5966 before being transferred to Note Fraud investors. *See In re Dreier LLP*, 429 B.R. 112, 136 (Bankr. S.D.N.Y. 2010).   Moreover, the district court, in affirming Judge Bernstein, was even more pronounced in its ruling that funds stolen by Marc Dreier and deposited in Account 5966 were DLLP property.  *See In re*

*Dreier LLP*, Nos. 10 Civ. 4758 (DAB), 10 Civ. 5669 (DAB), 2010 WL 3835179, at *5

(S.D.N.Y. Sept. 10, 2010) ("Gardi's argument that the stolen settlement funds were never

part of the Dreier LLP estate because they were stolen by Dreier . . . also lacks merit. . . .

[T]he stolen settlement funds were part of the Dreier LLP Bankruptcy estate[.]").

Patriot's argument in no way demonstrates that either Judge Bernstein or Judge Batts

reached the wrong decision.

> **B.      The Relation-Bank Doctrine Does Not Apply To Funds That Were
> Not In Account 5996 When The Forfeiture Order Was Signed**

Patriot argues that, under the relation-back doctrine, Marc Dreier's forfeiture of

the funds in Account 5966 stripped DLLP of any interest in any funds that ***had ever*** been

in Account 5966.  Thus, according to Patriot, the funds Marc Dreier transferred to Patriot

were never DLLP property; rather, they belonged to the federal government.  Patriot's

argument depends upon a misconception of not only the Forfeiture Orders entered in

Marc Dreier's criminal case, but also the relation-back doctrine as developed by the case

law.

Marc Dreier forfeited all interest DLLP had in funds ***held*** in Account 5966 at the

time of their seizure by the government and entry of the Preliminary Order of Forfeiture,

and the relation-back doctrine provided that title to ***those funds*** vested in the government

as of the time of the criminal offense.  Thus, funds in Account 5966 ***at the time of*** the

Preliminary Forfeiture Order, or in Marc Dreier's control ***at the time of*** the Preliminary

Forfeiture Order were forfeited to the government in Marc Dreier's criminal case and

were never DLLP property.  However, funds transferred out of Account 5966 prior to the

Preliminary Forfeiture Order were never forfeited, nor indeed has the government sought

their forfeiture.

The relation-back doctrine essentially provides that property forfeited by the government, pursuant to a civil or criminal forfeiture initiated by the government, becomes the government's property at the time of the criminal offense. However, the relation-back doctrine only applies to property that is actually forfeited. *See, e.g.*, *In re Dreier LLP*, 429 B.R. at 126 ("Under the relation-back doctrine, title **to forfeited property** automatically vests in the Government at the time of the defendant's criminal act.") (emphasis added); *United States v. Emerson*, 128 F.3d 557, 567 n.5 (7th Cir. 1997) ("[T]he relation-back doctrine provides that the right, title, and interest **in the forfeited property** vests in the United States at the time the defendant committed the offense that gives rise to the forfeiture.") (emphasis added); *United States v. Harris*, 246 F.3d 566, 575 (6th Cir. 2001) ("Under the relation-back doctrine, the government acquires its interest **in the defendant's forfeited property** at the time of the commission of the criminal acts giving rise to the forfeiture.") (quoting *United States v. Lavin*, 942 F.2d 177, 185 (3d Cir. 1991)) (emphasis added).

Here, the government only sought the forfeiture of Marc Dreier's property in Marc Dreier's possession or DLLP's possession at the time of the Preliminary Forfeiture Order. Schedule A to the Preliminary Forfeiture Order and Schedule I to the Final Forfeiture Order lists "[a]ny and all funds in" Account 5966, not "funds **that were** in" Account 5966.[12] Moreover, the reason that the Forfeiture Orders do not include transfers from Account 5966 made prior to the time of the Preliminary Forfeiture Order is because property not in the possession of the defendant is subject to forfeiture only where the government has traced the property and identified it as proceeds (or purchased by

---

[12] All exhibits are attached to the February 1, 2011, Declaration of J. Benjamin King, filed herewith.

proceeds) of the crime.[13]   Thus, the government could not have subjected the transfers

made to Patriot to forfeiture because the government had not traced those exact transfers

and identified them as proceeds of Marc Dreier's crimes.

>    **C.    The Coordination Agreement Demonstrates That The Relation-Back Doctrine Does Not Apply To The Patriot Transfers**

The fact that the Forfeiture Orders do not operate to forfeit funds previously

transferred out of Account 5966 prior to entry of those orders is made further evident

from the Coordination Agreement between the government and the Trustee, which both

Judge Bernstein and Judge Rakoff approved.   Under the Coordination Agreement, the

government agreed not to interfere with the Trustee's pursuit of avoidance actions, *inter*

*alia*, against Patriot, by seeking to forfeit the Trustee's recoveries from such actions.   *In*

*re Dreier LLP*, 429 B.R. at 121; *see also United States v. Dreier*, 682 F. Supp. 2d 417,

418 (S.D.N.Y 2010).

In return, the Trustee agreed not to contest forfeiture generally and, in particular,

certain funds that GSO had received from Account 5966.   *See id.*   These GSO funds had

been traced by the government from Account 5966 to a facility account at La Salle

National Bank where they were being held for the benefit of GSO.   The government had

identified these specific funds as the proceeds of Marc Dreier's crime and had obtained

an order from Judge Rakoff restraining them.

Thus, implicit in the government's willingness to enter into the Coordination

Agreement and Judge Bernstein's and Judge Rakoff's approval of it, was recognition that

---

[13]    The Preliminary Order of Forfeiture at 4 (Ex. 1) provides:

> The defendant shall forfeit any and all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the fraud offenses alleged in Counts One through Seven, and any and all property, real and personal, involved in the money laundering offense alleged in Count Eight, and all property traceable to such property.

the Trustee could seek to recover property under the Bankruptcy Code even if it might become forfeitable, notwithstanding the relation-back doctrine.

Further confirmation that the Forfeiture Orders did not forfeit funds previously transferred out of Account 5966 is found in the agreements between GSO and the government. GSO invested $165 million in Marc Dreier's Ponzi scheme and received a full return of principal plus $30.9 million in interest and fees. *In re Dreier LLP*, 429 B.R. at 119. The USAO froze $35.9 million of these transfers (the "Frozen Funds") in GSO accounts after Marc Dreier's arrest. *Id.* Just like the transfers to Patriot, GSO received its transfers from Account 5966. *See* Gov't's Mem. in Support of Application for Consent Order of Forfeiture, *United States v. Dreier*, No. 09 Cr. 85 (JSR) (Dec. 23, 2009) ("Gov't Mem."), at 5 (Ex. 3). Thus, if Patriot were correct in its reading of the scope of the Forfeiture Orders, Marc Dreier had already forfeited the Frozen Funds pursuant to the July 13, 2009, Preliminary Forfeiture Order. However, the government recognized that the Forfeiture Orders ***did not*** encompass the Frozen Funds:

> On July 13, 2009, the Court sentenced Dreier and signed the Preliminary Order of Forfeiture, imposing the Money Judgment and forfeiting Dreier's interest in the specific properties listed in the order.
>
> At the request of GSO, the Government agreed to postpone including the [Frozen Funds] in its application for the Preliminary Order of Forfeiture.

Gov't's Mem. at 7. The Final Order of Forfeiture is no broader than the Preliminary Order. *See* Final Forfeiture Order (Ex. 2). Thus, the Forfeiture Orders did not forfeit funds transferred out of Account 5966 prior to the Preliminary Forfeiture Order, and Patriot's argument fails.

**D.     The Relation-Back Doctrine Will Not Block The Trustee's Fraudulent
        Transfer Actions As A Matter Of Law**

The cases upon which Patriot relies regarding forfeiture and the relation-back
doctrine, and its impact on a trustee's right under the Bankruptcy Code to pursue
avoidance actions do not stand for the proposition that a non-governmental party (like
Patriot) can take advantage of the relation-back doctrine.  Rather, all of the cases cited
involve situations in which the government's right to seize or forfeit property is measured
against a private party's right to the forfeited property.  *See, e.g., United States v. One
Silicon Valley Bank Account*, 549 F. Supp. 2d 940, 957-58 (W.D. Mich. 2008)
(bankruptcy trustee versus government); *United States v. Pelullo*, 178 F.3d 196, 201-03
(3d Cir. 1999) (same); *United States v. Timley*, 507 F.3d 1125, 1130 (8th Cir. 2007)
(same).

To the contrary, in *Counihan v. Allstate Insurance Co.*, 25 F.3d 109 (2d Cir.
1994), the Second Circuit indicated that in a lawsuit between private parties, forfeiture
and the relation-back doctrine do not apply in the same manner as when the government
asserts them.  In *Counihan,* the plaintiff owned a one-half interest in a home in which her
son sold drugs.  *Id.* at 110.  After her son's arrest, the plaintiff continued to exercise
control over the home, and obtained a homeowner's policy from Allstate Insurance
Company ("Allstate").  *Id.* at 110-11.  The government ultimately obtained a forfeiture
order requiring the forfeiture of the home based on the son's drug sales.  *Id.* at 111.  After
Allstate issued the policy, but before the government obtained the forfeiture order, a fire
destroyed the home.  *Id.* at 110-11.  The plaintiff brought an action against Allstate,
seeking to require Allstate to pay on the policy.  *Id.* at 110.  Allstate argued that the
forfeiture divested the plaintiff of any ownership interest in the home, and that the

divestiture related back to the time of the drug offense, which occurred before the fire. *Id.* at 111. Thus, Allstate claimed no liability to the plaintiff. The Second Circuit disagreed ruling that the plaintiff had an insurable interest at the time of the fire, despite the forfeiture and the relation-back doctrine:

> The forfeiture statute at issue here is designed to provide a significant weapon in the ***government's*** arsenal for the war on narcotics. It certainly was not enacted to shield insurance carriers from their contractual obligations.

*Id.* at 113.

The same analysis applies here. The forfeiture laws and the relation-back doctrine provide an important tool to enable the government to fight financial crimes, such as those perpetrated by Marc Dreier, and to compensate victims of the crimes. But where the government has not acted to subject property to forfeiture, the relation-back doctrine should not be applied to strip a bankruptcy trustee of his or her ability to recover assets for the benefit of all creditors, and there is no case law to support it. If Patriot were to be successful in its efforts to apply forfeiture and the relation-back doctrine, the policies underlying the Bankruptcy Code would be undermined, and what was designed as a sword for the government would become a shield for recipients of fraudulent transfers. Clearly, that is not what Congress intended in enacting 21 U.S.C. § 853(c), not what the government intended in entering into the Coordination Agreement, not what Judge Rakoff intended in entering the Forfeiture Orders, and not what Judge Rakoff and Judge Bernstein envisioned in approving the Coordination Agreement.

## IV.    THE AMENDED COMPLAINT STATES A CLAIM FOR EQUITABLE SUBORDINATION

Once Patriot returns the transfers DLLP made to it, Patriot may assert a claim in the DLLP bankruptcy pursuant to 11 U.S.C. § 502(h).  The Amended Complaint alleges that, pursuant to 11 U.S.C. § 510(c), any such claim should be subordinated to the interests of other creditors because of Patriot's actual or constructive knowledge of the Note Fraud.  *See* Am. Cmplt. ¶¶ 97-100.

### A.    The Trustee Has Timely Raised Her Equitable Subordination Claim

Patriot argues that the Trustee has asserted her equitable subordination claim too soon because Patriot does not yet have a claim in the DLLP bankruptcy.  *See* Pat. Br. at 32.  However, if Patriot asserts a Section 502(h) claim, it will be treated as if it had arisen before the filing of the bankruptcy petition.  *See In re Enron Creditors Recovery Corp.*, 376 B.R. 442, 465 (Bankr. S.D.N.Y. 2007); *In re Coated Sales, Inc.*, 119 B.R. 452, 458 n.14 (Bankr. S.D.N.Y. 1990).  Thus, it is appropriate for the Trustee to have her equitable subordination claim in place now to respond to what would be a retroactively asserted 502(h) claim by Patriot.[14]

### B.    The Trustee Has Stated A Claim For Equitable Subordination

The Amended Complaint sets forth allegations supporting the inference that Patriot actually knew it received payments from DLLP pursuant to a fraudulent scheme. *See supra* at 4-7.  If Patriot accepted payments from DLLP knowing that it was participating in a fraudulent scheme, and knowing that any payments to Patriot were made from funds obtained from later investors, then Patriot is charged with inequitable

---

[14]    At worst, this Court should dismiss the equitable subordination claim without prejudice.  *See In re Tronox, Inc.*, 429 B.R. 73, 109 (Bankr. S.D.N.Y. 2010).

conduct that would support equitable subordination. Whether or not Patriot's conduct was sufficiently inequitable is a highly fact-intensive inquiry, and this Court cannot conclude, as a matter of law, that the Trustee's equitable subordination claim fails. *See In re Adelphia Comms. Corp.*, 365 B.R. 24, 69 (Bankr. S.D.N.Y. 2007) (denying motion to dismiss equitable subordination claim because inquiry into creditor's inequitable conduct was fact intensive).

## CONCLUSION

For all the reasons set forth above, the Trustee respectfully requests that this Court deny Patriot's Motion to Dismiss.

DATED:          February 1, 2011
                New York, New York

                                        Respectfully submitted,


                                        By:    *s/ J. Benjamin King*
                                            Howard D. Ressler, Esq.
                                            Stephen T. Loden, Esq.
                                            J. Benjamin King, Esq. *(pro hac vice)*
                                        DIAMOND MCCARTHY LLP
                                        620 Eighth Avenue, 39th Floor
                                        New York, New York 10018
                                        Tel: (212) 430-5400
                                        Fax: (212) 430-5499

                                        *Counsel for Sheila M. Gowan,*
                                        *Chapter 11 Trustee for the Estate of*
                                        *Dreier LLP*