**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x

In re:

        DREIER LLP,

                    Debtor.

----------------------------------------------------------------x

SHEILA M. GOWAN, Chapter 11 Trustee
of DREIER LLP,

                Plaintiff,

        v.

THE PATRIOT GROUP, LLC, *et al.*,

                Defendants.

----------------------------------------------------------------x

FOR PUBLICATION

Chapter 11
Case No. 09-15051 (SMB)

Adv. Pro. No. 10-03524 (MG)

**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND**
**DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS**

*A P P E A R A N C E S:*

DIAMOND McCARTHY LLP
*Attorneys for Sheila M. Gowan, Chapter 11 Trustee for Dreier LLP*
620 Eighth Avenue, 39th Floor
New York, NY 10018
By:    Howard D. Ressler, Esq.

-and-

1201 Elm Street, 34th Floor
Dallas, TX 75270
By:    J. Benjamin King, Esq. (argued)

-and-

909 Fannin Street
Suite 1500
Houston, TX 77010
By:    Stephen T. Loden, Esq.

WACHTELL, LIPTON, ROSEN & KATZ
*Attorneys for Defendants The Patriot Group, LLC, The Washington Special Opportunities Fund,
LLC, and The Washington Special Opportunities Fund, Inc.*
51 West 52nd Street
New York, NY 10019
By:    Emil A. Kleinhaus, Esq. (argued)


UNITED STATES DEPARTMENT OF JUSTICE
United States Attorney's Office
One St. Andrew's Place
New York, NY 10007
By:    Matthew L. Schwartz, Esq. (argued)


KLESTADT & WINTERS, LLP
*Attorneys for Official Committee of Unsecured Creditors*
570 Seventh Avenue
17th Floor
New York, NY 10018
By:    Tracy L. Klestadt, Esq. (argued)
       Brendan M. Scott, Esq.


**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is a motion to dismiss filed by The Patriot Group, LLC, The

Washington Special Opportunity Fund, LLC and The Washington Special Opportunity Fund,

Inc. (collectively, "Patriot" or "Defendants") asserting that the complaint fails to state a claim

upon which relief can be granted pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6),

made applicable by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012 (the

"Motion to Dismiss").  Pursuant to the actual and constructive fraudulent conveyance provisions

of §§ 544, 548(a), 550 of the Bankruptcy Code (the "Code") and various sections of New York

Debtor and Creditor Law[1] (the "NYDCL"), the chapter 11 trustee, Sheila Gowan ("Gowan" or

---

[1]        N.Y. DEBT. & CRED. LAW § 270 *et seq.* (McKinney 2011).

the "Trustee") seeks to avoid and recover prepetition transfers by Dreier LLP to the Defendants in the course of the Ponzi scheme perpetrated by Marc Dreier.[2]

Among the recent spate of frauds and Ponzi schemes, the crimes of Marc Dreier ("Dreier") stand out as among the most brazen. Dreier built a successful 200-plus lawyer firm based in New York—Dreier LLP ("Dreier LLP" or the "Debtor")—unique in that he was the firm's sole equity partner. Dreier's fraud shared much in common with frauds of other corrupt lawyers who have stolen client funds deposited in their law firm's bank accounts, although the amount of stolen client funds was very large.[3] But what sets Dreier apart, perhaps in a class of his own, is the Ponzi scheme he developed, as his thirst for cash and need to cover-up earlier thefts increased, by selling bogus forged promissory notes of one of his firm's corporate clients, Solow Realty Development Corp. ("Solow"), to supposedly-sophisticated hedge funds (the "Solow Note" or "Notes" or "Solow Notes"). Solow is a privately-held real estate development and investment firm based in New York which had no knowledge of Dreier's fraud.

Over the course of several years Dreier succeeded in selling over $700 million in bogus Solow Notes with maturities of approximately one year or less at allegedly above-market interest rates.[4] The new Solow Note investors wired funds to purchase the Notes to Dreier LLP, which deposited the funds in the firm's account entitled "Dreier LLP Escrow Account" with the last

---

[2]     The complaint also asserts a claim for equitable subordination against the Defendants pursuant to section 510(c) of the Code. *See* 11 U.S.C. § 510(c) (" Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—(1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest; or (2) order that any lien securing such a subordinated claim be transferred to the estate.").

[3]     It appears that Dreier stole approximately $48 million in client funds. *See* ECF Doc. # 93 in *United States v. Dreier*, No. 09–cr–85 (JSR) (S.D.N.Y. Mar. 17, 2009) ("Second Amended Restitution Order") at 3–4. *See also Gardi v. Jana Partners LLC (In re Dreier LLP)*, Adv. Pro. No. 10-3642 (SMB), 2011 WL 1980279, at *1–2 (Bankr. S.D.N.Y. May 23, 2011) (involving Dreier theft from 5966 Account of $6.3 million in proceeds received on behalf of a client, pursuant to settlement agreement that Dreier forged).

[4]     It appears that Dreier stole approximately $340 million from funds deposited in a Dreier LLP account by Note purchasers. *See* Second Amended Restitution Order at 3–4.

four digits of "5966" (the "5966 Account").  It is undisputed that the 5966 Account contained

commingled funds from firm clients, Note investors and law firm operating revenue.  Marc

Dreier controlled deposits and withdrawals from the 5966 Account, and used the funds in the

account at will to pay for his lavish lifestyle, to fund the operations of his law firm, when

necessary, and to make payments to earlier clients and Note investors whose funds he had earlier

stolen from the 5966 Account.  The scheme fell apart when Marc Dreier was arrested in Canada

for impersonating another client in an effort to raise additional funds needed to prevent his

scheme from unraveling when currently-due obligations could not be paid.  Shortly after Dreier's

arrest, Dreier LLP was forced into bankruptcy, and a chapter 11 trustee, Sheila Gowan, was

appointed.  An involuntary chapter 7 bankruptcy was also commenced against Marc Dreier

personally, and a chapter 7 trustee was appointed.

On May 11, 2009, Dreier was convicted upon his guilty plea to a multi-count federal

indictment and sentenced to 20 years in prison.  Additionally, upon his criminal conviction, a

civil forfeiture order was entered, not only forfeiting Marc Dreier's personal assets, but also

assets of Dreier LLP, including any funds in the 5966 Account.

The Trustee has commenced numerous adversary proceedings, including the three cases

that are pending before me.[5]  The Dreier LLP chapter 11 case and the Marc Dreier chapter 7

case, as well as numerous other avoidance actions, are pending before my colleague Judge Stuart

M. Bernstein.  The defendants in the cases before me are hedge funds that purchased bogus

---

[5]         In addition to this case, three other similar adversary proceedings are also pending before me—*Gowan v. Amaranth LLC (In re Dreier LLP)*, Adv. Pro. No. 10-03493 (MG) (hereinafter "Amaranth"); *Gowan v. Novator Credit Management, (In re Dreier LLP)*, Adv. Pro. No. 10-04278 (MG) (hereinafter "Novator"); and *Gowan v. Xerion Partners II Master Fund Ltd. (In re Dreier LLP)*, Adv. Pro. No. 10-04277 (MG) (hereinafter "Xerion").  A settlement of the *Xerion* case was approved by the Court in an Opinion and separate Order also entered today.  *See* Adv. Pro. No. 10-04277, ECF Doc. #s 40 and 41.

Solow Notes.[6]  The defendants in the *Patriot* and *Amaranth* cases are so-called "net winners," having been repaid the full amount of principal and interest on the Notes before the scheme unraveled; the defendants in the *Novator* and *Xerion* cases are so-called "net losers," having been repaid some but less than the full amount of the principal on the Notes.  The Trustee sued the defendants in the *Patriot*, *Novator* and *Xerion* cases on actual and constructive fraudulent conveyance avoidance claims under both federal and New York law to recover the transfers from the 5966 Account repaying principal and interest; in the *Amaranth* case, because the challenged transfers occurred more than two years before the chapter 11 filing, the Trustee sued the defendants only under New York law because of the longer statute of limitations.  The defendants in the four cases moved to dismiss the complaints, raising mostly the same arguments.  The Court entered a common briefing and argument schedule, heard argument on the motions to dismiss on April 5, 2011 (the "Hearing"), and took the motions under submission.

Two potentially case-dispositive issues are raised in these cases: (1) whether the forfeiture order, entered by the district court in Marc Dreier's criminal case upon his guilty plea, had the effect of forfeiting all funds in the 5966 Account, or traceable to the account, including the funds transferred to the defendants before the forfeiture order was entered, thereby precluding the Trustee from recovering the payments to defendants because, as a result of the forfeiture, the funds were not "property of the debtor," an essential element under federal and state avoidance claims; and (2) whether the defendants' deposits into the 5966 Account and the funds repaid to the defendants from the 5966 Account were held by Dreier LLP in an "express trust," precluding the Trustee from recovering the payments because funds held in an express

---

[6]      References made to the "defendants" in general refer to all of the defendants in the four cases pending before me.  References made to the "Defendants" specifically refer to the *Patriot* Defendants.

5

trust are not "property of the debtor"?  Additionally, the defendants' motions to dismiss raise other arguments, some common to all three cases and some specific to the individual cases.[7]

This opinion addresses the two potentially case-dispositive issues and the additional common arguments, as well as the case-specific issues in this case.  The motions to dismiss in the other two cases are resolved in separate opinions that incorporate this opinion, to the extent applicable, and address case-specific issues raised in each of those cases.

For the reasons explained below, the Court denies the motions to dismiss with respect to the two potentially case-dispositive issues, and grants the motions in part and denies the motions in part with respect to the common arguments and the case-specific issues in this case.  As explained, the forfeiture order issue raises only an issue of law, resolved against the defendants in this opinion, and therefore foreclosing the issue to defendants as the cases proceed.  The "express trust" issue, however, raises mixed questions of fact and law that cannot be resolved on the motions to dismiss, and must await further developments in these cases.

As to the common issues among the defendants, the Court reaches the following conclusions:  First, the "Ponzi scheme presumption" applies to the transfers made to defendants during the course of Dreier's fraud sufficient to state a claim for actual fraudulent conveyance under § 548(a)(1)(A) of the Bankruptcy Code.  Second, to state a claim for actual fraudulent conveyance under NYDCL § 276, the Court concludes that the Trustee has adequately pled the fraudulent intent of the transferor and need not plead the fraudulent intent of the transferee— "mutual fraudulent intent" is not necessary.  Third, as to the claims for constructive fraudulent

---

[7]       Because the arguments of the defendants were largely the same, each of the defendants adopted the arguments of the other defendants in their respective pleadings.  Prior to the Hearing, in an effort to streamline the proceedings, the Court requested that the defendants not repeat the arguments of the other defendants at the Hearing.  Accordingly, the Court considers each of the defendants' arguments applicable to the other defendants.  Notably, the trust/property of the estate issue, discussed below, was only addressed in the briefs in the *Xerion* case, which has now been settled.  However, since the defendants in all of these cases adopted each others' arguments, the Court will address that issue as well.

conveyance under § 548(a)(1)(B) of the Bankruptcy Code, the Court concludes that the

complaints are dismissed as to the repayment of principal because the Trustee concedes that such

repayment extinguished a common law claim, such as restitution, that defendants may have had

against the estate; however, the claims for constructive fraudulent conveyance under the

Bankruptcy Code are permitted to go forward as to the repayments in excess of principal because

the Debtor did not receive "reasonably equivalent value" for such transfers. Fourth, as to the

claims for constructive fraudulent conveyance under the NYDCL, the Court concludes that the

Trustee's concession that the repayment of principal satisfied an antecedent debt precludes, as a

matter of law, avoidance of such transfers; under controlling law, whether the defendants lacked

"good faith," an indisputably thorny inquiry, is not an issue under the NYDCL where the

transfers satisfied a valid antecedent debt. Fifth, the Trustee may seek recovery of the

repayments in excess of principal because the Debtor did not receive "fair equivalent" value for

the transfers. Sixth, consideration of the defendants' good faith sufficient to make out an

affirmative defense under § 548(c) of the Bankruptcy Code or NYDCL § 278(1) is not

appropriate at the motion to dismiss stage. Seventh, the claims for equitable subordination under

§ 510(c) of the Bankruptcy Code must be dismissed as premature unless the defendant has filed a

claim in the bankruptcy case.

Specific to the *Patriot* case, the motion to dismiss Counts I and III, the actual fraudulent

conveyance claims under Code § 548(a)(1)(A) and NYDCL §§ 276 and 276-a, is denied. With

regard to Counts II, IV, V and VI, the constructive fraudulent conveyance claims under Code §

548(a)(1)(B) and NYDCL §§ 273, 274 and 275, the motion to dismiss is granted to the extent of

the repayment of principal and denied to the extent the repayments exceeded the principal. With

regard to Count VII, for equitable subordination, the motion to dismiss is granted without

prejudice.

## I.    BACKGROUND

At bottom, the complaint alleges that the Defendants knew or should have known that

they received the transfers as part of Dreier's Ponzi scheme and should return funds received

during the course of the fraud that were paid from property of Dreier LLP.  The complaint

alleges causes of action under the applicable provisions of the Code and the NYDCL for actual

and constructive fraudulent conveyances seeking to avoid and recover transfers made by Dreier

LLP to the Defendants before the bankruptcy filing.  The Trustee also seeks preemptive

equitable subordination of any claims filed by the Defendants against the Dreier LLP estate (no

such claims having been filed so far), arguing that the Defendants unjustly benefited from the

proceeds received during the course of the fraudulent scheme.

### A.    Elements of the Fraud[8]

Unlike the classic Ponzi[9] scheme where a fraudster promises exorbitantly high rates of

return through its own investment activities, but in fact takes funds from one person to pay

another, Dreier perpetuated a Ponzi scheme through the sale of bogus Solow Notes from 2004 to

---

[8]      The facts are taken primarily from the "Background" section of the complaint.  The "Background" sections
of each of the three complaints at issue in the motions to dismiss are largely the same.

[9]      "A 'Ponzi' scheme, as that term is generally used, refers to an investment scheme in which returns to
investors are not financed through the success of the underlying business venture, but are taken from principal sums
of newly attracted investments.  Typically, investors are promised large returns for their investments.  Initial
investors are actually paid the promised returns, which attract additional investors."  *Merrill v. Abbott (In re Indep.
Clearing House Co.)*, 41 B.R. 985, 994 (Bankr. D. Utah 1994), *modified*, 62 B.R. 118 (D. Utah 1986); *Danning v.
Bozek (In re Bullion Reserve of N. Am.)*, 836 F.2d 1214, 1219 n.8 (9th Cir. 1988) ("A 'Ponzi' scheme is any sort of
fraudulent arrangement that uses later acquired funds or products to pay off previous investors."); *Hayes v. Palm
Seedlings Partners-A (In re Agric. Research and Tech. Grp., Inc.)*, 916 F.2d 528, 536 (9th Cir. 1990) ("Distributing
funds to earlier investors from the receipt of monies from later investors is the hallmark of Ponzi schemes.").

2008 with allegedly above-market interest rates and on favorable terms to investors.[10]  Dreier

received approximately $700 million in fraud proceeds over the course of the scheme (the "Note

Fraud") to fund his lavish lifestyle and fund the operations of his law firm, Dreier LLP, in which

he was the sole equity partner.  *See In re Dreier LLP*, 429 B.R. 112, 118 (Bankr. S.D.N.Y.

2010).  To fund the fraud, Dreier told most potential investors that a long-standing Dreier LLP

client, Solow Realty and Development Corp., was interested in borrowing from investment firms

to fund Solow's purchase of unspecified real estate investments.  (Compl. ¶ 16.)  Dreier

primarily used the principal obtained from later purchasers of Notes to pay off the principal and

interest due to earlier purchasers.[11]  *Dreier*, 429 B.R. at 118.

In furtherance of his scheme,  Dreier delivered "information packages" to potential

investors containing fabricated Solow financial statements and other information about the

"investment."  (Compl. ¶ 17.)  Dreier also crafted fake audit opinion letters on the letterhead of

Berdon LLP, an established accounting and auditing firm that did not know Dreier was using its

name as part of the fraud.  (*Id.*)  According to the Trustee, the financial statements contained

glaring irregularities that would cause a "reasonable" investor to inquire further.  (*Id.*)

In addition to defrauding investors into buying fake Notes, Dreier required investors to

execute "Term Loan Agreements" that contained the following language:

> The Borrower hereby authorizes the Lender to rely upon the
> telephone or written instructions of any person identifying himself
> or herself as an authorized officer of the Borrower and upon any
> signature which Lender believes to be genuine, and the Borrower
> shall be bound thereby in the same manner as if the officer were
> authorized or such signature were genuine.

---

[10]    All references to the first amended complaint filed by the Trustee against the Defendants on November 24,
2010 (the "Complaint") are cited herein as "Compl. ¶ __.".  (ECF Doc. # 12.)

[11]    Dreier also drained client funds from Dreier LLP bank accounts.  The Solow Note investors were not
Dreier LLP clients, at least with respect to the Note purchases.

(Compl. ¶ 21.)  In essence, this provision purported to bind Solow to the actions of any person who claimed to be an authorized officer of Solow, in this case, Dreier himself.  The Trustee characterizes this provision as "highly unusual."  (*Id.*)  The Term Loan Agreements also directed investors to deal only with Dreier because all legal notices, billing statements, payments, or communications of any kind were to be sent to "Solow Management c/o Dreier LLP" at the Dreier LLP address.  (Compl. ¶ 20.)

Investors were directed to wire their investments directly to the 5966 Account.  (Compl. ¶ 23.)  Although titled an "escrow" or "trust" account, the 5966 Account was used for purposes other than holding Dreier LLP client escrow funds.  (*Id.*)  Funds from the fraud deposited in the 5966 Account were commingled with legitimate client funds, Dreier LLP operating funds, and funds from other Dreier LLP accounts.  (*Id.*)  Funds held in the 5966 Account were transferred for different purposes, including return of funds to actual Dreier LLP clients, payments of principal and interest to investors in the Note Fraud, and distribution to other Dreier-owned accounts.  (*Id.*)

The Trustee avers that because of these facts, along with others that are specific to the defendants in each of the cases, the Defendants knew or should have known that the transfers they received were in furtherance of the Ponzi scheme.

### B.    Collapse of the Fraudulent Scheme and Forfeiture

Dreier's scheme collapsed after he was arrested in Toronto and charged with criminal impersonation.  He was arrested in New York upon his return from Toronto and charged with conspiracy, securities fraud, and money laundering.  Dreier pleaded guilty to all counts.  Following Dreier's guilty plea, Judge Rakoff signed an Order of Forfeiture/Preliminary Order of Forfeiture as to Specific Properties, *see* ECF Doc. # 85 in *United States v. Dreier*, No. 09–cr–85

(JSR) (S.D.N.Y. July 17, 2009) (the "Preliminary Forfeiture Order"), that ordered Dreier to

forfeit:

> the properties listed in <u>Schedule A</u> attached hereto (the "Specific
> Properties"), as property constituting or derived from proceeds
> obtained as a result of the fraud offenses alleged in Counts One
> through Seven, as well as property involved in the money
> laundering offense alleged in Count Eight and property traceable to
> such property;

*Id.* at 3.  "Specific Properties" included "[a]ny and all funds in [the 5966 Account] held at JP

Morgan Chase in the name of Dreier LLP." *Id.*, Schedule A, Item 13.  The Preliminary Forfeiture

Order also ordered Dreier to forfeit:

> any and all property, real and personal, that constitutes or is
> derived from proceeds traceable to the commission of the fraud
> offenses alleged in Counts One through Seven, and any and all
> property, real and personal, involved in the money laundering
> offense alleged in Count Eight, and all property traceable to such
> property.

*Id.* ¶ 2.

Because the defendants raised the issue of the effect of the Preliminary Forfeiture Order

on the Trustee's ability to bring avoidance actions, the Court entered an order requesting the

Office of the United States Attorney for the Southern District of New York (the "U.S. Attorney")

to file a statement of its position regarding whether the Preliminary Forfeiture Order deprived

Dreier LLP of an interest in funds that were transferred to the defendants.  (ECF Doc. # 27.)  In

addition, the Court directed the Trustee to file the transcripts of the hearings in the district court

and bankruptcy court with respect to the Preliminary Forfeiture Order, the Coordination

Agreement (as defined below), and the settlement between the government, the Trustee and GSO

Capital Partners LP and its affiliates (collectively, "GSO").  (*Id.*); *see Dreier*, 429 B.R. at 138

(denying motion to approve settlement without prejudice); *In re Dreier LLP*, ECF Doc. # 610,

No. 08-15051 (order approving settlement as revised), *aff'd*, No. 10 Civ. 4758 (DAB), 2010 WL

3835179, at *5 (S.D.N.Y. Sept. 10, 2010).  The U.S. Attorney submitted a statement in response

to the Court's request, setting out the U.S. Attorney's position that the Preliminary Forfeiture

Order did not forfeit the funds transferred to these defendants before the forfeiture order was

entered (the "Government Letter").[12]  (ECF Doc. # 42.)

### C.      Allegations Against Patriot

The Trustee filed an initial complaint against Patriot on August 24, 2010 and Defendants

filed an initial motion to dismiss on November 5, 2010.  (ECF Doc. #s 7–8.)  Thereafter, on

November 24, 2010, the Trustee filed the active Complaint, to which the Defendants filed a

motion to dismiss for failure to state a claim and a supporting declaration on January 11, 2010.

(ECF Doc. #s 13–15.)  On February 1, 2011, the Trustee filed the Trustee's Memorandum of

Law in Opposition to Defendants Motion to Dismiss the Amended Complaint (the "Trustee

Mem.").  (ECF Doc. # 23.)  And on February 18, 2011, the Defendants filed the Reply

Memorandum in Support of Defendants' Motion to Dismiss the Amended Complaint (the "Reply

Mem.").  (ECF Doc. # 31.)

### 1.      First Amended Complaint

The Trustee seeks to avoid and recover from Defendants prepetition transfers totaling

$16,650,000 representing the repayment of principal and the payment of interest received from

---

[12]      The Official Committee of Unsecured Creditors (the "Committee") filed a motion to intervene in these adversary proceedings seeking authorization to submit a statement of position on the issues raised by the defendants. (ECF Doc. # 29.)  After the Court granted the Committee permission to file a brief, the Committee submitted a short statement essentially adopting the arguments made by the U.S. Attorney in the Government Letter.  (ECF Doc. # 43.)

Dreier LLP within two years of the petition date under both the Code and the NYDCL.  (Compl.

¶ 1.)  The Complaint asserts the following claims against the Defendants[13]:

| Count No. | Allegation |
|---|---|
| I | Actual Fraudulent Conveyance – 11 U.S.C. §§ 548(a)(1)(A) and 550 |
| II | Constructive Fraudulent Conveyance – 11 U.S.C. §§ 548(a)(1)(B) and 550 |
| III | New York Law Fraudulent Conveyance – 11 U.S.C. §§ 544 and 550 and NYDCL §§ 276, 276-a, 278 and 279 |
| IV | New York Law Fraudulent Conveyance – 11 U.S.C. §§ 544 and 550 and NYDCL §§ 273, 278 and 279 |
| V | New York Law Fraudulent Conveyance – 11 U.S.C. §§ 544 and 550 and NYDCL §§ 274, 278 and 279 |
| VI | New York Law Fraudulent Conveyance – 11 U.S.C. §§ 544 and 550 and NYDCL §§ 275, 278 and 279 |
| VII | Equitable Subordination – 11 U.S.C. § 510(c) |

## 2.     Patriot's Involvement in the Note Fraud

Jonathan Kane ("Kane"), president of Patriot Group and an officer of Washington Special

Opportunity Fund LLC and Washington Special Opportunity Fund, Inc., was introduced to the

Note program by Adrian Kingshott ("Kingshott"), who arranged for Kane and others to meet

with Marc Dreier and another Patriot employee on June 18, 2007 in exchange for a fee

constituting a percentage of the purported principal on each Note.  (Compl. ¶ 24–25, 28.)[14]

Patriot agreed to participate in the purported Solow Note program and purchase Notes.

Thereafter, on June 25, 2007, Dreier and Patriot executed a non-disclosure agreement that

contained a provision prohibiting any Patriot employee from contacting "any officer, director,

---

[13]     The Complaint lumps the Patriot defendants together, without alleging the specific roles of each one. Defendants did not move to dismiss the group pleading so the Court will not address the matter further here.  Also, unlike in the *Amaranth* and *Novator* adversary proceedings, the Defendants did not argue that some of the Patriot entities are not liable as subsequent transferees and/or entities for whose benefit the transfers were made.  *See* 11 U.S.C. §§ 550(a)(1), (2).  Accordingly, the Court need not resolve the issue whether the Trustee may avoid and recover the transfers from certain of the Defendant-entities and will treat the Defendants as a single entity.

[14]     Kingshott previously worked for Amaranth Advisors LLC, another hedge fund implicated in Dreier's fraud that has drawn the ire of the Trustee.  (*Id.* ¶ 24.)

employee or agent of [Solow] regarding the Transaction, or [Solow's] business as it relates to the Transaction, except with the express written permission of [Dreier]."  (*Id.* ¶ 29.)  The non-disclosure agreement also required Patriot to communicate with Dreier himself, rather than with Solow, regarding the transaction or requests for information.  (*Id.*)

Prior to the closing of the transaction, Kane asked Dreier to provide him with the contact information for Steven Cherniak ("Cherniak"), Solow's actual CEO, to ask him questions about Solow's performance and "whether and how the recent turmoil in the credit markets could affect [Solow]."  (*Id.* ¶ 33–34.)  Dreier replied by email, providing Kane with a "dummy" email address that directed emails to Dreier himself rather than to Cherniak.  (*Id.*)  Kane emailed who he believed was Cherniak at the fake email address regarding the financial performance of Solow, but heard back from Dreier himself, purporting to be Cherniak.  (*Id.* ¶ 36.)  The email that Kane received from Dreier stated that "Cherniak" hoped the emails had been helpful and that Cherniak "[a]ppreciate[d] [his] interest in this program."  (*Id.*)  The following day, Kane took affirmative steps to reach Cherniak at his real email address and eventually spoke to Cherniak on the telephone.  (*Id.* ¶ 38.)  Cherniak was apparently confused about the transaction as confirmed by a later email from Cherniak's real email account to Kane that read: "I apologize for appearing confused when we spoke.  I was not aware of the details.  I've since spoken with Marc Dreier and he said everything is fine.  If you need anything further, please call Marc."  (*Id.*)  According to the Trustee, "Cherniak's 'confusion' should have alerted Kane that the transaction Patriot was about 'to enter into was not legitimate.'"  (*Id.*)  In addition, different signature blocks on the emails should have been a "red flag" for Kane.  (*Id.* ¶ 39.)

Nevertheless, on August 14, 2007, Patriot agreed to purchase $15 million of Notes with a one-year maturity and an interest rate of 11%.  (*Id.* ¶ 42.)  On the same date, Patriot wired $15

million to the 5966 Account.  (*Id.*)  On the closing date, Patriot's attorney, Stephen Geissler,

emailed Catherine Borrico, Dreier's secretary: "Just curious, why [is Patriot] wiring to your

account vs [Solow's] account?"  (*Id.* ¶ 41.)  Dreier never responded to Geissler's email.  (*Id.*)

After closing, Patriot's attorney emailed Kane congratulating him for being a lender "to a

something or other, weighing in at an 11.0% interest rate."  (*Id.* ¶ 43.)  Kane responded: "Just

hope I don't see Marc Dreier on a flight to Columbia any time soon."  (*Id.*)  According to the

Trustee, these emails "demonstrate that the Patriot Group had deep suspicions about the

legitimacy of the transaction" and "[a]t the least, the Patriot Group was on inquiry notice that the

transaction was illegitimate."  (*Id.* ¶ 44.)

The transfers from the 5966 Account[15] to Patriot occurred as follows: on November 14,

2007, Patriot received an interest payment of $412,500 from the 5966 Account.  (*Id.* ¶ 47.)  On

February 14, 2008, Patriot received a second interest payment of $412,500 from the 5966

Account.  (*Id.* ¶ 48.)  On May 14, 2008, Patriot received a third interest payment of $412,500

from the 5966 Account.  (*Id.* ¶ 49.)  On August 14, 2008, Patriot received a fourth interest

payment of $412,500 from the 5966 Account, along with the repayment of $15 million in

principal.  (*Id.* ¶ 51.)  In total, the Trustee seeks disgorgement of $16,650,000 transferred from

the 5966 Account to Patriot Group during the course of Dreier's fraudulent scheme.  Patriot was

a "net winner" because it received repayment of principal plus a profit in the form of interest.

## II.     DISCUSSION

### A.     Standard on a Motion to Dismiss

To survive a motion to dismiss pursuant to Rule 12(b)(6), "a complaint must contain

sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"

---

[15]          The parties do not dispute that all transfers came from the Dreier LLP 5966 Account.

*Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (quoting *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009)).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S.Ct. at 1949 (citations and internal quotation marks omitted). Plausibility "is not akin to a probability requirement," rather plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citation omitted).  Furthermore, a complaint that does not "plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior" that does not "suggest an unlawful agreement" must be dismissed. *Id.* at 1950 (citation omitted).

Following the Supreme Court's decision in *Iqbal*, courts use a two-prong approach when considering a motion to dismiss. *See, e.g.*, *McHale v. Citibank, N.A. (In re The 1031 Tax Group)*, 420 B.R. 178, 189–90 (Bankr. S.D.N.Y. 2009); *Weston v. Optima Commc'ns Sys., Inc.*, No. 09 Civ. 3732(DC), 2009 WL 3200653, at *2 (S.D.N.Y. Oct. 7, 2009) (Chin, J.) (acknowledging a "two-pronged" approach to deciding motions to dismiss); *S. Ill. Laborers' and Employers Health and Welfare Fund v. Pfizer, Inc.*, No. 08 CV 5175(KMW), 2009 WL 3151807, at *3 (S.D.N.Y. Sept. 30, 2009) (Wood, J.) (same); *Inst. for Dev. of Earth Awareness v. People for the Ethical Treatment of Animals*, No. 08 Civ. 6195(PKC), 2009 WL 2850230, at *3 (S.D.N.Y. Aug. 28, 2009) (Castel, J.) (same).  First, the court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in the factual garb. *Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true") (citing *Iqbal*, 129 S.Ct. at 1949–50); *Rescuecom Corp. v. Google Inc.*, 562 F.3d 123, 127 (2d Cir. 2009) (stating that the court must "accept as true all of the factual allegations set out in the

16

plaintiff's complaint, draw inferences from those allegations in the light most favorable to the plaintiff, and construe the complaint liberally") (quoting *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)); *Boykin v. Keycorp*, 521 F.3d 202, 204 (2d Cir. 2008) ("In reviewing a motion to dismiss, we accept the allegations in the complaint as true.") (citation omitted); *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) ("Although we construe the pleadings liberally, bald assertions and conclusions of law will not suffice.") (internal quotation marks omitted).  Second, the court must determine if these well-pleaded factual allegations state a "plausible claim for relief."  *Iqbal*, 129 S.Ct. at 1951 (citation omitted).

Courts do not make plausibility determinations in a vacuum; it is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 1950 (citation omitted).  A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 1949 (citation omitted).  Meeting the plausibility standard requires a complaint to plead facts that show "more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (citation omitted).  A complaint that only pleads facts that are "merely consistent with a defendant's liability" does not meet the plausibility requirement.  *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (internal quotation marks omitted)).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do."  *Id.* (quoting *Twombly*, 550 U.S. at 555 (internal quotation marks omitted)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* (citation omitted).  "The pleadings must create the possibility of a right to relief that is more than speculative."  *Spool*, 520 F.3d at 183 (citation omitted).

17

Courts deciding motions to dismiss must draw all reasonable inferences in favor of the nonmoving party and must limit their review to facts and allegations contained in (1) the complaint, (2) documents either incorporated into the complaint by reference or attached as exhibits, and (3) matters of which the court may take judicial notice. *Blue Tree Hotels Inv. (Canada), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004) (citation omitted); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002); *DDR Const. Servs., Inc. v. Siemens Indus., Inc.*, No. 09 CIV. 09605 RJH, 2011 WL 982049, at *1 (S.D.N.Y. Mar. 22, 2011).  Courts also consider documents not attached to the complaint or incorporated by reference, but "upon which the complaint *solely* relies and which *[are] integral to the complaint*."  *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) (internal quotation marks omitted) (quoting *Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991)); *see also Kalin v. Xanboo, Inc.*, No. 04 Civ. 5931(RJS), 2009 WL 928279, at *8 (S.D.N.Y. Mar. 30, 2009) (Sullivan, J.); *Grubin v. Rattet (In re Food Mgmt. Grp.)*, 380 B.R. 677, 690 (Bankr. S.D.N.Y. 2008) ("A court may even consider a document that has not been incorporated by reference where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (internal quotation marks omitted) (quoting *Buena Vista Home Entm't, Inc. v. Wachovia Bank, N.A. (In re Musicland Holding Corp.)*, 374 B.R. 113, 119 (Bankr. S.D.N.Y. 2007), *aff'd*, 386 B.R. 428 (S.D.N.Y. 2008), *aff'd*, 318 Fed. App'x. 36 (2d Cir. 2009)).

When fraud is pleaded, Rule 9(b) requires the plaintiff to plead fraud with particularity. *See Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 251 (2d Cir. 1987).  Pursuant to Rule 9(b) "in alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's

mind may be alleged generally." FED R. CIV. P. 9(b).  The Second Circuit has stated that the

complaint must: "(1) detail the statements (or omissions) that the plaintiff contends were

fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were

made, and (4) explain why the statements (or omissions) were fraudulent." *Harsco Corp. v.

Segui*, 91 F.3d 337, 347 (2d Cir. 1996) (citations omitted).  Although the second part of Rule

9(b) permits scienter to be pleaded generally, the pleader must "allege facts that give rise to a

strong inference of fraudulent intent." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d

Cir. 1994) (citation omitted); *see also The Responsible Pers. of Musicland Holding Corp. v. Best

Buy Co., Inc. (In re Musicland Holding Corp.)*, 398 B.R. 761, 773 (Bankr. S.D.N.Y. 2008).

Plaintiffs may not allege "fraud by hindsight." *See Shields*, 25 F.3d at 1129 (quoting *Denny v.

Barber*, 576 F.2d 465, 470 (2d Cir. 1978) (Friendly, J.)).  A strong inference of fraudulent intent

"may be established either (a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial

evidence of conscious misbehavior or recklessness." *Id.* at 1128; *accord ATSI Commc'ns, Inc. v.

The Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).  The purpose of Rule 9(b) is to further

three goals: "(1) providing a defendant fair notice of plaintiff's claim, to enable preparation of

defense; (2) protecting a defendant from harm to his reputation or goodwill; and (3) reducing the

number of strike suits." *DiVittorio v. Equidyne Extractive Indus. Inc.*, 822 F.2d 1242, 1247 (2d

Cir. 1987) (citation omitted).

For claims brought by a bankruptcy trustee, "courts take a more liberal view when

examining allegations of actual fraud . . . in the context of a fraudulent conveyance, since a

trustee is an outsider to the transaction who must plead fraud from second-hand knowledge."

*Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395 (Bankr.

S.D.N.Y. 2007) (internal quotation marks omitted) (quoting *Picard v. Taylor (In re Park S. Secs., LLC)*, 326 B.R. 505, 517–18 (S.D.N.Y. 2005)); *Secs. Investor Prot. Corp. v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999) (citation omitted). Accordingly, courts have recognized that "allegations of circumstantial evidence are sufficient to establish fraudulent intent," *Pereira v. Grecogas Ltd. (In re Saba Enters., Inc.)*, 421 B.R. 626, 643 (Bankr. S.D.N.Y. 2009), because "the trustee's lack of personal knowledge is compounded with complicated issues and transactions which extend over lengthy periods of time." *Stratton Oakmont*, 234 B.R. at 310 (citation omitted). However, "relaxing the particularity requirement in bankruptcy cases should not be construed to eliminate that requirement altogether." *Id.* at 311 (citation omitted).

Rule 9(b) imposes additional limitations. First, a pleader cannot allege fraud based upon information and belief unless the facts are "peculiarly within the opposing party's knowledge." *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974), *cert. denied*, 421 U.S. 976 (1975), *overruled on other grounds by Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1100 n.9 (1991); *accord Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 655, 664 (2d Cir. 1997) (citation omitted). In those cases, the pleader must nonetheless allege facts upon which the belief is founded. *Campaniello Imps.*, 117 F.3d at 664. In addition, "group pleading is generally forbidden because each defendant is entitled to know what he is accused of doing." *O'Connell v. Arthur Andersen LLP (In re AlphaStar Ins. Grp. Ltd.)*, 383 B.R. 231, 257–58 (Bankr. S.D.N.Y. 2008) (citation omitted); *see also DiVittorio*, 822 F.2d at 1247 ("Where multiple defendants are asked to respond to allegations of fraud, the complaint should inform each defendant of the nature of his alleged participation in the fraud.").

### B.     The Preliminary Forfeiture Order Does Not Bar the Trustee From Asserting Her Avoidance Actions

A threshold issue that the Court must determine is whether the funds transferred from the 5966 Account were forfeited to the United States Government (the "Government"), thereby divesting the Dreier LLP estate of any interest in the funds such that avoidance and recovery of the transfers by the Trustee is not possible. *See, e.g.*, 11 U.S.C. § 548(a) (trustee may only recover "transfer . . . of an interest of the debtor in property"). As explained below, the Court concludes that while the transferred funds may have been forfeit*able*, they were not forfeit*ed* to the Government by virtue of entry of the Preliminary Forfeiture Order. Therefore, the Trustee may claim an interest in the property sufficient to maintain the avoidance actions brought against the Defendants.

### 1.   Background and Parties' Contentions

The focus of the parties' contentions is the language of the Preliminary Forfeiture Order entered against Dreier in the criminal case before Judge Rakoff in the United States District Court for the Southern District of New York (the "District Court"). Based on the terms of the Preliminary Forfeiture Order, the defendants assert that the Trustee has no right to, or interest in, funds that passed through the 5966 Account that were traceable to Dreier's crimes. Specifically, the defendants rely on the language that required Dreier to forfeit funds "traceable" to the commission of the fraud offenses. *See* Preliminary Forfeiture Order ¶ 2. In response, the Trustee, with the support of the Government, argues that the Preliminary Forfeiture Order was written in the present tense and only applied to those funds that were in the 5966 Account at the time the Preliminary Forfeiture Order was entered.[16] It follows that Dreier forfeited all interest

---

[16]     As noted above, the Court requested that the Government file a statement of position regarding whether it believed that the Preliminary Forfeiture Order divested the Dreier LLP estate of any rights to the funds transferred out of the 5966 Account. The Government stated that "the Trustee's reading of the language of the Forfeiture Order

Dreier LLP had in funds *then held* in the 5966 Account; those funds transferred out of the 5966

Account before the Preliminary Forfeiture Order was entered were not forfeited to the

Government.

On July 13, 2009, Judge Rakoff, entered the Preliminary Forfeiture Order ordering Dreier

to forfeit "the Specific Properties [defined below] to the United States for disposition in

accordance with the law . . . ."  Preliminary Forfeiture Order ¶ 2.  Dreier was ordered to forfeit:

> any and all property, real and personal that constitutes or is derived
> from proceeds traceable to the commission of the fraud offenses
> alleged in Counts One through Seven, and any and all property,
> real and personal, involved in the money laundering offense
> alleged in Count Eight, and all property traceable to such property.

*Id.*  Schedule A to the Preliminary Forfeiture Order indicates which properties were forfeited to

the Government (the "Specific Properties").  One property listed on Schedule A—and the one at

issue here—is "[a]ny and all funds in [the 5966 Account] held at JP Morgan Chase in the name

of Dreier LLP."  *Id.* Schedule A, Item 13.[17]

## 2.    Criminal Forfeiture Process and Relation-Back Doctrine

The parties do not contest the specific process by which the Government seizes assets

pursuant to applicable forfeiture laws and procedures.  The criminal forfeiture process is a two-

step procedure governed by 21 U.S.C. § 853 and Federal Rule of Criminal Procedure 32.2.

Assuming proper notice is given to a criminal defendant that the Government will seek

forfeiture, upon a guilty plea or verdict, the court must determine what property is subject to

forfeiture and enter a preliminary forfeiture order.  FED. R. CRIM. P. 32.2(b)(1), (2).  The

---

is the correct one.  The order—which forfeits '[a]ny and all funds in Account No. 36502055966 held at JP Morgan Chase in name of Dreier LLP'—applies to the then-current funds in the 5966 Account, and does not purport to forfeit all funds that ever flowed through that account."  Government Letter n.6.

[17]    Subsequently, on August 31, 2010, the District Court entered the *Final Order of Forfeiture As to Specific Properties, see* ECF Doc. # 156 in *United States v. Dreier,* No. 09–cr–85 (JSR) (S.D.N.Y. Aug. 31, 2010) (the "Final Order"), that did not alter the language of this paragraph.  *Id.* at Schedule A, Item 13.

preliminary forfeiture order is entered by the court irrespective of any third-party's interest in the forfeited property.  *Id.* at 32.2(b)(2)(A).

A court may enter a general order of forfeiture in the event that it "cannot identify all the specific property subject to forfeiture."  FED. R. CRIM. P. 32.2(b)(2)(C).  A general order typically "lists identified property to be forfeited, describes other property in general terms, and states that the order will be amended when property is identified."  3 Charles Alan Wright & Sarah N. Welling, FED. PRACTICE AND PROCEDURE § 573 (4th ed. 2011).

A court may determine that property is forfeitable regardless of whether it is held by the defendant or a third party.  *United States v. Ida*, 14 F. Supp. 2d 454, 460–61 (S.D.N.Y. 1998).  However, preliminary forfeiture only divests the criminal defendant of his own interest in the forfeited property and is not final as to the interest of third parties.  FED. R. CRIM. P. 32.2(b)(4)(A) ("At sentencing—or at any time before sentencing if the defendant consents—the preliminary forfeiture order becomes final as to the defendant.  If the order directs the defendant to forfeit specific property, it remains preliminary as to third parties until the ancillary proceeding is concluded under Rule 32.2(c).").

A third party can petition the court for a hearing, called an ancillary proceeding, to adjudicate its interest in the forfeited property.  *See* 21 U.S.C. § 853(n)(2).  A third party has thirty days from the final publication of notice of the forfeiture to petition the court for an ancillary proceeding.  *Id.*  A third party can assert a valid interest in forfeited property in two ways: first, the party can show that it has a superior right, title or interest to the defendant at the time of the criminal act(s), or second, the third party can show that it is a bona fide purchaser for value.  21 U.S.C. §§ 853(n)(6)(A), (B); *see also Pacheco v. Serendensky*, 393 F.3d 348, 353 (2d Cir. 2004).  Petitioning the court for an ancillary proceeding is the exclusive means for a third

party to claim an interest in forfeited property.  *See, e.g.*, *DSI Assocs. LLC v. United States*, 496

F.3d 175, 183 (2d Cir. 2007); *see also* 21 U.S.C. § 853(k) (barring third-parties from intervening

in a criminal case).

When all ancillary proceedings have concluded, the court must then enter a final

forfeiture order "as necessary to account for any third-party rights."  FED. R. CRIM. P. 32.2(c)(2).

If no party files a timely petition or if all claims are denied following a hearing, the preliminary

order becomes a final order of forfeiture if the court makes a finding that the defendant has an

interest in the property that is forfeitable.  *Id.*  When the court enters a final forfeiture order, all

third party rights are extinguished.  *See United States v. Marion*, 562 F.3d 1330, 1339 (11th Cir.

2009) ("The failure to file a petition within this thirty-day time period extinguishes a third

party's interests.") (citation omitted); *see also* 21 U.S.C. § 853(n)(7); FED. R. CRIM. P. 32.2(c)(2).

However, the Government may move to amend the forfeiture order to include either

subsequently located forfeitable property or substitute property.  FED. R. CRIM. P. 32.2(e)(1).

Pursuant to the "relation-back" doctrine, "[a]ll right, title, and interest in [property subject

to criminal forfeiture] vests in the United States upon the commission of the act giving rise to

forfeiture under this section."  21 U.S.C. § 853(c).  Under the "relation-back" doctrine, the

Government's interest in forfeitable property vests as of the moment when the criminal conduct

occurred.  *See United States v. Parcel of Land, Bldgs., Appurtenances and Improvements, known*

*as 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111, 125 (1993) ("Under the relation back

doctrine, a decree of forfeiture had the effect of vesting title to the offending res in the

Government as of the date of its offending conduct."); *United States v. Timley*, 507 F.3d 1125,

1130 (8th Cir. 2007) ("[T]he proceeds of an offense do not exist before the offense is committed,

and when they come into existence, the government's interest under the relation-back doctrine

24

immediately vests.") (citation omitted); *United States v. Nava*, 404 F.3d 1119, 1124 (9th Cir.

2005) ("The title to the forfeited property vests in the United States at the time the defendant

commits the unlawful acts, . . . although it attaches only upon the defendant's conviction.")

(citations omitted).

The relation-back doctrine can divest a bankruptcy estate of its property even though the

estate was created *before* the forfeiture order was entered.  In *United States v. Zaccagnino III*,

No. 03-10095, 2006 WL 1005042 (C.D. Ill. Apr. 18, 2006), the court found that since the date of

the crime occurred prior to the creation of the bankruptcy estate, the defendant's property that

was obtained as a result of the illegality belonged to the Government.  *Id.* at *4.  Therefore, to

the extent that title to any forfeited asset vested in the Government prepetition by virtue of the

relation-back doctrine, that forfeited property was not property of the estate.  *Id.*

However, the relation-back doctrine does not necessarily forfeit a defendant's property

interest merely because such property is *subject* to forfeiture.  *See 92 Buena Vista Avenue*, 507

U.S. at 127 ("[I]t is clear that the fictional and retroactive vesting of title thereunder is not self-

executing, but occurs only when the Government wins a judgment of forfeiture."); *see also*

*Giuffre v. Bissell*, 31 F.3d 1241, 1258 (3d Cir. 1994) ("However, the common law 'relation back'

doctrine, which is a fictional and retroactive vesting of title, is not self-executing; rather, it takes

effect only upon the entry of a judicial order of forfeiture or condemnation.") (citation omitted).

"The preliminary order determines that the *specific property covered by the order* constitutes a

forfeitable asset and extinguishes the criminal defendant's interest in the property."  *Uecker &*

*Assocs., Inc. v. L.G. Hunt & Assocs. Inc. (In re Am. Basketball League, Inc.)*, 317 B.R. 121, 126

(Bankr. N.D. Cal. 2004) (emphasis added).

In this case, it is clear that title to Dreier's *forfeited* assets vested in the Government prior to the creation of the bankruptcy estate through operation of the relation-back doctrine. The defendants do not dispute this proposition. Nor do they contend that the relation-back doctrine applies to all property conceivably subject to forfeiture. Rather, the defendants assert that Dreier LLP's "interest in [the transferred funds at issue in these adversary proceedings] was in fact forfeited under the *express terms* of the Preliminary Forfeiture Order." (Defs' Joint Resp. to the Submission of the United States Attorney For the Southern District of New York (ECF Doc. # 44) at 3 (emphasis added)).

### 3.  The Preliminary Forfeiture Order Did Not Divest the Estate of Its Interest in the Funds Transferred to the Defendants

#### a.  Language of the Preliminary Forfeiture Order

Based on the language of the Preliminary Forfeiture Order, the Court concludes that only the funds in the 5966 Account at the time the Preliminary Forfeiture Order was entered were forfeited to the Government. Looking to the clear language of the Preliminary Forfeiture Order, only those funds in the 5966 Account at the time the Preliminary Forfeiture Order was entered were among the "Specific Properties" listed, and thus forfeited to the Government. Preliminary Forfeiture Order ¶ 2; *Id.*, Schedule A, Item 13. Funds transferred from the 5966 Account before the Preliminary Forfeiture Order was entered may have been forfeit*able* as part of "any and all property, real and personal that constitutes or is derived from proceeds traceable to the commission of the fraud offenses," *id.* ¶ 2, but they were not actually forfeited at the time the Preliminary Forfeiture Order was entered because proceeds traceable were not included among the "Specific Properties" forfeited. Therefore, the express terms of the Preliminary Forfeiture Order did not divest the Trustee from seeking avoidance and recovery of the funds that were once in the 5966 Account.

26

While the phrase in the Preliminary Forfeiture Order "proceeds traceable to the commission of the fraud offenses" standing alone may suggest that the funds paid out of the 5966 Account were already forfeited, the language merely tracks the wording of 21 U.S.C. § 853(a), listing property that is subject to forfeiture—*i.e.*, forfeitable property.  Inclusion of the statutory language gives the Government the legal authority to subsequently amend the Preliminary Forfeiture Order to include additional property as part of the property forfeited to the Government.  *See* 11 U.S.C. § 853(a); FED. R. CRIM P. 32.2(e).

Schedule A to the Preliminary Forfeiture Order is written in the *present tense* to include "[a]ny and all funds in" the 5966 Account.  Preliminary Forfeiture Order, Schedule A, Item 13. The Government did *not* amend the Preliminary Forfeiture Order to include funds that passed through the 5966 Account and were traceable to Dreier's Ponzi scheme.  The "Specific Properties" listed in Schedule A did not, by their terms, include funds paid out before the Preliminary Forfeiture Order was entered.  The "traceable to" language appears only in a general clause.

The Preliminary Forfeiture Order also states that "the Government is now entitled, pending any assertion of third-party claims, *to reduce the Specific Properties to its possession and to notify any and all potential purchasers and transferees thereof of its interest therein.*"  *Id.* at 3 (emphasis added).  This clause is significant as it expressly authorized the Government to take possession of "[a]ny and all funds in" the 5966 Account—not "any and all funds *that are traceable*" to the 5966 Account.[18]

---

[18]    If the Government intended to cause the immediate forfeiture of funds traceable to the 5966 Account, it could have attempted to do so in the Preliminary Forfeiture Order.  *See* ECF Doc. # 12 in *United States v. Marino*, No. 05-cr-01036 (CM) (S.D.N.Y. Oct. 20, 2005) (defendant convicted in the Bayou Group Ponzi scheme case was ordered to forfeit "all right, title and interest . . . in the Specific Property, *and all property traceable thereto*") (emphasis added)).  The Court does not need to decide here whether it would be permissible to include either subsequently located forfeitable property or substitute property without moving to amend a preliminary order.  FED. R. CRIM. P. 32.2(e)(1).

**b.  Surrounding Facts and Circumstances Support this Conclusion**

The Court's interpretation of the Preliminary Forfeiture Order is bolstered by the facts and circumstances surrounding this case.  Notably, the defendants faced the possibility of losing tens of millions of dollars due to the Government forfeiture.  They never petitioned the court for an ancillary proceeding claiming superior rights in the payments they received from the 5966 Account despite adopting the view in these cases that all traceable proceeds from the 5966 Account were actually forfeited to the Government.  It is reasonable to assume that if the defendants believed the Government was going to seize their funds—ones which merely flowed through the 5966 Account—they would have petitioned the District Court prior to entry of the Final Order on August 31, 2010 since the Final Order extinguishes all third party rights.  *See* FED. R. CRIM. P. 32.2(c)(2).  The defendants trotted out their forfeiture theory only when it became clear that the payments were not forfeited.

The events that unfolded between the Government and GSO also bear on the issue of what property was forfeited to the Government.  GSO was an investment manager for certain purchasers of Dreier's bogus Notes.  During the course of Dreier's fraudulent scheme, GSO transferred $165 million to Dreier LLP and received full repayment of its principal plus close to $31 million in interest and fees.  *Dreier*, 429 B.R. at 119.  The payments to GSO included $62.6 million from the 5966 Account within ninety (90) days before Dreier LLP's bankruptcy filing.  *Id.*  On the motion of the Government, the District Court entered a restraining order freezing over $35 million in transferred funds that GSO placed in affiliate subaccounts.  *Id.* at 120.  Although the Preliminary Forfeiture Order did not expressly include these GSO frozen funds, the Government was going to amend the Preliminary Forfeiture Order to specifically add these funds to "Specific Properties" forfeited by the Preliminary Forfeiture Order.  *Id.*  Before the

Preliminary Forfeiture Order was amended, however, the parties entered into a consent order of

forfeiture, whereby GSO agreed to disgorge all the interest and fees it received during the Ponzi

scheme in exchange for the Government's promise to not pursue additional forfeiture actions

against GSO.  *Id.*  The GSO settlement evidences the Government's belief that the Preliminary

Forfeiture Order, as written, did not encompass the funds GSO received from transfers traceable

to the 5966 Account.  Absent the settlement with GSO the Government intended to amend the

Preliminary Forfeiture Order to reach funds transferred from the 5966 Account.[19]  Therefore, the

Government's position in the GSO matter is entirely consistent with the position the Government

has taken here and which the Court adopts—that under the plain language of the Preliminary

Forfeiture Order the funds traceable to the 5966 Account may have been forfeitable, but those

funds were not actually forfeited without amending the Preliminary Forfeiture Order or

commencing a third party ancillary proceeding seeking forfeiture of those funds.

The Trustee and the Government also negotiated a Coordination Agreement dated

December 18, 2009, whereby the Government and the Trustee agreed to divide up Dreier LLP's

assets between the forfeiture and bankruptcy proceedings.  (Decl. of Steven M. Schwartz in

Support of Defs. Amaranth Advisors L.L.C. and Amaranth Partners LLC's Mot. to Dismiss the

First Am. Compl. (ECF Doc. # 9), Ex. F ¶¶ 1–8 (the "Coordination Agreement")); Government

Letter at 9, 13.  The thrust of the Coordination Agreement was to avoid the possibility that the

Government would seek forfeiture of funds obtained by the Trustee through her avoidance

actions.  The Coordination Agreement demonstrates that the Government's interest in Dreier

---

[19]      Certain of the *Amaranth* defendants argue that Judge Bernstein correctly recognized the scope of the
Preliminary Forfeiture Order when he stated that "it also included all property traceable to the 5966 Account."
(Reply Mem. of Law in Further Support of Defs. Amaranth Partners LLC and Amaranth Advisors LLC's Mot. to
Dismiss the First Am. Compl., Adv. Pro. No. 10-03493 (MG) (ECF Doc. # 27) at 4 (citing *Dreier*, 429 B.R. at
118)).  However, Judge Bernstein explicitly stated that because the court was considering a motion to approve a
settlement, he did not decide underlying questions of law or fact.  *Dreier*, 429 B.R. at 124.

LLP's assets was not intended to be exhaustive.  The Government "agreed to forebear from

forfeiting the proceeds of *these* and certain other avoidance actions" so that the Trustee could

effectuate a distribution of avoidance action proceeds to creditors.  Government Letter at 13

(emphasis added).

The terms of the Coordination Agreement further demonstrate that the Preliminary

Forfeiture Order did not extend to funds paid out of the 5966 Account before the Preliminary

Forfeiture Order was entered.  The Coordination Agreement states that the Government "shall

not seek to forfeit or assert a right with respect to the proceeds of any actions seeking to avoid

fraudulent transfers or preferences brought by the Chapter 11 Trustee against the persons and

entities identified in the attached Schedule 2."  Coordination Agreement ¶ 4.  The names of the

defendants are listed in Schedule 2.  *Id.*, Schedule 2.  If the Court were to adopt the reading of

the Preliminary Forfeiture Order espoused by the defendants, the language in the Coordination

Agreement would be rendered meaningless because the proceeds would have already been

forfeited to the Government.  In addition, there would be no avoidable transfers of "property of

the debtor."

The language of the Final Order is also noteworthy.  Unlike the Preliminary Forfeiture

Order, the Final Order does not contain the language "traceable to the commission of the fraud

offenses" that was included in the Preliminary Forfeiture Order.  The Final Order simply states

that the Government "shall and is hereby deemed to have clear title to the Forfeited Properties,

and the same are hereby forfeited to the United States for disposition according to law."  Final

Order at 3.  "Forfeited Properties" includes "[a]ny and all funds in [the 5966 Account] held at JP

Morgan Chase in the name of Dreier LLP"—the same language as used in the Preliminary Order.

*Id.* at 3, Schedule I, Item 13.  The Final Order divested Dreier and third parties of their interest in

funds *then held* in the 5966 Account—not proceeds traceable to the 5966 Account.  It is

reasonable to assume that the Government intended the Preliminary Forfeiture Order and the

Final Order to be consistent with each other.

      For all of these reasons, the Court finds that the language of the Preliminary Forfeiture

Order does not divest the Dreier LLP estate of any rights in the funds transferred out of the 5966

Account and bar the Trustee from pursuing her avoidance actions.

      **C.**      **Were the Transferred Funds "Property of the Debtor"?**

      As with the discussion above regarding the Preliminary Forfeiture Order, the issue

whether the defendants deposited and received trust funds is potentially outcome determinative

for the defendants' motions to dismiss.  Because a trustee has standing only to avoid "any

transfer . . . of an interest of the debtor in property," if transferred funds were not "property of

the debtor," the Trustee may not seek avoidance and recovery of the transfers from the 5966

Account to the defendants during the course of the fraud.  *See, e.g.*, 11 U.S.C. § 548(a)(1).

Consequently, whether the challenged transfers can be avoided by the Trustee depends upon

whether the funds used to repay the defendants were property of the Debtor at the time they were

paid, or whether the funds were trust funds in which Dreier LLP had no equitable interest.

      The Bankruptcy Code provides that "property of the estate" includes "all legal or

equitable interests of the debtor in property as of the commencement of the case."  11 U.S.C. §

541(a)(1).  A debtor's estate includes "that property that would have been part of the estate had it

not been transferred before the commencement of the bankruptcy proceedings."  *Begier v. IRS*,

496 U.S. 53, 58 (1990).  "Because the debtor does not own an equitable interest in property he

holds in trust for another, that interest is not 'property of the estate.'"  *Id.* at 59.

31

The defendants argue that the repayments they received from the 5966 Account cannot be avoided because the transfers were not "property of the debtor," but rather were "trust funds." (*See* Mem. of Law in Support of Defs' Mot. to Dismiss (ECF Doc. # 10) (the "Xerion Mem.") at 11–21.)[20]  The defendants put forth what amounts to a two-step analysis in support of their argument.  First, defendants contend that the complaints contain facts sufficient to conclude that the defendants deposited "trust funds" into the 5966 Account.  In support of their first contention, the defendants point to four allegations in each of the complaints:

- The attorney trust account was titled "Dreier LLP Escrow Account;" (*see* Compl. ¶ 22.)

- The defendants made all but one payment under the fraudulent notes into this escrow account; (*see Novator* Compl., (ECF Doc. # 1, Adv. Pro. No. 10-04278) ¶ 44, 59.)

- All of the transfers the defendants received were from this escrow account; (*see* Compl. ¶¶ 47–51.)

- The escrow account was used in part as an escrow account and "funds were transferred to return escrow funds to DLLP clients;" (*see id.* ¶ 23.)

Second, defendants rely on case law that holds that "where an express trust has been created, the debtor-trustee should be presumed to have answered the defendant-beneficiary's request for reconveyance of *trust funds* with payment of *trust funds.*"  *Daly v. Deptula (In re Carrozzella & Richardson)*, 255 B.R. 267, 276 (Bankr. D. Conn. 2000).

The Trustee counters that funds in the 5966 Account were property of the Debtor and all funds transferred out of the 5966 Account were property of the Debtor because the trust account was a "trust" in name only.  (Mem. of Law in Opp. to Defendants' Mot. to Dismiss (ECF Doc. # 18, Adv. Pro. No. 10-04277) ("Trustee Opp. to Xerion Mem.") at 6–8.)  Specifically, the complaints allege that the 5966 Account was in substance a "hopelessly commingled" account

---

[20]   As noted above, the *Xerion* defendants, who have since settled the adversary proceeding brought by the Trustee, carried the torch on the trust/property of the debtor argument.  The other defendants adopted these arguments.

holding "deposits from investors in the Note Fraud, legitimate client funds, and DLLP operating funds" in addition to funds from other Dreier LLP accounts that were deposited in and/or transferred to Account 5966.  (*See* Compl. ¶ 23.)  The Trustee argues that the mere fact that the account into which the defendants deposited their funds was labeled a trust account is not enough to establish that the defendants deposited "trust funds" into the account.  (Trustee Opp. to Xerion Mem. at 11–12.)

Because the Trustee has sufficiently pled that the funds transferred to the defendants were "an interest of the debtor in property," 11 U.S.C. § 548(a)(1), the defendants' motions to dismiss on the theory that the money used to repay the defendants was trust money is denied.  Neither the language in the complaints, nor any of the documents that may be considered on the motions to dismiss, establish as a matter of law that the funds deposited by the defendants into the 5966 Account or the money used to repay the defendants from the 5966 Account were "trust funds." Indeed, to succeed on her avoidance claims, the Trustee will have to prove the transfers she seeks to avoid were of property of Dreier LLP.  The outcome of that issue raises disputed issues of fact and law that cannot be resolved at the motion to dismiss stage.

### 1.  Standing

As an initial matter, the Trustee argues that the defendants do not have standing to raise the issue whether the funds transferred to the defendants were trust funds that did not form "property of the debtor."  The Court disagrees.  This case is distinguishable from cases in which defendants seek to assert the rights of third parties in claiming that transferred funds were trust property.  Here, the defendants are asserting their own rights—namely, that they deposited funds

in an express trust and were repaid with trust funds.[21]  Therefore, to the extent they can prove

that they deposited "trust funds" into the 5966 Account from which they were repaid, the

defendants have standing to assert the defense that the property they received was not "an

interest of the debtor in property."  *See, e.g.*, 11 U.S.C. § 548(a)(1).

Several cases cited by the Trustee in support of her contention that the defendants lack

standing to assert a trust defense are factually and procedurally distinguishable.  In *Cassirer v.

Sterling Nat'l Bank & Trust Co. of N.Y. (In re Schick)*, 246 B.R. 41, 43 (Bankr. S.D.N.Y. 2000)

("*Schick II*"), a decision on a motion for partial summary judgment and not on a motion to

dismiss, the chapter 7 trustee of an individual debtor-attorney commenced a preference

avoidance action against a bank whose loan to the debtor was allegedly repaid with funds the

lawyer stole from his law firm's attorney-trust account and deposited with commingled funds in

his personal bank account.  The loan repayment was made from the personal account.  The bank

argued that the trustee lacked standing to bring the avoidance action because the funds stolen by

the debtor were not property of the debtor.[22]  *Id.* at 44.  Judge Bernstein concluded that the

bank's argument was based on "an erroneous legal postulate.  [The debtor] had legal title to the

funds subject, at most, to an equitable duty to reconvey the funds to the victims of his

conversion.  The [defendant], who is not the victim, lacks standing to raise their rights either

offensively, or as a defense in this adversary proceeding."  *Id.* at 43.  The bank was attempting to

impose a constructive trust on the stolen funds and lacked standing to do so.

> Though analogized to a trust, a constructive trust is not a trust at
> all, but an equitable remedy designed to prevent unjust enrichment

---

[21]     But the very nature of a Ponzi scheme case, with earlier investors repaid with funds supplied by later investors, suggests the improbability that any payments received by a transferee came from trust funds deposited by that party.

[22]     Section 547(b) of the Bankruptcy Code, similar to section 548, permits a trustee to "avoid any transfer of an interest of the debtor in property . . . ."  11 U.S.C. § 547(b).

> . . . . As the right is personal, the beneficiary may choose not to
> assert his remedy.  In addition, the beneficiary may be barred from
> asserting a constructive trust claim because the statute of
> limitations has run, or because he has an adequate remedy at law.
> The personal nature of the equitable right prevents someone other
> than the beneficiary from using it offensively or defensively.
> Thus, a stranger cannot sue to impose a constructive trust for the
> benefit of a defrauded party.  These same principles prevent a
> transferee in an avoidance action from maintaining that the
> transferred funds were held by the debtor in constructive trust for
> another.

*Id.* at 45–46 (internal citations omitted).

The holding in *Schick II* is grounded on long-settled principles.  In *Morris Plan Indus. Bank of N.Y. v. Schorn*, 135 F.2d 538, 539 (2d Cir. 1943), a debtor refused to turn over or give an accounting to the trustee of money she had stolen from her employer.  The debtor argued that the stolen assets were not property of the estate and were therefore not recoverable by the trustee.

Judge Clark rejected the debtor's argument:

> Several cases hold directly that a bankrupt cannot refuse to turn
> over to his trustee assets of which he had assumed possession and
> dominion merely upon a showing that title to them is in a third
> person . . . .  Also in line is the well settled rule that property
> converted, embezzled, or otherwise taken by the bankrupt, or
> obtained by him by fraud, can be claimed from the bankrupt estate
> only so long as it can be definitely traced, with *the consequence
> that an attempted repayment by the bankrupt prior to bankruptcy is
> a preference, except when made from the very property taken*.  The
> rules [*sic*] applies even to property which the bankrupt had held in
> trust.  Then, too, the claimant himself may waive his rights to the
> specific property, and does so if he files a claim for its value
> without standing on such rights. . . .
>
> These rules also accord with the more usual conclusion of the
> common law that to the claim of a possessor the assertion of title in
> a third party is not a good defense.

*Id.* at 539–40 (emphasis added) (citations omitted).  Under *Morris Plan*, unless the defendants were repaid "from the very property taken" from them, the payments would potentially be avoidable either as a preference or fraudulent conveyance.

35

Similarly, in *McHale v. Boulder Capital LLC (In re The 1031 Tax Grp., LLC)*, 439 B.R.

47 (Bankr. S.D.N.Y. 2010), analyzing the issue as one of prudential standing, this Court

concluded that the avoidance defendant lacked prudential standing to claim that the funds

received by the defendant were not property of the debtor because they were held in an express,

resulting or constructive trust for the benefit of others. *Id.* at 61–68.  The defendant in *Boulder

Capital* argued that it wasn't attempting to enforce or impose a trust, but that it was merely

attempting to demonstrate the existence of express trusts held by the debtor.  This Court rejected

Boulder's distinction, explaining that "Boulder cannot establish express trusts without pressing

the rights of putative beneficiaries.  Contrary to Boulder's apparent belief, express trusts are not

presumed to exist based on mere allegation.  Boulder would be required to assert the rights of

alleged beneficiaries to these putative trusts, something it clearly lacks prudential standing to

do." *Id.* at 65.

Unlike the defendants in the *Schick II* or the *Boulder Capital* cases, the defendants in

these cases assert that they deposited their funds in an express trust in the 5966 Account.  In this

respect, the defendants are not attempting to assert the rights of third parties.  But Patriot cannot

argue that it was paid with another victim's trust property, which is more likely in the

circumstances of a Ponzi scheme case.  *Morris Plan Indus. Bank*, 135 F.2d at 539.

*Schick II* and *Boulder Capital* both differ from the cases currently before the Court in

another crucial respect.  The motions currently before the Court are Rule 12(b)(6) motions to

dismiss for failure to state a claim; *Schick  II* and *Boulder Capital* were before the courts on

motions for summary judgment.  Here, the Court limits its inquiry to the complaints and any

other documents properly considered on motions to dismiss.[23]  Applying the standards of Rule

8(a), because the complaints adequately allege that the funds transferred to the defendants were

---

[23]       *See* section II.A, *supra.*

"property of the debtor," and no documents properly called to the Court's attention lead to a

different conclusion, the motions to dismiss on this ground are denied.  At trial, of course, the

Trustee will need to prove that the allegations in the complaints are true.

The defendants also argue "courts routinely adjudicate avoidance claims in favor of non-

beneficiary transferees without addressing standing issues where, as here, a transferee received

transfers from a trust account."  (Reply Mem. of Law in Further Support of Defs' Mot. to

Dismiss, Adv. Pro. No. 10-04277 (ECF Doc. # 31) at 14.)  The three cases they cite are

distinguishable.  In all three cases, *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d

838 (6th Cir. 2002)*; Daly v. Kennedy (In re Kennedy)*, 279 B.R. 455 (Bankr. D. Conn. 2002);

and *Heilbronner v. Nicosia (In re Valerino Const. Inc.)*, 250 B.R. 39 (Bankr. W.D.N.Y. 2000),

the bankruptcy courts either determined at trial or the parties stipulated to the fact that the money

used to repay the defendant was "trust money."  The 5966 Account contained commingled funds,

as was conceded by all parties at the Hearing, so it was not strictly speaking a "trust fund."  This

is a crucial distinction, as the *Boulder Capital* court recognized in a footnote:

> In support of its trust arguments Boulder relies heavily on *Daly v.
> Kennedy (In re Kennedy)*, 279 B.R. 455 (Bankr. D. Conn. 2002).
> *Kennedy* is inapposite.  The court in *Kennedy* assumed the
> existence of a trust when making its determination that certain
> transferred funds were not property of the estate.  *See id.* at 458–
> 59.  The Court agrees that funds held in trust by a debtor for the
> benefit of a third party are not funds of the estate.  But as the
> *Kennedy* court presumed the existence of a trust, it has no
> precedential value on the issue whether a litigant has standing to
> litigate the existence of a trust on behalf of a third party.

*The 1031 Tax Grp., LLC*, 439 B.R. at 64 n.4.  The distinction is critical, because in the case of

commingled accounts, there is a presumption that money used to repay a defendant in a

preference action "could have been used to pay other creditors" and "'presumptively constitutes

property of the debtor's estate.'"  *Cassirer v. Hershkowitz (In re Schick)*, 234 B.R. 337, 343

37

(Bankr. S.D.N.Y. 1999) (citation omitted).  This presumption shifts the burden from the trustee

to the defendant upon a showing by the trustee that the funds came from a commingled account

to which the debtor held legal title.  *Id.*  Because of this presumption, the defendant in an

avoidance action involving a commingled account has the burden of proving that the debtor only

held legal title.  *Id.* at 343–44.  Here, it is undisputed that the 5966 Account was a commingled

account.

### 2.   General Trust Law

Whether funds held in escrow constitute an express trust is determined using state law.

*Barnhill v. Johnson*, 503 U.S. 393, 398 (1992) (noting that as used in the Bankruptcy Code,

"'Property' and 'interests in property' are creatures of state law").  THE RESTATEMENT (THIRD)

OF TRUSTS defines a trust:

> when not qualified by the word "resulting" or "constructive," [as] a
> fiduciary relationship with respect to property, arising from a
> manifestation of intention to create that relationship and subjecting
> the person who holds title to the property to duties to deal with it
> for the benefit of charity or for one or more persons, at least one of
> whom is not the sole trustee.

RESTATEMENT (THIRD) OF TRUSTS § 2 (2003).  It is black letter law that the commingling of

funds in a trust account does not destroy or alter the nature of the deposited funds.  *See* 106 N.Y.

JUR. 2D TRUSTS § 238 (2011) ("A trust follows funds into a bank account, even where they are

mixed with private funds of the trustee, since the act of the trustee in commingling trust moneys

in a mixed bank account does not, of itself, destroy the identity of the trust moneys so as to

prevent their reclamation.") (collecting New York cases).  While "trusts" are often casually

conceived of as accounts, Scott and Ascher on Trusts notes that "it seems proper [] to define the

trust either as a relationship with certain characteristics or perhaps as a legal institution involving

such a relationship."  1 AUSTIN W. SCOTT, WILLIAM F. FRATCHER, & MARK L. ASCHER, SCOTT

AND ASCHER ON TRUSTS (5th ed. 2007) (hereafter "1 Scott and Ascher on Trusts").

Consequently, it is important to consider specifically the funds transferred to and from the 5966

Account as distinct from other monies held in the 5966 Account.  The inquiry therefore isn't

whether the 5966 Account was a "trust account" per se, but whether the funds the Trustee is

seeking to recover were "trust funds."

### 3.  New York Express Trust Requirements Are Not Satisfied

Under New York law, "[a] valid express trust requires (1) a designated beneficiary, (2) a

designated trustee, (3) a fund or other property sufficiently designated or identified to enable title

of the property to pass to the trustee, and (4) actual delivery of the fund or property, with the

intention of vesting legal title in the trustee."  *In re Doman*, 890 N.Y.S.2d 632, 634 (2d Dep't

2009) (citing *Brown v. Spohr*, 73 N.E. 14, 17 (N.Y. 1904)).  An express trust may be created

orally or in writing; no particular form of words is necessary.  *Agudas Chasidei Chabad of U.S.

v. Gourary*, 833 F.2d 431, 434 (2d Cir. 1987) (citing *Martin v. Funk*, 75 N.Y. 134, 141 (1878)).

*See also LFD Operating, Inc. v. Ames Dep't Stores, Inc. (In re Ames Dep't Stores, Inc.)*, 274

B.R. 600, 623 (Bankr. S.D.N.Y. 2002) ("An express trust is a fiduciary relationship with respect

to property, subjecting the person by whom the title to property is held to equitable duties to deal

with the property for the benefit of another person, which arises as a result of a manifestation of

an intention to create it.  Generally, four elements comprise an express trust: (i) a designated

beneficiary; (ii) a designated trustee who is not the beneficiary; (iii) a fund or other property

sufficiently designated or identified to enable title thereto to pass to the trustee; and (iv) the

actual delivery of the fund or other property, or the legal assignment thereof to the trustee, with

the intention of passing legal title thereto to him or her as trustee.") (internal quotation marks

omitted) (quoting RESTATEMENT (SECOND) OF TRUSTS § 2 (1959)).[24]

Neither the complaints nor any documents referenced by the parties contain facts

sufficient for the Court to conclude at this stage of the proceedings that the funds deposited by

the defendants into the 5966 Account were intended as "trust funds."

### a.   Marc Dreier/Dreier LLP Was Not Necessarily an Intended Trustee of Defendants

The complaints do not allege facts from which the Court can conclude that Dreier acted

as an intended trustee of the defendants.  In fact, it appears that Dreier may have acted as

"purported" agent for Solow, even though Solow was innocent of the scheme.[25]  The facts

contained in the complaints suggest that Marc Dreier, and possibly Dreier LLP, may have been

acting as agent for Solow, rather than as an intended trustee for the defendants sufficient to meet

the requirements of an express trust.[26]  Therefore, at least for purposes of defendants' motions to

---

[24]      In *Ames*, Judge Gonzalez rejected the arguments that Ames received and held revenue from department store shoe sales as trustee or agent for the benefit of LFD, despite the fact that the Ames' contract with LFD's predecessor-in-interest expressly stated that the shoe sales revenue "shall be property of [LFD] from the time of such sale, that Ames shall act as [LFD's] agent in the collection and holding of such proceeds, and that Ames shall hold such proceeds in trust for [LFD] until such time as they are paid over to [LFD]." 274 B.R. at 608.

[25]      The Court need not reach the issue here, but the facts in the complaint suggest that there may have been an agent-principal relationship between Dreier and Solow.

While an agent-principal relationship and a trustee-beneficiary relationship are both considered fiduciary relationships, the two relationships are substantively different.  In a principal-agent relationship, the principal controls the agent, and the agent acts on behalf of or for the principal.  A trustee on the other hand is not subject to the control of the trust beneficiary.  The trustee has a duty to handle the trust corpus in a manner consistent with the best interests of the trust beneficiary, but a trustee is ultimately governed by the terms of the trust rather than the nature of the relationship.  *See* RESTATEMENT (SECOND) OF TRUSTS § 7 cmt. b (1959); RESTATEMENT (THIRD) OF TRUSTS § 5 cmt. e (2003).

[26]      As to the Defendants, the Trustee references an email from Patriot's attorney, Stephen Geissler, to Marc Dreier's secretary: "Just curious, why [is Patriot] wiring to your account vs [Solow's] account?" (Compl. ¶ 41.) Dreier's office never responded to Geissler's inquiry, but the email suggests that Patriot intended for the funds transferred in exchange for the Notes to go directly to Solow and was confused why the funds would pass through Dreier LLP's account. While the Court has not been provided with copies of the Term Loan Agreements governing the sale of the bogus Notes, the Complaint alleges that "the Term Loan Agreements directed investors to deal only with MSD: all legal notices, billing statements, payments, or communications of any kind whatsoever pursuant to

dismiss, the complaints do not contain information sufficient to establish as a matter of law that

Marc Dreier/Dreier LLP was an intended trustee of the defendants.

### b.  The Complaints Do Not Contain Facts Sufficient to Determine That Defendants Intended to Create an Express Trust

It is possible to create an express trust without using the words "trust" or "trustee" and

"conversely, the mere fact that the settler uses one or both of these words does not necessarily

indicate an intention to create a trust."  1 Scott and Ascher on Trusts, § 4.2; *see also  In re*

*Morales Travel Agency*, 667 F.2d 1069, 1071 (1st Cir. 1981) ("In the absence of any provision

requiring Morales to hold the funds in trust by keeping them separate, and otherwise restricting

their use, the label 'trust' could in these circumstances and for present purposes have no legal

effect."); *see also Superintendent of Ins. for the State of N.Y. v. First Cent. Fin. Corp. (In re First*

*Cent. Fin. Corp.)*, 269 B.R. 481, 495 (Bankr. E.D.N.Y. 2001)).  In other words, the Trustee is

correct in her assertion that the fact that the funds were deposited into and transferred from an

account labeled as an attorney trust account is not dispositive in establishing the existence of an

express trust between the defendants and Dreier LLP.  As the *Morales* court explained,

"talismanic language [can] not throw a protective mantle over these receipts in the absence of a

genuine trust mechanism."  *Morales*, 667 F.2d at 1071.  All four of the elements must be

satisfied; nomenclature alone does not suffice.

Under New York law, there must be either "an explicit declaration of trust, or

circumstances which show beyond reasonable doubt that a trust was intended to be created."

*Agudas Chasidei Chabad of U.S.*, 833 F.2d at 434 (citing *Beaver v. Beaver*, 117 N.Y. 421, 428

(1889)); *see also Martin v. Funk*, 75 N.Y. at 141 ("No particular form of words is necessary to

constitute a trust, while the act or words relied upon must be unequivocal, implying that the

---

the notes were to be sent to: Solow Management Corp c/o Dreier LLP."  (*Id.*)  Such a directive could have indicated to the funds that Dreier LLP was acting as Solow's agent in administering the Notes.

person holds the property as trustee for another."). In distinguishing whether defendants intended to create a trust or a debt, "the test is whether they intend[ed] for the person receiving the money to have a beneficial, as well as a legal, interest in it." 1 Scott and Ascher on Trusts, § 2.3.8.1. Case law clearly establishes that if a recipient of funds is not prohibited from using the funds as his own and is not prohibited from commingling the funds with his own monies, a debtor-creditor relationship exists, not a trust relationship. *Ames Dep't Stores, Inc.*, 274 B.R. at 624; *see also Foothill Capital Corp. v. Clare's Food Mkt., Inc. ( In re Coupon Clearing Serv., Inc.)*, 113 F.3d 1091, 1101 (9th Cir.1997) (finding better guidance in a series of cases that do not find a trust where commingling of funds and payment out of general funds is sufficient); *First Cent. Fin. Corp.*, 269 B.R. at 495 (observing that the segregation of alleged trust funds is a factor that courts consider in distinguishing a trust and a debt in bankruptcy); *In re Einhorn*, 59 B.R. 179, 184 (Bankr. E.D.N.Y. 1986) (finding that crucial factor in determining whether a trust relationship is created is the duty to segregate funds); *Leased Pet Dep'ts, Inc. v. Cook United, Inc. (In re Cook United, Inc.)*, 50 B.R. 559, 561 (Bankr. N.D. Ohio 1985) (finding that an alleged trustee that commingles funds does not create a trust in a department store context)).

There is no indication in the complaints, or in any of the other documents for that matter, that the defendants intended the funds handed over in exchange for the Notes to be segregated. In fact, the defendants in this case expressed confusion why the funds were not being wired directly to Solow, but were instead going through Dreier LLP's account. (Compl. ¶ 41.)

If the intention to create a trust is not clearly expressed in writing, it can be inferred from all the circumstances. *Harleyville Worcester Mut. Ins. Co. and Lumbermens Mut. Cas. Ins. Co. v. Fleet Nat'l Bank (In re Suprema Specialties, Inc.)*, No. 02-10823, 2006 WL 2583648, at *10 (Bankr. S.D.N.Y. June 8, 2006) ("The formation of a trust relationship is dependent upon the

intention of the parties, which, if not clearly indicated by the language of the parties, is to be

inferred from all the circumstances.") (citing *Stratford Fin. Corp. v. Finex Corp.* 367 F.2d 569

(2d Cir. 1966)).  Additionally, "to be accurate . . . it is necessary, when dealing with the creation

of a trust and its terms, to speak not of the settlor's intention but of the settlor's manifestation of

intention."  1 Scott and Aischer on Trusts, § 4.1.  The complaints do not allege that the

defendants ever manifested an intention to create an express trust.  While the complaints allege

that payments were made to "Solow Management Corp c/o Dreier LLP," *see, e.g.*, Compl. ¶ 20,

neither this language, nor the fact that the funds were transferred to an account labeled "Dreier

LLP Escrow Account" or "Dreier LLP Attorney Trust Account," indicates an intent by the

defendants to create an express trust.

      Also problematic is that at least with regard to these defendants, it appears that Dreier

may not have been brokering the Note sale in his capacity as a lawyer, but rather as a friend of

Solow.  (Compl. ¶ 16) ("Solow agreed to pay above-market interest in those loans as a favor to

assist MSD in developing the investors as DLLP clients.").  Patriot was not a client of Dreier

LLP in this transaction.  This could render New York Rule of Professional Conduct 1.15,

prohibiting the commingling of client funds with personal funds, inapplicable.  N.Y. RULES OF

PROF'L CONDUCT R. 1.15(a), (b)(1).  Rule 1.15 prohibits attorneys from mixing "funds or other

property belonging to another person, where such possession *is incident to his or her practice of

law*" with personal funds.  N.Y. RULES OF PROF'L CONDUCT R. 1.15 (emphasis added).  If Dreier

was not holding the funds from the defendants incident to his practice of law, he may not have

been precluded from commingling those funds with other non-trust funds.  This inquiry raises

questions of fact not readily discernible from the documents the Court may consider on a motion

to dismiss.

In sum, the complaints fail to demonstrate an unequivocal manifestation of intent on behalf of the defendants to have created a trust.  At the motion to dismiss stage, it is premature to glean the existence of an express trust, an indisputably factual inquiry, which would preclude the Trustee from succeeding on her avoidance actions.  Any other trust issue will have to await further developments in these cases.

### D.    Claims for Actual Fraudulent Conveyance

Counts I and III assert actual fraudulent conveyance claims under the Bankruptcy Code and the NYDCL, respectively.  The Defendants' motion to dismiss these two claims is denied.

### 1.   Section 548(a)(1)(A) of the Bankruptcy Code

Count I alleges that the transfers made from the 5966 Account were made with actual fraudulent intent and are therefore avoidable under section 548(a)(1)(A) of the Bankruptcy Code. Section 548(a)(1)(A) provides for the avoidance of an interest in property of the debtor within two years prior to the filing of its bankruptcy petition provided that the transfer was made with an "actual intent to hinder, delay or defraud."[27]  "A claim for actual fraudulent transfer pursuant to § 548(a)(1)(A) or applicable state law must satisfy the requirements of Rule 9(b) of the Federal Rules of Civil Procedure."  *Andrew Velez Const., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Const., Inc.)*, 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007) (quoting *Official*

---

[27]    Section 548(a)(1)(A) provides:

> (a)
>> (1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>>> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted.

11 U.S.C. § 548(a)(1)(A).

*Committee of Unsecured Creditors of Verestar, Inc. v. Am. Tower Corp. (In re Verestar, Inc.)*,
343 B.R. 444, 459–60 (Bankr. S.D.N.Y. 2006)).  "To establish a claim for actual fraudulent
transfer under § 548(a)(1)(A), a plaintiff must plead facts showing that the transfer was made by
the defendant with the intent to hinder, delay or defraud present or future creditors of the
transferor."  *Id.* (citation omitted).  The "plaintiff must establish the actual fraudulent intent of
the transferor/debtor."  *MarketXT*, 361 B.R. at 395; *see also Silverman v. Actrade Capital, Inc.
(In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005) ("Cases under §
548(a)(1)(A) indicate that it is the intent of the transferor and not the transferee that is relevant
for purposes of pleading a claim for intentional fraudulent conveyance under the Bankruptcy
Code.") (citations omitted).  "There is a split regarding the level of proof needed to show actual
fraud under 11 U.S.C. § 548(a)(1)(A)" with some courts requiring a clear and convincing
evidence standard and others requiring that the party seeking to avoid the transfers show actual
fraud by a preponderance of the evidence.  *Savage & Assocs., P.C. v. Mandl (In re Teligent,
Inc.)*, 380 B.R. 324, 336 (Bankr. S.D.N.Y. 2008) (Bernstein, J.) (citations omitted).

Courts have uniformly recognized a presumption of actual intent to defraud on the part of
the transferor in the context of a Ponzi scheme.  Known as the "Ponzi scheme presumption," an
actual intent to defraud is presumed because the transfers "made in the course of a Ponzi scheme
could have been made for no purpose other than to hinder, delay or defraud creditors."  *Bear
Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 8 (S.D.N.Y. 2007)
(quoting *Gredd v. Bear Stearns Secs. Corp. (In re Manhattan Fund Ltd.)*, 359 B.R. 510, 517–18
(Bankr. S.D.N.Y. 2007)); *see also Picard v. Merkin (In re Bernard L. Madoff Inv. Secs. LLC)*,
440 B.R. 243, 255 (Bankr. S.D.N.Y. 2010) ("It is now well-recognized that the existence of a
Ponzi scheme establishes that transfers were made with the intent to hinder, delay and defraud

45

investors.") (citing cases); *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 637

(Bankr. S.D. Ohio 2006) (stating that "bankruptcy [and other] courts nationwide have recognized

that establishing the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent to

defraud") (citation omitted).  "If the Ponzi scheme presumption applies, actual intent for

purposes of section 548(a)(1)(A) is established as a matter of law."  *McHale v. Boulder Capital*

*LLC (In re The 1031 Tax Grp.)*, 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010) (citation and internal

quotation marks omitted).

 The parties here do not dispute that Dreier engaged in a Ponzi scheme through the sale of

bogus Solow Notes.  Rather, the Defendants focus their challenge on whether the Ponzi scheme

presumption still exists in this Circuit.  The Court rejects Defendants' argument; the Ponzi

scheme presumption is alive and well in this Circuit and elsewhere.

 Certainly, the Complaint in this case (and the complaints in the *Amaranth* and *Novator*

adversary proceedings) sufficiently alleges the existence of the Ponzi scheme.  *See, e.g.*, Compl.

¶ 1 ("This is an action seeking to avoid and recover pre-petition transfers of DLLP assets to the

Patriot Group made as part of Marc S. Dreier's . . . confessed criminal Ponzi scheme.");  *Id.* ¶ 15

("Trustee's knowledge . . . is based upon a review of documents . . . filed in connection with the

criminal case against MSD (including, *inter alia*, MSD's admission in a July 7, 2009, letter sent

to the U.S. District Court in connection with his criminal sentencing that he operated "a massive

Ponzi scheme") . . . ."); Trustee Mem. at 4 ("Marc S. Dreier operated a Ponzi scheme involving

the sale of fictitious notes, supposedly issued by a DLLP client, Solow Realty and Development

Corp . . . , to investors—primarily hedge funds—and the use of the proceeds of the sales of notes

to later investors to pay the principal and interest due earlier investors . . . .").  Through the

continued sale of bogus Solow Notes, Dreier used later acquired funds to pay off previous

investors in the Note Fraud to avoid detection of the fraud. *See Bullion Reserve of N. Am.*, 836 F.2d at 1219 n.8 (9th Cir. 1988) (Ponzi schemes are "any sort of fraudulent arrangement that uses later acquired funds or production to pay off previous investors.") (citation omitted); *see also Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Grp., LLC)*, 362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007) ("[T]he label 'Ponzi scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud.") (citations omitted).[28]

The Defendants argue that there is no longer a Ponzi scheme presumption after the Second Circuit's decision in *Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43 (2d Cir. 2005). *See* Transcript of Hr'g 94:8-9, Apr. 5, 2011, ECF Doc. # 52, Apr. 5, 2011 ("For the record, I don't believe the Ponzi scheme presumption still exists . . . ."). The Court rejects this argument out of hand. *Sharp* did not involve a Ponzi scheme and the Second Circuit did not discuss or refer to the Ponzi scheme presumption or Ponzi schemes in general. *See Manhattan Inv. Fund Ltd.*, 397 B.R. at 10–11 ("First, *Sharp* did not involve a Ponzi scheme and the court did not discuss the Ponzi scheme presumption. Therefore, there is no reason to ignore the long line of cases that support the presumption's continuing existence.") (citations omitted). Indeed, this Court has applied the Ponzi scheme presumption in a recent decision, as have other courts in this district post-*Sharp*. *See, e.g., The 1031 Tax Grp.*, 420 B.R. at 189–90 (Glenn, J.); *see also Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P. (In re Bayou Grp., LLC)*, 439 B.R. 284, 303 (S.D.N.Y. 2010) (Gardephe, J.); *Drenis v.*

---

[28]     Further supporting the notion that this was a Ponzi scheme, Dreier's actions have been characterized as such in previous opinions by Judge Bernstein in the main bankruptcy case. *See Dreier*, 429 B.R. at 118 ("In addition to practicing law, Dreier ran a Ponzi scheme between 2004 and 2008. He sold bogus promissory notes, and received approximately $700 million in fraud proceeds over the course of the scheme.") (citations omitted).

*Haligiannis*, 452 F. Supp. 2d 418, 429–30 (S.D.N.Y. 2006) (Holwell, J.); *Picard v. Stanley Chais (In re Bernard L. Madoff Inv. Secs. LLC)*, No. 08–01789 (BRL), Adv. Pro. No. 09–01172 (BRL), 2010 WL 5841402, at *6 (Bankr. S.D.N.Y. Feb. 24, 2011) (Lifland, J.); *Bernard L. Madoff Inv. Secs. LLC*, 440 B.R. at 255 (Lifland, J.).

The Defendants also assert that, even if the Ponzi scheme presumption applies, they are entitled to the "good faith" defense of Bankruptcy Code § 548(c) at the motion to dismiss stage because the defense is apparent from the face of the Complaint.  (*See* Mem. of Law in Support of Defendants' Mot. to Dismiss the Am. Compl. (ECF Doc. # 14) ("Patriot Mem.") at 27, n.6) ("Although section 548(c) of the Bankruptcy Code [is an] affirmative defense[], dismissal is nevertheless warranted, since [it is] apparent from the Amended Complaint.")  Citing the Second Circuit case of *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67 (2d Cir. 1998), the Defendants contend that the Trustee failed to adequately plead that they acted in bad faith because it is apparent from the face of the Complaint they had no knowledge of Dreier's fraudulent scheme.  *Id.* at 74 ("An affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) without resort to summary judgment procedure, if the defense appears on the face of the complaint.") (citations omitted).  However, as the Trustee is not required to plead the Defendants' bad faith (or lack of good faith) at this stage, and the Complaint does not contain allegations establishing good faith as a matter of law, the Court will not consider the § 548(c) defense in connection with the claims against the Defendants seeking avoidance of the transfers on a theory of actual fraudulent conveyance under § 548(a)(1)(A).

Section 548(c) of the Bankruptcy Code provides a "good faith" defense to an otherwise avoidable transfer:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title,

> a transferee or oblige of such a transfer or obligation that takes for
> value and in good faith has a lien on or may retain any interest
> transferred or may enforce any obligation incurred, as the case may
> be, to the extent that such transferee or obligation gave value to the
> debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).  Section 548(c) provides a defense to both actual and constructive fraudulent

conveyance claims under the Bankruptcy Code.  *See MarketXT*, 426 B.R. at 476.  However,

contrary to the Defendants' argument, courts have recognized that, "in light of § 548(c), the

*transferee* of a fraudulent transfer must prove his good faith in order to sustain his defense and

retain the value that he gave."  *Actrade*, 337 B.R. at 805 (collecting cases).  Section 548(c) "has

been construed as an affirmative defense, all elements of which must be proven by the

defendant-transferee."  *Id.* (citing *Breeden v. L.I. Bridge Fund, LLC (In re Bennett Funding Grp.

Inc.)*, 232 B.R. 565, 573 (Bankr. N.D.N.Y. 1999)).  The Trustee need not dispute a transferee's

good faith defense upon the face of the complaint.  *Bayou Grp., LLC*, 362 B.R. at 639 ("It is not

incumbent on the plaintiff to plead lack of good faith on the defendants' part because lack of

good faith is not an element of a plaintiff's claim under Section 548(a)(1).").  "Rather, the

transferee bears the burden of establishing its good faith under section 548(c) of the Code as an

*affirmative defense* that "may be raised and proved by the transferee at trial."  *Bernard L. Madoff

Inv. Secs. LLC*, 440 B.R. at 256 (citation omitted).  At the motion to dismiss stage, the Trustee

need not plead lack of good faith as an element of the claim itself.  *See Actrade*, 337 B.R. at 805.

Although some defenses may be appropriately considered at the motion to dismiss stage,

including defenses based on the statute of limitations or qualified immunity, such is not the case

here.  *See, e.g.*, *Pani*, 152 F.3d at 74–75 (dismissing complaint against insurance company on

grounds of official immunity); *Gharty v. St. John's Queens Hosp.*, 869 F.2d 160, 162 (2d Cir.

1989) ("Where the dates in a complaint show that an action is barred by a statute of limitations, a

defendant may raise the affirmative defense in a pre-answer motion to dismiss."); *see also* 5B Wright & Welling, FED. PRACTICE & PROCEDURE § 1357 ("As a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted by the district court only in the relatively unusual case in which the plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to securing relief.").   Whether the Defendants took the transfers in good faith is a factual question that may not be determined on the face of the Complaint.  *See Bernard L. Madoff Inv. Secs. LLC*, 440 B.R. at 256; *LaVigna v. Lipshie (In re Wise)*, 173 B.R. 75, 78–79 (Bankr. E.D.N.Y. 1994) ("[L]ack of good faith at the time of the transfer . . . may not be determined on the face of the Plaintiff's complaint.").   The dispute here centers on the Trustee's argument that the Defendants knew or should have known that the transfers were made with tainted funds; on the other hand, the Defendants assert that they had no knowledge of Dreier's fraud and took the transfers in good faith at all times.   Determining the Defendants' good faith is an indisputably factual inquiry to be undertaken by the Court after the close of discovery and need not be resolved at the motion to dismiss stage.   It is simply not the Trustee's burden at this stage of the case to counter the Defendants' declaration of good faith.

The Defendants argue that the bankruptcy court decision in *Feldman v. Chase Home Finance (In re Image Masters, Inc.)*, 421 B.R. 164 (Bankr. E.D. Pa. 2009) supports their position that a court may consider the § 548(c) good faith defense on a motion to dismiss.  In *Image Masters*, the court dismissed actual fraudulent conveyance claims against certain banks that collected mortgage payments from the debtor, and received the transfers for value and in good faith under section 548 of the Bankruptcy Code and applicable Pennsylvania law.  *Id.* at 180–88. The court in *Image Masters* stated that "[d]efendants have the burden, of course, of proving that they received the transfers for value and in good faith as an affirmative defense to the Trustee's

causes of action.  Nevertheless, a complaint may be subject to dismissal under Rule 12(b)(6)

when an affirmative defense . . .  appears on its face." *Id.* at 181 (citations and internal quotation

marks omitted).  There is nothing exceptionable in that legal proposition.  But without

necessarily subscribing to the application of that legal principle in the *Image Masters* case, it is

clear that the proposition is of no help to the Defendants here.  In *Image Masters*, the court read

the complaint as conceding that the defendants were not aware of the fraud the debtor was

perpetrating; nor were the defendants a party to any of the documents executed in connection

with the fraudulent scheme.  *Id.* at 172–73 ("The Defendants were not part of or aware of the

artifice and scheme concocted by Snyder and the Debtors.").  In fact, counsel to the trustee in

*Image Masters* conceded during oral argument that "there [was] no relationship between the

debtor and these lenders." *Id.* at 181.

    The Defendants in this case were not strangers to the fraudulent transaction.  Indeed,

Defendants contend that they were the innocent victims.  The Trustee, on the other hand, argues

that the Defendants were on inquiry notice of the alleged fraud.  The Court concludes, based on

the allegations in the Complaint, that there are legitimate issues of fact regarding the Defendants'

good faith that should be considered on a full evidentiary record after the close of discovery.  *See*

*Kapila v. Integra Bank, N.A. (In re Pearlman)*, 440 B.R. 569, 577–78 (Bankr. M.D. Fla. 2010)

(distinguishing *Image Masters* on similar grounds); *see also Notinger v. Costa (In re Robotic*

*Vision Sys., Inc.)*, 374 B.R. 36, 59 (Bankr. D.N.H. 2007) ("[D]etermining whether adequate

consideration was received and whether good faith existed is a factual inquiry that is

inappropriate at the motion to dismiss stage.") (citing *Miller v. McCown De Leew & Co., Inc. (In*

*re The Brown Schools)*, 368 B.R. 394, 408 (Bankr. D. Del. 2007)).

Accordingly, the Debtor's actual intent to defraud creditors is presumed by operation of the Ponzi scheme presumption and the Court will not consider the § 548(c) good faith defense at this stage. The motion to dismiss Count I—avoidance of the transfers as actually fraudulent under § 548(a)(1)(A)—is denied.

### 2. Actual Fraudulent Conveyance Under New York Law

Count III of the Complaint seeks avoidance and recovery of prepetition transfers to the Defendants under NYDCL § 276, made applicable to this case by § 544 of the Bankruptcy Code.[29] Section 276 of the NYDCL allows the Trustee to avoid any "conveyance made . . . with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors." NYDCL § 276. To adequately plead a claim to recover actual fraudulent transfers under the NYDCL, the complaint must state with particularity the factual circumstances constituting fraud under Rule 9(b). *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d 79, 106–07 (S.D.N.Y. 2004) (applying the pleading requirements of Rule 9(b) to actual fraud claims under both the Bankruptcy Code and the NYDCL). "Actual fraudulent intent must be proven by clear and convincing evidence, but it may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 639 (2d Cir. 1995) (citation omitted).

The question of law raised by the parties is whether the Trustee must plead fraudulent intent of *both* the transferor and transferee to state a claim under NYDCL § 276. (Patriot Mem. at 24 n.4; Trustee Mem. at 25–26.) Stated differently, is fraudulent intent of the transferor *and*

---

[29]      Section 544(b)(1) of the Bankruptcy Code provides, in relevant part, that the Trustee may "avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title." 11 U.S.C. § 544(b)(1).

the transferee an element of an actual fraudulent conveyance claim brought under NYDCL §
276?  The question is important here because the Complaint (and the complaints in the other
adversary proceedings) does not plead fraudulent intent by the transferees.  Case law in this
Circuit is divided on this question.  Indeed, I previously concluded in *Andrew Velez Constr.*, 373
B.R. at 276, that "[u]nder [NYDCL § 276], unlike a claim under Bankruptcy Code § 548(a)(1),"
the plaintiff "must plead fraudulent intent of both the transferor and the transferee under § 276."
(citation omitted).  Many of the opinions (including my own in *Andrew Velez Constr.*) that
concluded that fraudulent intent of both transferor and transferee is required have reached that
result simply by citing prior decisions without further analysis of the issue.  Further analysis now
persuades the Court that to state a claim under NYDCL § 276 the Complaint need only
sufficiently allege fraudulent intent by the transferor.  This aligns the fraudulent intent pleading
requirement under Bankruptcy Code § 548(a)(1)(A) and NYDCL § 276.  The Ponzi scheme
presumption in cases such as these satisfies the Trustee's pleading requirement.

   The Second Circuit has stated that "[t]o prove actual fraud under § 276, a creditor must
show intent to defraud on the part of the transferor.  Where actual intent to defraud is proven, the
conveyance will be set aside regardless of the adequacy of the consideration given."  *Sharp*, 403
F.3d at 56 (quoting *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n.5 (2d Cir. 1995)).  The
Second Circuit in *Sharp* affirmed the dismissal of the avoidance complaint on other grounds so
whether intent by the transferee is also required was arguably unnecessary to the decision.  *Id.*
The quote from *HBE Leasing* comes from a footnote which reads, in full: "The 'good faith' in §
272 [of NYDCL] is the good faith of the transferee-in this case, Murphy (and Goldstein and
Clemence Frank).  By contrast, to prove actual fraud under § 276, a creditor must show intent to
defraud on the part of the transferor."  *HBE Leasing*, 61 F.3d at 1059 n.5.  The footnote primarily

dealt with the "good faith" requirement in the definition of "fair consideration" in NYDCL §

272, rather than pleading requirements for actual fraudulent intent.  *Id.*  No authority is cited for

this statement of the law.  Many lower court decisions in this Circuit after *Sharp* and *HBE*

*Leasing* did not simply follow their lead on the issue of intent.

Some lower court opinions require only pleading fraudulent intent by the transferor.  *See*

*Geron v. Schulman (In re Manshul Constr. Corp.),* No. 96B44080(JHG), 96B44079(JHG), 97

CIV. 8851(JGK), 99 CIV. 2825(JGK), 2000 WL 1228866, *46 (S.D.N.Y. Aug. 30, 2000)

(Koeltl, J.) ("It is not necessary under DCL § 276 to show fraudulent intent on the part of the

transferee.  However, a transfer motivated by actual fraudulent intent may not be voided if a

transferee who paid fair consideration did not have actual or constructive knowledge of such

intent.") (citation and internal quotation marks omitted); *Crowthers McCall Pattern, Inc. v.*

*Lewis*, 129 B.R. 992, 999 (S.D.N.Y. 1991) (Lasker, J.) ("The plaintiff counters that it need only

plead and prove the fraudulent intent of the transferor; good faith and fair consideration on the

part of each of the transferees is an affirmative defense which [defendant] entities must plead and

prove.  Case law supports [plaintiff's] position that it is the intent of the transferor and not the

intent of the transferee that is relevant to liability under § 276.  As Justice Cardozo observed, 'If

the grantor made the conveyance with fraudulent intent, the burden was on the grantee to show

that he had accepted it for value, in which event the [creditors] mights [*sic*] have to prove that he

had notice of the fraud.'  Thus, the intent of the [defendants] is relevant only as an affirmative

defense and the allegations of the complaint are sufficient as they stand.") (quoting *Brody v.*

*Pecoraro*, 164 N.E. 741, 742 (N.Y. 1928)) (citation omitted); *Le Café Creme, Ltd. v. Le Roux (In*

*re Le Café Creme, Ltd.)*, 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000) (Brozman, J.) ("It is the

intent of the transferor and not that of the transferee that is dispositive.") (quoting *Stratton*

54

*Oakmont*, 234 B.R. at 318 (Brozman, J.) ("It is the intent of the transferor and not that of the

transferee that is dispositive.  The intent of the transferee only becomes relevant as an affirmative

defense if the defendant is not the initial transferee.") (citations omitted)); *Bruno Mach. Corp. v.

Troy Die Cutting Co., LLC (In re Bruno Mach. Corp.)*, 435 B.R. 819, 853–54 (Bankr. N.D.N.Y.

2010) (Littlefield, J.) ("[I]t is the intent of the transferor and not that of the transferee that is

dispositive . . . .  The intent of the transferee only becomes relevant as an affirmative defense if

the defendant is not the initial transferee.") (citation and internal quotation marks omitted);

*Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 658–59 (Bankr. E.D.N.Y. 2008) (Stong,

J.) ("[I]t is the intent of the transferor and not that of the transferee that is dispositive.") (citations

and internal quotation marks omitted).

Other lower court opinions require pleading of fraudulent intent by the transferor and

transferee.  *See, e.g.*, *Andrew Velez Constr.*, 373 B.R. at 276 (Glenn, J.); *MarketXT*, 361 B.R. at

395 (Gropper, J.) ("Under the Bankruptcy Code, the plaintiff must establish the actual fraudulent

intent of the transferor/debtor; under the NYDCL the plaintiff must establish the actual

fraudulent intent of both the transferor and the transferee.") (citations omitted);  *Park S. Secs.*,

326 B.R. at 517 (Drain, J.) ("Section 548(a)(1)(A) of the Bankruptcy Code and section 276 of the

New York Debtor–Creditor Law, incorporated by Bankruptcy Code section 544(b), provide that

a trustee may avoid transfers of an interest of the debtor in property made with actual intent to

hinder, delay, or defraud creditors.  The 'intent' that must be established under section 548(a) is

the *debtor's* actual fraudulent intent; under section 276 of the N.Y. D.C.L., however, the Trustee

must establish both the debtor's *and* the transferee's actual fraudulent intent.") (citation omitted);

*Gredd v. Bear Stearns Secs. Corp. (In re Manhattan Inv. Fund, Ltd.)*, 310 B.R. 500, 508 (Bankr.

S.D.N.Y. 2002) (Lifland, J.) ("Under N.Y. D & CL section 276, a cause of action must allege

fraudulent intent on the part of the transferor as well as the *transferee*. Fraudulent intent on the part of one of the parties is insufficient.") (citations and internal quotation marks omitted); *Gentry v. Kovler (In re Kovler)*, 249 B.R. 238, 243 (Bankr. S.D.N.Y. 2000) (Hardin, J.) (the "*Kovler* 2000 Opinion") ("Mutual fraudulent intention on the part of both parties to the transaction is required in order to invoke the protection of the law prohibiting fraudulent conveyances; fraudulent intent on the part of one of the parties is insufficient.").[30]

The *Kovler* 2000 Opinion appears to be the original basis for the decisions in this district holding that intent of the transferor and transferee is required. The court's statement that "[m]utual fraudulent intention on the part of both parties to the transaction is required," 249 B.R. at 243, appears to be based upon a quote from a New York state case, *Anderson v. Blood*, 46 N.E. 493 (N.Y. 1897), that "[t]he transferee must have participated or acquiesced in the transferor's fraudulent act." *Kovler*, 249 B.R. at 243. As an initial matter, the quoted statement does not appear in the *Anderson* case, which dealt primarily with whether a purchaser of certain real estate was entitled to a bona fide purchaser defense after being conveyed certain property. *Anderson*, 46 N.E. at 494–96. The court in *Kovler* also relied on the decision in *Key Bank of N.Y. v. Diamond*, 611 N.Y.S.2d 382, 384 (4th Dep't 1994). However, the *Key Bank* decision involved the recovery of attorneys' fees under NYDCL § 276-a which, as discussed more fully

---

[30]      Judge Lifland, in the *Bernard L. Madoff Inv. Secs. LLC* matter brought against defendant J. Ezra Merkin, recently addressed the issue whether the trustee must prove mutual fraudulent intent to state a claim under NYDCL § 276. *Bernard L. Madoff Inv. Secs., LLC*, 440 B.R. at 257–58. Judge Lifland addressed the "good faith" of the transferee because he "[a]ssumed that a transferee's intent must be pled under section 276 of the NYDCL . . . ." *Id.* at 257. He concluded that the complaint sufficiently alleged the factual circumstances and strong circumstantial evidence of the defendants' motive and opportunity to commit fraud. *Id.* at 257–59. In addition, Judge Lifland considered the defendants' "good faith" in connection with the argument that the defendants provided "reasonably equivalent value" for the transfers because they reduced a common law claim for restitution against the debtor. *Id.* at 261–62. The defendants could not benefit from the remedy of restitution because they were not "innocent." *Id.* The facts of the Dreier cases are markedly different from those in *Madoff* —first, as explained below, the Court concludes that the Trustee need not prove the Defendants' fraudulent intent to state a claim under NYDCL § 276. In addition, the Trustee has already conceded that Dreier LLP received "reasonably equivalent value" and "fair equivalent" value for the reduction of a common law claim, such as restitution, that the Defendants would have had against the estate. Trustee Mem. at 11. Here, the Court need not address whether a claim for restitution could succeed. *See* footnote 41, *infra*.

below, requires that the plaintiff prove the intent of both the transferor and the transferee.  *Id.*;
*see* NYDCL § 276-a.  Thus, neither *Anderson* nor *Key Bank* stand for the proposition that
"mutual fraudulent intention of both parties" is necessary to avoid a transfer as a fraudulent
conveyance under NYDCL § 276.

Perhaps in recognition of the fact that its statement of the law was without support, the
*Kovler* court issued an "Order Correcting Decision After Trial" in 2005 (the "Correcting
Opinion"), five years after the initial decision, replacing the statement that "mutual fraudulent
intention" must be proved under NYDCL § 276.  *Gentry v. Kovler (In re Kovler)*, 329 B.R. 17,
18–19 (Bankr. S.D.N.Y. 2005).  The court replaced the paragraph regarding mutual fraudulent
intention with the following paragraph:

> Where the plaintiff establishes actual and mutual fraudulent intent
> by both parties, the transaction is a fraudulent conveyance
> regardless of consideration or the solvency of the transferor.
> *Golden Budha Corp. v. Canadian Land Co. of America*, 931 F.2d
> 196, 201 (2d Cir. 1991) ("If 'the transferee participated or
> acquiesced in the transferor's fraudulent design . . . the transaction
> falls within the condemnation of the fraudulent conveyance
> statutes, without regard to the adequacy or nature of the
> consideration, the solvency of the transferor, or the primary
> purpose of the transferee to secure a profitable purchase.'"
> (quoting 30 N.Y. JUR. 2D *Creditor's Rights* § 243 (1983))); *U.S. v.
> McCombs*, 30 F.3d 310, 327–28 (2d Cir. 1994) ("[S]ection 276
> focuses on the 'actual intent' of the transacting parties . . . [and] . .
> . where actual intent to defraud creditors is proven, the conveyance
> will be set aside regardless of the adequacy of consideration
> given.").

*Id.*  The Correcting Opinion attempts to rectify the misstatement of the requirements for a claim
under § 276 made in the *Kovler* 2000 Opinion, but by that time, the proverbial horse had already

left the barn.[31]  Between the *Kovler* 2000 Opinion and the issuance of the Correcting Opinion, the

court in *Manhattan Inv. Fund* had picked up the *Kovler* decision, stating:

> Under N.Y. D & CL section 276, a cause of action must allege
> fraudulent intent on the part of the transferor as well as the
> *transferee.  See Sullivan v. Messer (In re Corcoran),* 246 B.R. 152,
> 161 (E.D.N.Y. 2000) (*emphasis added*); *Gentry v. Kovler (In re
> Kovler),* 249 B.R. 238, 243 (Bankr. S.D.N.Y. 2000) (holding that
> N.Y. D & CL requires "mutual fraudulent intention on the part of
> *both parties to the transaction*") (*emphasis added*).  "Fraudulent
> intent on the part of one of the parties is insufficient."  *In re
> Kovler,* 249 B.R. at 243.  Accordingly, although N.Y. D & CL
> section 276 requires a showing that "the transferee must have
> participated or acquiesced in the transferor's fraudulent act."

*Manhattan Inv. Fund,* 310 B.R. at 508 (citation omitted).[32]

---

[31]      The Correcting Opinion removes the paragraph that inaccurately states the law, but it substitutes a
paragraph that is far from clear in stating the proper rule.  Judge Hardin more clearly stated his changed position in
2008 in *In re Bayou Grp., LLC*, 396 B.R. at 827 n.5, *overruled on other grounds*, 439 B.R. 284 (S.D.N.Y. 2010):

> The defendants point to a prior decision of this Court, *Gentry v. Kovler (In re Kovler),*
> 249 B.R. 238 (Bankr. S.D.N.Y. 2000), *citations corrected,* 329 B.R. 17 (Bankr. S.D.N.Y.
> 2005), as authority that under N.Y. Debt. & Cred. Law § 276 a plaintiff must prove that
> both the transferor and the transferee acted with "actual intent."  *Kovler's* statement of
> the law was corrected and updated in the 2005 citation above.  The original *Kovler*
> decision is one of several cases which mistakenly suggest that under Section 276 a
> plaintiff must prove the malicious intent of both the transferor and the transferee (with
> some citing *Kovler* for that proposition).  *See, e.g., Andrew Velez Constr., Inc. v. Consol.
> Edison Co. of N.Y., Inc. (In re Andrew Velez Constr., Inc.),* 373 B.R. 262, 276 (Bankr.
> S.D.N.Y. 2007); *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.),* 361
> B.R. 369, 396 (Bankr. S.D.N.Y. 2007); *Picard v. Taylor (In re Park S. Secs., LLC),* 326
> B.R. 505, 517 (Bankr. S.D.N.Y. 2005); *Gredd v. Bear, Stearns Secs. Corp. (In re
> Manhattan Inv. Fund Ltd.),* 310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002).  These cases are
> in direct conflict with governing decisions in this Circuit holding that only the intent of
> the transferor is relevant under Section 276.  *See, e.g., Sharp International,* 403 F.3d 43,
> 56; *HBE Leasing Corp. v. Frank,* 61 F.3d 1054, 1059 n. 5 (2d Cir.1995); *Geron v.
> Schulman (In re Manshul Constr. Corp.),* 2000 WL 1228866, *46, 2000 U.S. Dist.
> LEXIS 12576 at * 129 (S.D.N.Y. Aug. 29, 2000); *Crowthers McCall Pattern, Inc. v.
> Lewis,* 129 B.R. 992, 999 (S.D.N.Y. 1991); *Le Café Creme, Ltd. v. Le Roux (In re Le
> Café Creme, Ltd.),* 244 B.R. 221, 239 (Bankr. S.D.N.Y. 2000); *Secs. Investor Protection
> Corp. v. Stratton Oakmont, Inc.,* 234 B.R. 293, 318 (Bankr. S.D.N.Y. 1999); *Brody v.
> Pecoraro,* 250 N.Y. 56, 61, 164 N.E. 741 (1928) (Cardozo, J.).  The statute itself makes
> this clear.  Section 276 is concerned only with a "conveyance made . . . with intent," and
> only a transferor can be said to have "made" a conveyance.  There is no reference in this
> provision to the transferee or the transferee's intent.

*Id.*  By the time of the *Bayou* decision in 2008, several other cases, including my own in *Andrew Velez
Constr.*, 373 B.R. at 276, had picked up and repeated the holding from the original *Kovler* opinion.

Other later decisions in this district picked up the *Manhattan Inv. Fund* decision and held

that the plaintiff must establish both the debtor's and the transferee's actual fraudulent intent.

*See Park S. Secs.*, 326 B.R. at 517–18 (dismissing claims under § 276 on a motion to dismiss

because trustee had not plead with particularity the fraudulent intent of the transferee);

*MarketXT*, 361 B.R. at 395–97 (same).[33]

The text of NYDCL § 276 juxtaposed against other sections of the NYDCL compel the

conclusion that it is the transferor's intent alone, and not the intent of the transferee, that is

relevant under NYDCL § 276. Section 276 allows a trustee to avoid: "[e]very conveyance made

and every obligation incurred with actual intent, as distinguished from intent presumed in law, to

hinder, delay, or defraud either present or future creditors . . . ." NYDCL § 276. On the other

---

[32]    *Manhattan Inv. Fund* also relied on *Sullivan v. Messer (In re Corcoran)*, 246 B.R. 152, 161 (E.D.N.Y. 2000). In *Corcoran*, the court was asked to consider, among other things, whether the bankruptcy court properly concluded that transfers of real property and funds from a trust account were intentionally fraudulent under NYDCL § 276. *Id.* at 152. In explaining the trustee's burden of proof on the claim under section 276, the court stated:

> To secure summary judgment on a theory of "actual fraud" in the transfer of 38 Albany Street, the trustee was obligated to show as a matter of law that (1) Corcoran transferred the property with "actual intent to hinder, delay or defraud his creditors," N.Y. Debt. & Cred. Law § 276; *and* (2) Ms. Sullivan had "knowledge of the fraud at the time of the purchase," N.Y. Debt. & Cred. Law § 278(1); *see also HBE Leasing v. Frank IV*, 48 F.3d at 639; *FDIC v. Malin*, 802 F.2d 12, 18 (2d Cir.1986).

*Id.* at 161 (emphasis added). But the decision in *Corcoran* was on a motion for summary judgment where the plaintiff had to negate the transferee's bona fide purchaser defense under § 278(1). NYDCL § 278(1). To overcome the defendant's affirmative defense, the plaintiff in *Corcoran* needed to prove that the transferee had "knowledge of the fraud at the time of the purchase." In *Manhattan Inv. Fund*, as in this case, the court was considering a motion to dismiss, with no requirement that the plaintiff defeat the defendant's good faith defense of § 278(1) by proving that the defendant had knowledge of the fraud at the time of the transfers. As discussed more fully below, § 278(1) is an affirmative defense that was appropriately considered at the summary judgment phase in *Corcoran*, but does not factor into the Trustee's burden on a motion to dismiss.

[33]    The New York state cases that have considered the issue whether the transferee's intent must be proved under NYDCL § 276 do not clearly support a conclusion one way or another. *See, e.g., Citibank, N.A. v. Plagakis*, 779 N.Y.S.2d 576, 577–78 (2d Dep't 2004); *Miller v. Miller*, 715 N.Y.S.2d 70, 70–71 (2d Dep't 2000); *Chamberlain v. Amato*, 688 N.Y.S.2d 345, 347 (4th Dep't 1999); *Grumman Aerospace Corp. v. Rice*, 605 N.Y.S. 305, 307 (2d Dep't 1993); *ACLI Gov't Secs., Inc. v. Rhoades*, 653 F. Supp. 1388, 1394–95 (S.D.N.Y. 1987); *Brody*, 164 N.E. at 742 (Cardozo, J.); *but see Meyer v. Mayo*, 187 N.Y.S. 346, 347 (2d Dep't 1921); *Hall v. Frith*, 101 N.Y.S. 31, 33 (N.Y. Sup. 1906); 30 NY JUR. CREDITORS' RIGHTS AND REMEDIES § 352 (2011) ("Mutual fraudulent intention on the part of the parties to a transaction is required in order to invoke the protection of the law prohibiting fraudulent conveyances; fraudulent intent on the part of one of the parties is insufficient.").

hand, NYDCL § 276-a, allows a plaintiff to recover attorneys' fees "where such conveyance is found to have been made by the debtor and received by the transferee with actual intent." NYDCL § 276-a.[34]  A claim under section 276-a requires a finding of fraudulent intent by both the transferor and the transferee.  *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991) (stating that recovery of attorneys' fees under § 276-a requires an "explicit finding of actual intent to defraud" on the part of both the transferor and the transferee); *Key Bank*, 611 N.Y.S.2d at 384. In contrast, NYDCL § 276 makes no reference to the actual fraudulent intent of the transferee and the difference between the provisions cannot be ignored.  *See Bayou Grp., LLC*, 396 B.R. at 826 n.5 ("The statute itself makes this clear.  Section 276 is concerned only with a 'conveyance made . . . with intent,' and only a transferor can be said to have 'made' a conveyance.  There is no reference in this provision to the transferee or the transferee's intent.").

Further support that the transferee's intent is irrelevant at the motion to dismiss stage is evident from the structure of Article 10 of the NYDCL.  Similar to the affirmative defense available to a defendant under § 548(c), the transferee's intent is considered in connection with

---

[34]     NYDCL § 276-a provides in full:

> In an action or special proceeding brought by a creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors to set aside a conveyance by a debtor, *where such conveyance is found to have been made by the debtor and received by the transferee with actual intent*, as distinguished from intent presumed in law, to hinder, delay or defraud either present or future creditors, in which action or special proceeding the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors shall recover judgment, the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees of the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors in such action or special proceeding, and the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors shall have judgment therefor against the debtor and the transferee who are defendants in addition to the other relief granted by the judgment.  The fee so fixed shall be without prejudice to any agreement, express or implied, between the creditor, receiver, trustee in bankruptcy, or assignee for the benefit of creditors and his attorney with respect to the compensation of such attorney.

NYDCL § 276 (emphasis added).

the affirmative defense under NYDCL § 278(1).[35]  Article 10 of the New York Debtor &

Creditor Law is based on the Uniform Fraudulent Conveyance Act ("UFCA"), promulgated in

1918.  *See Le Café Crème*, 244 B.R. at 238 n.13 ("New York's DCL Article 10 enacts the

Uniform Fraudulent Conveyance Act rather than the more modern Uniform Fraudulent Transfer

Act.").  NYDCL § 278 provides an affirmative defense that allows a bona fide purchaser for

value who took without knowledge of the fraud to retain the transfer.  *See* NYDCL § 278(1).

Case law and the statutory framework confirm that NYDCL § 278(1) is an affirmative

defense and the burden of proof under the section 278(1) affirmative defense is on the defendant,

not on the plaintiff.  *See FDIC v. Malin*, 802 F.2d 12, 18 (2d Cir. 1986) ("Phyllis Malin

[transferee] must also satisfy the remaining elements of section 278 to claim its benefits.

Specifically, it must be determine whether Phyllis was a 'purchaser for fair consideration without

knowledge of the fraud at the time of the purchase.'") (citation omitted); *United States v.

Orozco-Prada*, 636 F. Supp. 1537, 1542 (S.D.N.Y. 1986) (discussing lack of case law regarding

whose burden it is to prove that transferees were bona fide purchasers and concluding that "the

burden of proof rests with [the transferees] to establish that, indeed, they were *bona fide*

purchasers for valuable consideration and had neither actual nor constructive knowledge that the

conveyance from [the transferors] was fraudulent"); *Jacobs*, 394 B.R. at 659 (placing the burden

on "innocent purchaser" to "affirmatively show good faith in order to take advantage of" the

NYDCL § 278 defense); *see also Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg.

Inv. Corp.)*, 256 B.R. 664, 676 (Bankr. S.D.N.Y. 2000) (characterizing NYDCL § 278 as a

---

[35]       NYDCL § 278(1) provides as follows:

> Where a conveyance or obligation is fraudulent as to a creditor, such creditor,
> when his claim has matured, may, as against any person except a purchaser for
> fair consideration *without knowledge of the fraud* at the time of the purchase, or
> one who has derived title immediately or mediately from such a purchaser[.]

NYDCL § 278(1) (emphasis added).

"parallel" to the 548(c) good faith affirmative defense where burden is on transferee to establish

defense).[36]

The language of NYDCL § 276 tracks the language of § 9 of the UFCA, titled "Rights of

Creditors Whose Claims Have Matured," which provides as follows:

> (1)     Where a conveyance or obligation is fraudulent as to a
> creditor, such creditor, when his claim has matured, may, as
> against any person except a purchaser for fair consideration
> without knowledge of the fraud at the time of the purchase, or one
> who has derived title immediately or mediately from such a
> purchaser[.]

UNIF. FRAUDULENT CONVEYANCE ACT § 9, 7A U.L.A. 482 (1918).  Though there is no

commentary to this section of the UFCA because it was superseded by the Uniform Fraudulent

Transfer Act ("UFTA") in 1984, UNIF. FRAUDULENT TRANSFER ACT § 8, 7A U.L.A. 178–79

(1984), titled "Defenses, Liability, and Protection of Transferee," confirms that the UFCA § 9

(upon which NYDCL § 278 is based) is intended to be an affirmative defense with the ultimate

burden of proof placed on the transferee.[37]

---

[36]     If the plaintiff seeks summary judgment where the defendant has raised the § 278 affirmative defense, the
plaintiff has the burden to establish that the defendant did not have "knowledge of the fraud at the time of purchase."
*See Corcoran*, 246 B.R. at 161.

[37]     Section 8(a) of the UFTA provides as follows:

> (a)     A transfer or obligation is not voidable under [the actual fraudulent
> conveyance provision] against a person who took in good faith and for a
> reasonably equivalent value or against any subsequent transferee or obligee.

UNIF. FRAUDULENT TRANSFER ACT § 8(a).  Comment 1 to UFTA § 8 further provides that:

> Subsection (a) states the rule that applies when the transferee establishes a
> complete defense to the action for avoidance based on [the actual fraudulent
> conveyance provision].  The subsection is an adaptation of the exception stated
> in § 9 of the Uniform Fraudulent Conveyance Act.  The person who invokes this
> defense carries the burden of establishing good faith and the reasonable
> equivalence of the consideration exchanged.  *Chorost v. Grand Rapids Factory
> Showrooms, Inc.*, 77 F. Supp. 276, 280 (D.N.J. 1948), *aff'd* 172 F.2d 327, 329
> (3d Cir. 1949).

*Id.*, cmt. 1.

Because § 278 is an affirmative defense, the transferee's actual fraudulent intent is considered at the summary judgment phase or at trial on a full evidentiary record.[38]  On a motion to dismiss, the trustee only needs to allege a prima facie case of actual fraud.  If the trustee meets the evidentiary burden of proving a prima facie case of actual fraud at trial, in order to retain the transfer the burden shifts to the transferee to establish the affirmative defense under § 278 by establishing that the transferee received the transfer for "fair consideration" and "without knowledge of the fraud."  *See Orozco-Prada*, 636 F. Supp. at 1541 ("Proof of actual fraudulent intent makes a *prima facie* case and shifts to the grantee the burden of establishing his good faith in the transfer.") (citation omitted).  Whether the Defendants in this case took the transfers in good faith and for value are issues to be raised as affirmative defenses and "need not be negated by the Trustee in the Complaint."  *Stratton Oakmont*, 234 B.R. at 318 (citation omitted).

After a full analysis of the case law and statutory construction of Article 10 of the NYDCL, the Court concludes that the Trustee need not plead the transferee's fraudulent intent under NYDCL § 276—all that is relevant at the motion to dismiss stage is that the Trustee has adequately plead the transferor's actual fraudulent intent.  Applying the Ponzi scheme presumption, the Complaint here sufficiently pleads the transferor's actual fraudulent intent.  Therefore, the motion to dismiss Count III—actual fraudulent conveyance under NYDCL § 276—is denied.[39]

---

[38]     The § 278 affirmative defense cannot be considered at the pleading stage on a motion to dismiss for the same reasons discussed  above in connection with the § 548(c) good faith defense.  *See* section II.D.1, *supra*.

[39]     The Court also rejects the Defendants' argument that transfers cannot be avoided under NYDCL § 276 because they were payments of a valid antecedent debt under cases such as *Irving Trust Co. v. Kaminsky*, 19 F. Supp. 816, 818 (S.D.N.Y. 1937) ("[A] transfer by an insolvent debtor to pay or to secure an antecedent debt has never been treated as a transfer to hinder, delay or defraud creditors, although it is self-evident that other creditors are necessarily hindered and delayed by such a transfer.") (citations omitted).  (Patriot Mem. at 22–24.)  *Kaminsky* has been rejected by the Second Circuit as being too "rigid" an interpretation of New York fraudulent conveyance law.  *See Atlanta Shipping Corp., Inc. v. Chem. Bank*, 631 F. Supp. 335, 347 (S.D.N.Y. 1986), *aff'd,* 818 F.2d 240 (2d Cir. 1987) ("The rigidity of *Kaminsky* and the other cases the defendant cites no longer characterizes the law of

The Defendants also seek dismissal of the request for attorneys' fees included in Count

III pursuant to NYDCL § 276-a.  Section 276-a allows the Trustee to recover attorneys' fees in

an action seeking to set aside an actual fraudulent conveyance, where such conveyance is found

to have been made by the debtor and received by the transferee with actual intent, as

distinguished from intent presumed in law, to hinder, delay or defraud either present or future

creditors . . . ."  NYDCL § 276-a.  The Complaint does not separately state causes of action

under NYDCL §§ 276 and 276-a.  Rather, the request for attorneys' fees is an additional remedy

sought by the Trustee.  But attorneys' fees will only be recoverable if the Trustee establishes at

trial actual fraudulent intent by Defendants.  While the Complaint does not plead actual

fraudulent intent by Defendants, the request for attorneys' fees need not be stricken at his time.

Unless the Trustee establishes actual fraud by the Defendants, the Trustee will not be able to

recover attorneys' fees, even if the Trustee recovers damages on the actual fraudulent transfer

claim.  If the Trustee is unable to develop through discovery evidence of actual fraud by

Defendants, the portion of Count III requesting attorneys' fees can be dismissed before trial or

following trial.

### E.    Constructive Fraudulent Conveyance Claims

Counts II, IV, V and VI seek to avoid the transfers to Patriot as constructively fraudulent

transfers under §§ 548(a)(1)(B) of the Bankruptcy Code and NYDCL §§ 273, 274, 275,

respectively.  With regard to these claims, the Motion to Dismiss is granted to the extent of the

---

fraudulent conveyances.  The mere existence of an antecedent debt is not alone sufficient to validate an otherwise
fraudulent transfer.") (citing 24 N.Y. JUR., FRAUDULENT CONVEYANCES § 76 (1962) ("It is possible for a preferential
transfer to be a vehicle of fraud even though based upon a bona fide antecedent debt . . . .")).  *See also* 30 N.Y. JUR.
2D CREDITORS' RIGHTS § 385 (2011) ("A preferential transfer to a creditor, even though based upon a bona fide
antecedent, may be a vehicle of fraud, such as where it is made with actual intent to defraud, delay or hinder other
creditors.").  Thus, a conveyance made with the intent to hinder, delay or defraud creditors is fraudulent regardless
of the consideration exchanged.  *See McCombs*, 30 F.3d at 327–28.

principal and denied as to the amounts received in excess of principal under both the Bankruptcy

Code and the NYDCL.

### 1.  Section 548(a)(1)(B) of the Bankruptcy Code

To prevail on a constructive fraud claim under the Bankruptcy Code, the Trustee must

show, *inter alia*, that the debtor received "less than reasonably equivalent value in exchange for

such transfer."  11 U.S.C. § 548(a)(1)(B)(i).[40]  "The heightened federal pleading standard for

allegations of fraud does not apply to a complaint to avoid transfers as constructively

fraudulent."  *Bernard L. Madoff Inv. Secs. LLC*, 2010 WL 5841402, at *9 (citing *Actrade*, 337

B.R. at 801–02).  "As the party seeking to avoid the transaction, the Trustee bears the burden of

proof by a preponderance of the evidence" on all elements of a claim for constructive fraudulent

transfer under § 548(a)(1)(B).  *Bennett Funding Grp., Inc.*, 232 B.R. at 570 (citation omitted).

---

[40]     The constructive fraud provisions of the Bankruptcy Code, § 548(a)(1)(B), provides as follows:

> (a)
>> (1) The trustee may avoid any transfer (including any transfer to or for the benefit of an insider under an employment contract) of an interest of the debtor in property, or any obligation (including any obligation to or for the benefit of an insider under an employment contract) incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>>> (B)
>>>> (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
>>>> (ii)
>>>>> (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
>>>>> (II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;
>>>>> (III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or
>>>>> (IV) made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548(a)(1)(B).

As to the repayment of principal, the Trustee concedes that the Defendants provided, and the Debtor received, "reasonably equivalent value" under the Bankruptcy Code and "fair equivalent" under the NYDCL "because the repayment of principal extinguished a common law claim, such as restitution, that Patriot may have had against DLLP." Trustee Mem. at 11; *see also* H'rg Tr. 214:20–25 ("Q: So I don't have to – for purposes here you have admitted that they have a restitution claim to the amount of the principal and I don't have to examine whether there are circumstances whether – as to whether a restitution claim could or couldn't be asserted? A: Correct."). This concession precludes avoidance and recovery of the transfers to Defendants for the repayment of principal under § 548(a)(1)(B) of the Bankruptcy Code.[41] *See, e.g.*, *Levit v. R.T Milford Co. (In re Thunderdome Houston Ltd. P'ship)*, No. 98 C 4615, 2000 WL 889846, at *8 (Bankr. N.D. Ill. June 23, 2000) ("[C]ourts have reasoned that because a Ponzi investor immediately obtains a claim for restitution against the debtor upon making the investment by virtue of the debtor's fraud, the claim constitutes a debt owed to the investor.") (citation omitted); *see also Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*, 330 B.R. 362, 364 (S.D.N.Y. 2005) (concluding that satisfaction or securing of antecedent debt is fair consideration as a matter of law); *Pereira v. Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*, 301 B.R. 801, 805–06 (Bankr. S.D.N.Y. 2003) (Bernstein, C.J.) ("Past consideration is good consideration. An 'antecedent debt' satisfies the requirement of fair consideration and reasonably equivalent value, and putting aside transfers to insiders, the payment of an existing

---

[41]     In light of the Trustee's concession, it is unnecessary to consider whether there are circumstances in which a transferee is precluded from asserting a restitution claim for the return of principal. *See, e.g.*, RESTATEMENT (THIRD) OF RESTITUTION & UNJUST ENRICHMENT § 63 (Tentative Draft No. 7, 2010) (Equitable Disqualification (Unclean Hands): "Recovery in restitution to which an innocent claimant would be entitled may be limited or denied because of the claimant's inequitable conduct in the transaction that is the source of the asserted liability."). *See also Bernard L. Madoff Inv. Secs. LLC*, 440 B.R. at 262 (rejecting argument that the debtors received "reasonably equivalent value" for transfers in satisfaction of claim for restitution because such argument "relies on the premise that the [defendants] are 'innocent' investors entitled to restitution. Only innocent investors who reasonably believed that they were investing in a legitimate enterprise are entitled to claims for restitution") (citations omitted).

liability is not fraudulent.") (citations and internal quotation marks omitted), *vacated Pereira v.*

*Dow Chem. Co. (In re Trace Int'l Holdings, Inc.)*, No. 04 Civ. 1295 (KMW), 2009 WL 1810112,

at * 5 (S.D.N.Y. June 25, 2009). However, the Trustee maintains that she may still recover the

interest payments made to Defendants under the Bankruptcy Code because the Defendants did

not provide "reasonably equivalent value" for the payment of interest. Trustee Mem. at 13–16.[42]

The Defendants disagree.

Patriot makes several arguments that it provided reasonably equivalent value in exchange

for the amounts in excess of principal received on the purported loan made to Solow. First,

Patriot argues that it provided "value" to Dreier LLP in exchange for the 11% interest it was paid

on its loan over a one-year period because Dreier LLP was able to use the funds for a period of

time and the use of funds had value that inured to Dreier LLP's benefit. Patriot Mem. 18–21.

Patriot principally relies on two cases, *Lustig v. Weisz & Assoc. Inc. (In re Unified Commercial*

*Capital Inc.)*, 260 B.R. 343 (Bankr. W.D.N.Y. 2001) and *Daly v. Deptula (In re Carrozzella &*

*Richardson)*, 286 B.R. 480 (D. Conn. 2002).[43]

Both cases are inapplicable here. Dreier LLP, from whose account the payments in

excess of principal were paid, was not a signatory or obligor on the Notes; the payments in

excess of principal did not extinguish a *contractual* debt owed by Dreier LLP to Patriot. In both

---

[42]    Throughout their papers and at the Hearing, the parties asserted different factual and legal arguments about repayment principal and payment of interest. The Court believes, however, that the better characterization of the transfers made to the Defendants is to distinguish between principal and amounts received in excess of principal (or profit).

[43]    These cases are grounded in a line of authority where the courts have looked at the contractual relationship between the investor and the debtor to determine whether the investor should be able to keep its profits received in a Ponzi scheme. *See, e.g.*, *Balaber–Strauss v. Lawrence*, 264 B.R. 303, 308 (S.D.N.Y. 2001), *aff'g In re Churchill Mortgage Inv. Corp.*, 256 B.R. 664, 680 (Bankr. S.D.N.Y. 2000); *Solow v. Reinhardt (In re First Commercial Mgmt Grp., Inc.)*, 279 B.R. 230, 236–38 (Bankr. N.D. Ill. 2002); *R.W. Cuthill, Jr. v. Greenmark, LLC (In re World Vision Entm't., Inc.)*, 275 B.R. 641, 657–58 (Bankr. M.D. Fla. 2002). The prevailing theory in these cases is that a transferee who received funds during the Ponzi scheme is entitled to keep interest payments because the transferee provided value over time for the use of the funds by the debtor, rather than focusing on the conduct of the debtor's principals. *See In re Canyon Sys. Corp.*, 343 B.R. at 641.

*Unified Commercial Capital* and *Carrozzella & Richardson*, a trustee asserted fraudulent conveyance actions under the Bankruptcy Code and relevant state law against recipients of interest payments from a debtor that engaged in a Ponzi scheme. *Unified Commercial Capital*, 260 B.R. at 345–46; *Carrozzella & Richardson*, 286 B.R. at 481. In *Unified Commerical Capital*, investors purchased "debentures" and "certificates of deposits" promising "guaranteed" returns of twelve percent (12%) per annum or more and "safety of principal." 260 B.R. at 345–46. Unified Commercial Capital, the debtor, "had a contractual obligation to pay the Interest" to the investors. *Id.* at 346. Likeweise, in *Carrozzella & Richardson*, the investors deposited funds *directly with the debtor* and were promised an annual rate of return between 8% and 15%. 286 B.R. at 483–84. The debtor paid investors reasonable amounts of agreed upon interest for use of the defendant's money over time. *Id.* The court concluded that the debtor received a dollar-for-dollar forgiveness of *contractual* debt by making the agreed-upon interest payments. *Id.* at 491.

Dreier LLP's payment in excess of principal to Defendants did not reduce a valid contractual debt because there was no valid contract. The essence of the Note Fraud was Dreier's forgery of Solow Notes. Dreier LLP was not a contract party to the Term Loan Agreements executed by investors. In *Unified Commercial Capital* and *Carrozzella & Richardson*, the debtors took the investments from investors pursuant to contracts between the debtors and investors and, according to those courts, the debtors benefitted from the use of funds over time. Though Dreier LLP may have benefited from the use of the money to fund normal operating expenses and meet payroll obligations, there was no contractual debt owed by Dreier LLP to Defendants that was satisfied through the payments in excess of principal to bring it within *Unified Commercial Capital* and *Carrozzella & Richardson*.

Patriot also argues that the payments in excess of principal extinguished a debt that

Dreier LLP owed to Patriot for breach of an implied warranty of authority because Patriot could

have recovered "benefit of the bargain" damages for such a breach. Patriot Mem. 17–18. The

RESTATEMENT (THIRD) OF AGENCY § 6.10 provides that:

> A person who purports to make a contract, representation, or
> conveyance to or with a third party on behalf of another person,
> lacking power to bind that person, gives an implied warranty of
> authority to the third party and is subject to liability to the third
> party for damages for loss caused by breach of that warranty,
> including loss of the benefit expected from performance by the
> principal, unless
>     (1) the principal or purported principal ratifies the act as
> stated in § 4.01; or
>     (2) the person who purports to make the contract,
> representation, or conveyance gives notice to the third party that no
> warranty of authority is given; or
>     (3) the third party knows that the person who purports to
> make the contract, representation, or conveyance acts without
> actual authority.

*Id.* "An agent's implied warranty of authority is a solution to a problem otherwise confronted by

third parties who deal with persons whom they believe to act as agents with power to bind a

principal." *Id.*, cmt. b. A cause of action for breach of implied warranty of authority may lie

against the "person who purports to make a contract, representation, or conveyance to or with a

third party on behalf of another person." *Id.* § 6.10. In this case, an action for breach of implied

warranty may lie against Dreier himself, but not against Dreier LLP. *See DePetris & Bacharach,

LLP v. Srour*, 898 N.Y.S.2d 4, 5–6 (1st Dep't 2010) (reversing dismissal of cause of action for

implied warranty of authority against defendants for their *own* conduct in misrepresenting that

they had authority to enter into a contract with plaintiff).

Patriot asserts that "DLLP had a clear obligation to pay interest to Patriot under the

doctrine of implied warranty of authority" because "under the doctrine of authority, *a person*

*pretending to be an agent for another* is liable for the debts that *he* incurs on behalf of the supposed principal."  Reply Mem. at 9 (emphasis added).  However, contrary to the Defendants' assertion, the Court cannot conclude as a matter of law that an action for breach of implied warranty of authority would lie against Dreier LLP such that payments in excess of principal would satisfy an antecedent debt that Dreier LLP owed to Patriot.  Defendants miss a step in the analysis.  Although the Complaint alleges that "MSD told interested investors that Solow agreed to pay above-market interest on those loans as a favor to assist MSD in developing the investors as DLLP clients" and that Dreier "told potential investors that a long-standing DLLP client, [Solow], was interested in borrowing millions of dollars from investment firms at above-market interest rates to fund Solow's purchase of unspecified real estate investments," these statements do not establish Dreier LLP's liability based on Marc Dreier's breach of an implied warranty of authority.  (Compl. ¶ 16.)  Whether Dreier's conduct can be imputed to Dreier LLP is not at issue before the Court, and certainly not addressed in connection with a potential cause of action for breach of implied warranty of authority.

In any event, even if Patriot could assert a claim for payments in excess of principal for breach of implied warranty of authority against Dreier LLP, Patriot should not be permitted to recover ahead of unsecured creditors of the Dreier LLP estate.  The RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT recognizes that:

> When restitution is based on a wrongful interference with the claimant's legally protected interests, the claimant may be entitled (as against a recipient at fault or a successor in interest) to a recovery exceeding the amount of the claimant's loss.  In any such case, however,
> > (a) the portion of the restitution claim exceeding the claimant's loss is subordinated to the claims of the recipient's creditors, and

> (b) restitution to the claimant from assets that would
> otherwise go to innocent dependents of a deceased recipient is
> limited to the amount of the claimant's loss.

*Id.* § 61 (Tentative Draft No. 7, 2010). Based on a theory of equity, "if a supracompensatory

award to the restitution claimant would come at the expense of a third party who is innocent of

the underlying wrong: typically, an unpaid creditor or a surviving dependent of the wrongdoing

recipient," a court may exercise its discretion in declining to award a recovery to the restitution

claimant. *Id.*, cmt. a. It follows that any claim for breach of implied warranty against Dreier

LLP (assuming that Dreier's conduct is imputed to Dreier LLP) that allowed Patriot to recover in

excess of the amount of Patriot's loss of principal may be "subordinated to the claims of the"

Dreier LLP bankruptcy estate. *Id.* § 61(a).

　　For the forgoing reasons, the Court concludes that the Defendants have not provided

reasonably equivalent value for payments in excess of principal received from Dreier LLP under

the Bankruptcy Code.[44] In light of the Trustee's concession that the Defendants provided

reasonably equivalent value for the repayment of *principal*, Count II, constructive fraudulent

conveyance under the Bankruptcy Code, is dismissed to the extent of the repayment of principal

and denied as to the payments in excess of principal.[45]

---

[44]　　The Court's conclusion that the Defendants did not provide "reasonably equivalent value" for the payments in excess of principal is consistent with those courts that have held that investors in a Ponzi scheme are not entitled to retain the fictitious profits they received. *See Bayou Grp., LLC*, 362 B.R. at 636 ("[V]irtually every court to address the question has held unflinchingly that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers.") (citations and internal quotation marks omitted); *Universal Clearing House Co.*, 77 B.R. at 857 ("[W]e conclude that the debtors received a 'reasonably equivalent value' in exchange for all transfers to a defendant that did not exceed the defendant's principal undertaking but, to the extent a defendant received more than he gave the debtors, the debtors did not receive a reasonably equivalent value."); *Churchill Mortg. Inv. Corp.*, 256 B.R. at 682 (*Universal Clearing House* stands for the "universally-accepted rule that investors may retain distributions from an entity engaged in a Ponzi scheme to the extent of their investments, while distributions exceeding their investments constitute fraudulent conveyances which may be recovered by the Trustee.").

[45]　　Because Patriot was a "net winner," the Trustee's recovery on the constructive fraudulent conveyance claims is limited to the amount recovered by the transferees in excess of the original principal amount of the investment in the Solow Notes. For "net losers," such as *Novator*, that recovered less than the amount of principal

## 2.   Constructive Fraudulent Conveyance Under New York Law

Counts IV, V and VI seek avoidance and recovery of the prepetition transfers to

Defendants as constructive fraudulent conveyances under NYDCL §§ 273,[46] 274[47] and 275,[48]

respectively.   A transfer is deemed a constructively fraudulent conveyance under NYDCL §§

273, 274 and 275, if it is made without "fair consideration," and one of the following conditions

is met:

> (i) the transferor is insolvent or will be rendered insolvent by the
> transfer in question, DCL § 273; (ii) the transferor is engaged in or
> is about to engage in a business transaction for which its remaining
> property constitutes unreasonably small capital, DCL § 274; or (iii)

---

(although some of what they received may have been denominated as "interest"), the Trustee cannot recover anything on the constructive fraudulent conveyance claims.   *See* the accompanying opinion in *Gowan v. Novator Credit Management Ltd. (In re Dreier LLP)*, Adv. Pro. No. 10-04278 (MG) (Bankr. S.D.N.Y. June 16, 2011) (ECF Doc. # 37).

[46]       NYDCL § 273 provides:

> Every conveyance made and every obligation incurred by a person who is or
> will be thereby rendered insolvent is fraudulent as to creditors without regard to
> his actual intent if the conveyance is made or the obligation is incurred without a
> fair consideration.

N.Y. Debt. & Cred. § 273.

[47]       NYDCL § 274 provides:

> Conveyances by persons in business: Every conveyance made without fair
> consideration when the person making it is engaged or is about to engage in a
> business or transaction for which the property remaining in his hands after the
> conveyance is an unreasonably small capital, is fraudulent as to creditors and as
> to other persons who become creditors during the continuance of such business
> or transaction without regard to his actual intent.

N.Y. Debt. & Cred. § 274.

[48]       NYDCL § 275 provides:

> Conveyances by a person about to incur debts: Every conveyance made and
> every obligation incurred without fair consideration when the person making the
> conveyance or entering into the obligation intends or believes that he will incur
> debts beyond his ability to pay as they mature, is fraudulent as to both present
> and future creditors.

N.Y. Debt. & Cred. § 275.

the transferor believes that it will incur debt beyond its ability to
pay, DCL § 275.

*Sharp*, 403 F.3d at 53; NYDCL §§ 273, 274, 275.[49]  Under NYDCL § 272(a), "fair

consideration" is given for property or an obligation: "[w]hen in exchange for such property, or

obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent

debt is satisfied."  NYDCL § 272(a).  The Trustee concedes that the repayment of principal was

for a "fair equivalent" under the NYDCL because such payments extinguished a common law

claim, such as restitution, that Patriot may have had against DLLP.  Trustee Mem. at 11.

Still, the Trustee asserts that she may avoid and recover the transfer of *both* principal and

payments in excess of principal made to Defendants during the course of Dreier's Ponzi scheme

under the NYDCL because the Defendants took the transfers with a lack of good faith, an

element of "fair consideration' in NYDCL § 272 and incorporated into NYDCL §§ 273, 274 and

275.  Trustee Mem. at 11–12, 13–16 ("[T]he Trustee may still recover the principal repayments

under the DCL's constructively fraudulent transfer statute if the Trustee can establish that Patriot

lacked good faith.").  In response, the Defendants argue that the Trustee cannot recover the

repayment of principal based on the Second Circuit's statement in *Sharp*, 403 F.3d at 54, that

"bad faith does not appear to be an articulable exception to the broad principal that 'the

satisfaction of a preexisting debt qualifies as fair consideration for a transfer of property.'"  *Id.*

(quoting *Pashaian v. Eccelston Props.*, 88 F.3d 77, 85 (2d Cir. 1996)).  According to the

Defendants, the concession that repayment of principal extinguished an antecedent debt,

combined with the absence of any allegation that Patriot participated in the fraud, precludes the

---

[49]      The parties do not dispute that at the time it made the payments: (1) Dreier LLP was insolvent, or in the
alternative, Dreier LLP became insolvent as a result of each of the payments, *see* NYDCL § 273; (2) Dreier LLP
was engaged in, or was about to engage in, a business or transaction for which the property remaining in its hands
after each of the transfers constituted unreasonably small capital, *see* NYDCL § 274; and/or (3) Dreier LLP had
incurred, was intended to incur, or believe that it would incur debts beyond its ability to pay them as the debts
matured, *see* NYDCL § 275.  (Compl. ¶ 80, 87, 94.)

Trustee from recovering the repayment of principal from the Defendants as a constructive

fraudulent conveyance under the NYDCL.  *See* Reply Mem. at 3.  For the reasons discussed

below, the Court concludes that the Trustee cannot recover repayment of principal based on the

NYDCL constructive fraudulent conveyance provisions.  With regard to the payments in excess

of principal, the Court concludes, as it did above in connection with the claims for constructive

fraud under the Bankruptcy Code, that the payment of interest was not for "fair equivalent" value

and may be recovered by the Trustee.

The Second Circuit has stated that "fair consideration" under the NYDCL has three

elements:

> (1)  the transferee must convey property in exchange for the
>       transfer, or the transfer must discharge an antecedent debt;
>
> (2)  what the transferee exchanges for the transfer must be of "fair
>       equivalent" value to the property transferred by the debtor; *and*
>
> (3)  the transferee must make the exchange in "good faith."

*See Sharp*, 403 F.3d at 53–54 (emphasis added) (citing *HBE Leasing*, 61 F.3d at 1058–59) ("fair

consideration" requires not only that the exchange be for equivalent value, but also that the

conveyance be made in good faith).  "Under New York law, the party seeking to have the

transfer set aside bears the burden of proof on the element of fair consideration and, since it is

essential to a finding of fair consideration, good faith."  *Actrade*, 337 B.R. at 802 (citing

*McCombs*, 30 F.3d at 326).  The Trustee must prove the elements of a claim for constructive

fraudulent conveyance under the NYDCL by a preponderance of the evidence standard.  *See*

*Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 376 n.6 (S.D.N.Y. 2003) (Chin, J.) (concluding

that the appropriate standard of proof for claim brought under NYDCL § 273 is a preponderance

of the evidence standard).

While courts uniformly recognize that "fair consideration" contains two elements—the transfer must be made for "fair equivalent" value *and* received in good faith—whether a complaint should survive a motion to dismiss if the Trustee alleges lack of "fair consideration" by pleading either a lack of "fair equivalent" value *or* a lack of good faith is less than clear. *See, e.g.*, *HBE Leasing*, 61 F.3d at 1058–59 (explaining that the test for "fair consideration" is in the disjunctive and all three elements must be met to establish that the transfer was for "fair consideration"); *SEC v. Universal Express, Inc.*, No. 04 Civ. 3233 (GEL), 2008 WL 1944803, at *5 (S.D.N.Y. Apr. 30, 2008) ("In New York, the concept of fair consideration has two components—the exchange of fair value and good faith—and both are required.") (citation and internal quotation marks omitted); *Silverman v. United Talmudical Academy Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*, 446 B.R. 32 (Bankr. E.D.N.Y. 2011) (Stong, J.) (analyzing "fair equivalent" value in the context of constructive fraudulent transfer claims brought by trustee and determining that factual issues existed in denying summary judgment and not analyzing "good faith" element); *but see Actrade*, 337 B.R. at 802–08 (analyzing both "fair equivalent" value and "good faith" on a motion to dismiss notwithstanding determination that questions of fact existed regarding "fair equivalence" of transfers).  When explaining the burden of proof necessary to establish "fair consideration," however, the Second Circuit has made clear that the test under NYDCL § 272 is in the disjunctive.  Accordingly, the Court concludes that the Trustee need not allege the absence of each element of "fair consideration" to state a claim for constructive fraudulent conveyance at the motion to dismiss stage.  *See Sharp*, 403 F.3d at 53–54.  To defeat a motion to dismiss, the Trustee need only allege a lack of "fair consideration" by pleading a lack of "fair equivalent" value *or* a lack of good faith on the part of the transferee.

The Court begins its analysis by addressing whether the Trustee's concession that the repayment of principal extinguished an antecedent debt that the Defendants may have had against Dreier LLP negates the state law constructive fraudulent transfer claims. The Trustee concedes that the Defendants provided "fair equivalent" value under the NYDCL in exchange for the repayment of its principal because the repayment of principal extinguished a common law claim, such as restitution, that the Defendants may have had against Dreier LLP. Trustee Mem. at 11. Notwithstanding this concession, the Trustee argues that the she is entitled to avoid and recover the repayment of principal to Defendants, even if Defendants provided fair equivalent value because the Trustee can show lack of "fair consideration" by demonstrating a lack of good faith on the part of the Defendants in receiving the transfers. *Id.* at 11–12 ("[T]he Trustee may still recover the principal repayments under the DCL's constructively fraudulent transfer statute if the Trustee can establish that Patriot lacked good faith.").

On a number of occasions, the Second Circuit has steadfastly held that "in general, a transfer for antecedent debt is deemed a good faith transfer," and bad faith will only nullify such a transfer if "the transferee is an officer, director, or major stockholder of the transferor." *Atlanta Shipping Corp.*, 818 F.2d at 248–49 (affirming dismissal of claims brought under the constructive fraud provisions of the NYDCL because payments to lender "satisfied an antecedent debt" and lender was not an officer, director or shareholder of transferee); *Pashaian*, 88 F.3d at 85 ("New York courts have carved out one exception to the rule that preferential payments of pre-existing obligations are not fraudulent conveyances: preferences to a debtor corporation's shareholders, officers, or directors are deemed not to be transfers for fair consideration.") (quoting *HBE Leasing*, 48 F.3d at 634–35) (citations omitted); *Sharp*, 403 F.3d at 54 ("[B]ad faith does not appear to be an articulable exception to the broad principle that the satisfaction of

76

a preexisting debt qualifies as fair consideration for a transfer of property.") (citation and internal

quotation marks omitted).

The rationale for the conclusion that payment of a valid antecedent debt does not qualify

as a fraudulent conveyance under the NYDCL is based on the objective of the UFCA, which

"[u]nlike the Bankruptcy Code . . . is a set of legal rather than equitable doctrines, whose purpose

is not to provide equal distribution of a debtor's estate among creditors, but to aid specific

creditors who have been defrauded by the transfer of a debtor's property." *HBE Leasing*, 48

F.3d at 634 (citing *Boston Trading Grp., Inc. v. Burnazos*, 835 F.2d 1504, 1508 (1st Cir. 1987)).

> Thus, the UFCA does not bestow a broad power to reorder creditor
> claims or to invalidate transfers that were made for fair
> consideration, at least where no actual intent to hinder, delay, or
> defraud creditors has been shown.  As the definition of "fair
> consideration" in DCL § 272 makes clear, even the preferential
> repayment of pre-existing debts to some creditors does not
> constitute a fraudulent conveyance, whether or not it prejudices
> other creditors, because "[t]he basic object of fraudulent
> conveyance law is to see that the debtor uses his limited assets to
> satisfy *some* of his creditors; it normally does not try to choose
> among them." *Boston Trading,* 835 F.2d at 1509; *see also Atlanta
> Shipping Corp. v. Chemical Bank,* 818 F.2d 240, 249 (2d
> Cir.1987); *Ronga v. Chiusano,* 97 A.D.2d 753, 468 N.Y.S.2d 174,
> 175 (1983); 1 Garrard Glenn, *Fraudulent Conveyances and
> Preferences* § 289, at 488–90 (1940).

*Id.*  Accordingly, in the absence of an actual intent to hinder, delay or defraud creditors or a

transfer made to an officer, director, or major shareholder of the transferor, the NYDCL does not

give a court authority to invalidate a transfer that satisfied a valid antecedent debt.  *See also The

Liquidation Trust v. Daimler AG (In re Old CarCo LLC)*, 435 B.R. 169, 190 (Bankr. S.D.N.Y.

2010) (Gonzalez, C.J.) ("It is only when the transferee is an insider that New York courts

recognize an exception to the rule the repayment of an antecedent debt constitutes fair

consideration.") (citation and internal quotation marks omitted).

Based on this analysis, the Court concludes that the Trustee's claims to recover principal

for constructive fraudulent conveyance under NYDCL §§ 273, 274 and 275 must fail. In her

papers and at the Hearing, the Trustee has made clear that she does not dispute that the

Defendants provided "fair equivalent" value under the NYDCL in exchange for the repayment of

principal because such repayment extinguished a common law claim, such as restitution, that the

Defendants may have had against Dreier LLP. Courts have recognized that reduction of a

restitution claim satisfies an antecedent debt in the context of a fraudulent scheme. *See Jobin v.*

*McKay (In re M & L Bus. Mach. Co., Inc.)*, 84 F.3d 1330, 1342 (10th Cir. 1996) (holding that

debtor's payments to investors were for reasonably equivalent value because such payments

reduced the amount of the investors' claims for rescission); *Wyle v. C.H. Rider & Family (In re*

*United Energy Corp.)*, 944 F.2d 589, 595–96 (9th Cir. 1991) (repayment of principal was

reasonably equivalent value for reduction of restitution claim in satisfaction of an antecedent

"debt" within the Bankruptcy Code definition); *Mark A. McDermott, Ponzi Schemes and the Law*

*of Fraudulent and Preferential Transfers,* 72 Am. Bankr. L.J. 157, 165–66 (1998) ("[E]ach

dollar which an investor receives as a return of his principal investment constitutes a reduction of

his claim for restitution against the debtor, which, as the satisfaction of an antecedent debt of the

debtor, constitutes value (or consideration) to the debtor.") (footnote omitted). In this case, the

Trustee concedes that the repayment of principal reduced a restitution claim that the Defendants

may have had against the Debtor which satisfied a valid antecedent debt that Dreier LLP owed to

the Defendants. Accordingly, the repayment of principal was on account of an antecedent debt,

sufficient to bring it within *Atlanta Shipping*, *HBE Leasing* and *Sharp*, and not avoidable under

the constructive fraud provisions of the NYDCL. *See Sharp Int'l Corp v. State St. Bank & Trust*

*Co. (In re Sharp Int'l Corp.)*, 302 B.R. 760, 782 (E.D.N.Y. 2003) (rejecting "alternative ground"

that "a lack of good faith on the part of the transferee . . . was grounds for avoiding the [transaction]" where transaction constituted repayment of a valid antecedent debt).

As to the payments in excess of principal, the Court concludes, as it did above in the context of "reasonably equivalent value" under the Bankruptcy Code, that the Defendants have not provided "fair equivalent" value for payments in excess of principal. *See supra*, section II.E.1. According to applicable Second Circuit law, a creditor seeking to invalidate the transfers bears the burden of proving that the transfer was made without "a fair consideration." NYDCL §§ 272, 273, 274, 275. For a transfer to be made for "a fair consideration" three elements must be satisfied, including that the transfer be for "fair equivalent" value *and* the transfer be taken in good faith. NYDCL § 272; *Sharp*, 403 F.3d at 53–54. It follows that to disprove that a transfer was made for "a fair consideration," the Trustee must establish the absence of one of the elements of "fair consideration. *Id.* This can be accomplished, alternatively, by establishing that the Defendants failed to provide "fair equivalent" value for the transfer *or* that the Defendants took the transfer with a lack of good faith. *Id.* By alleging that the transfers in excess of principal were not for "fair equivalent" value, the Trustee has properly plead a claim for constructive fraudulent conveyance under the NYDCL. The Trustee's claims for constructive fraudulent conveyance under the NYDCL are permitted to go forward to recover amounts in excess of principal.[50]

---

[50]    In light of the Court's determination that the repayment of principal cannot be invalidated under the NYDCL and the payments in excess of principal made to Defendants was not for "fair equivalent" value, the Court need not address whether the Trustee has adequately plead that the Defendants took the transfers with a lack of good faith in connection with the Trustee's constructive fraudulent conveyance claims. *See* NYDCL § 272. Nevertheless, as discussed more fully below, the "good faith" inquiry under NYDCL § 278(1) and 548(c) may be relevant in the context of the Defendants' affirmative defenses.

### 3.  Good Faith Affirmative Defenses Under Bankruptcy Code § 548(c) and NYDCL § 278

The Defendants will no doubt plead good faith affirmative defenses to the state law claims and Bankruptcy Code claims.  *See* NYDCL § 278(1); 11 U.S.C. § 548(c).  While the Court need not address the merits of these defenses now, the Court will briefly discuss issues arising from these defenses that may shape further proceedings in this and the other similar adversary proceedings.

Issues of "good faith" under both the NYDCL and the Bankruptcy Code have been subject of wide-ranging debate among courts and commentators.  The parties addressed the good faith defense in their briefs, but further briefing and analysis will likely be necessary after the close of discovery either on a motion for summary judgment or at trial.

### a.    NYDCL § 278(1)

As noted above in section II.D.2, NYDCL § 278(1) provides an affirmative defense to a transferee of an otherwise avoidable transfer that permits the transferee to retain the transfer.  NYDCL § 278(1) ("Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may, as against any person except a purchaser for *fair consideration without knowledge of the fraud* at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser . . . .") (emphasis added).  To establish this defense, a defendant must prove that it took the transfer for "fair consideration," which requires three elements:

> (1)  the transferee must convey property in exchange for the transfer, or the transfer must discharge an antecedent debt;
>
> (2)  what the transferee exchanges for the transfer must be of "fair equivalent" value to the property transferred by the debtor; *and*
>
> (3)  the transferee must make the exchange in "good faith."

80

*See Sharp*, 403 F.3d at 53–54 (emphasis added) (citation omitted).  Accordingly, the Defendants

would have to establish their "good faith" to benefit from the NYDCL § 278(1) affirmative

defense.[51]

The Second Circuit recognized that the question of "good faith" under the NYDCL is "an

elusive concept."  *Sharp*, 403 F.3d at 53 ("Good faith is an elusive concept in New York's

constructive fraud statute.  It is hard to locate that concept in a statute in which 'the issue of

intent is irrelevant.'") (citation omitted).  Collier has recognized that "[t]he unpredictable

circumstances in which courts may find its presence or absence render any definition of 'good

faith' inadequate, if not unwise."  5 COLLIER ON BANKRUPTCY ¶ 548.09[2][b] at 548-96 (16th ed.

rev. 2011); *see also Boston Trading*, 835 F.2d at 1512 (recognizing that "courts and

commentators have had difficulty determining the meaning of 'good faith' in [the] definition of

'fair consideration.'").  The "good faith" element of "fair consideration" was considered by the

Second Circuit in *HBE Leasing*:

> We believe that where, as here, a transferee has given equivalent
> value in exchange for the debtor's property, the statutory
> requirement of "good faith" is satisfied if the transferee acted
> without either actual or constructive knowledge of any fraudulent
> scheme.  *See Atlanta Shipping*, 818 F.2d at 249; 1 Glenn, *supra*, §
> 295, at 512 (UFCA requirement of "good faith" refers solely to
> "whether the grantee knew, or should have known, that he was not
> trading normally, but that . . . the purpose of the trade, so far as the
> debtor was concerned, was the defrauding of his creditors.").

48 F.3d at 635–36.  A transferee need not have "actual knowledge of the scheme that renders the

conveyance fraudulent.  Constructive knowledge of fraudulent schemes will be attributed to

---

[51]      The Defendants would also have to establish that they took the transfers "without knowledge of the fraud."
*See* NYDCL § 278(1).  Whether "knowledge" as contemplated by § 278 is actual knowledge or constructive
knowledge is a question left for another day.  *See, e.g.*, *Morse v. Howard Park Corp.*, 272 N.Y.2d 16, 22 (Sup. Ct.
1966) ("[I]f The Fund, as a transferee of the mortgage, was a purchaser for valuable consideration without
knowledge, *actual or constructive*, of the transferor's fraud, i.e., a bona fide purchaser, The Fund is entitled to
protection of its title against the creditors of the transferor.") (emphasis added).

transferees who were aware of circumstances that should have led them to inquire further into

the circumstances of the transaction, but who failed to make such inquiry." *Id.* at 636.  To

determine "constructive knowledge," the court recognized that "[t]here is some ambiguity as to

the precise test" in the context of determining "good faith" under the NYDCL:

> While some cases have stated that purchasers who do not make
> appropriate inquiries are charged with "the knowledge that
> ordinary diligence would have elicited," *United States v. Orozco-
> Prada,* 636 F. Supp. 1537, 1543 (S.D.N.Y.1986), *aff'd,* 847 F.2d
> 836 (2d Cir. 1988); *see also Morse v. Howard Park Corp.*, 50
> Misc. 2d 834, 272 N.Y.S.2d 16, 22 (Sup. Ct. 1966), others appear
> to have required a more active avoidance of the truth, *see Schmitt
> v. Morgan,* 98 A.D.2d 934, 471 N.Y.S.2d 365, 367 (1983) (test is
> whether subsequent purchaser who did not make serious inquiry
> "was shielding himself from knowledge that a fraudulent
> conveyance had occurred"); 1 Glenn, *supra,* § 304, at 532
> (transferee may be charged with knowledge only when there is
> "conscious turning way from the subject").

*Id.* Without expressly resolving what test to apply to determine whether a transferee had

"constructive knowledge" of the fraud, Judge Newman, writing in *HBE Leasing*, in the context

of determining whether transactions should be "collapsed," appears to have applied a rigorous

test.  *Id.* at 637. ("Under the circumstances, her failure to inquire represented a *conscious turning

away* from the subject.") (emphasis added).

Other courts that have considered the "good faith" element of state fraudulent

conveyance statutes have implied that "good faith" requires an inquiry whether there was a

"failure to deal honestly, fairly and openly."  *Southern Indus., Inc. v. Jeremias*, 411 N.Y.S.2d

945 (2d Dep't 1978).  Those cases consider whether the transaction carries the earmarks of a

good faith bargain: "(1) an honest belief in the propriety of the activities in question; (2) no

intent to take unconscionable advantage of others; and (3) no intent to, or knowledge of the fact

that the activities in question will hinder, delay, or defraud others."  *Id.* (citing *Sparkman &*

82

*McLean Co. v. Derber*, 481 P.2d 585 (1971)).  *See also Ostashko v. Ostashko*, No. 00-CV-7162

(ARR), 2002 WL 32068357, at \*22–23 (E.D.N.Y. 2002); *Interpool Ltd. v. Patterson*, 890 F.

Supp. 259, 267 (S.D.N.Y. 1995); *Eisenberg v. Feiner (In re Ahead By A Length, Inc.)*, 100 B.R.

157, 169 (Bankr. S.D.N.Y. 1989).

The Court need not resolve the good faith issues at this stage of the cases.  Further factual

development, briefing and argument will sharpen the focus of the analysis.

### b.        Section 548(c) Good Faith Defense

The Defendants will no doubt assert the "good faith" defense under § 548(c).  The

Bankruptcy Code does not define "good faith" as used in § 548, however, most courts have

applied an "objective" or "reasonable person" standard.  *See, e.g.*, *Bayou Grp., LLC*, 439 B.R. at

313 ("An objective, reasonable investor standard applies to both the inquiry notice and the

diligent investigation components of the good faith test."); *Manhattan Inv. Fund*, 397 B.R. at 22–

23 (stating that "objective standard applies to both questions"); *Enron Corp. v. Avenue Special

Situations Fund II, L.P. (In re Enron Corp.)*, 340 B.R. 180, 207 (Bankr. S.D.N.Y. 2006), *rev'd

on other grounds*, 379 B.R. 425 (S.D.N.Y. 2007); *see also M & L Bus. Mach. Co.*, 84 F.3d at

1337–38; *Brown v. Third Nat'l Bank (In re Sherman),* 67 F.3d 1348, 1355 (8th Cir. 1995).

Under this objective approach, "subjective assertions of good faith . . . are of no moment."

*Agric. Research and Tech. Grp., Inc.*, 916 F.2d at 536.  These courts have looked to what the

transferee objectively knew "rather than examining what the transferee actually knew from a

subjective standpoint."  *Enron Corp.*, 340 B.R. at 208, n.25 (citation omitted).

In *Goldman v. City Capital Mortg. Corp. (In re Nieves)*, No. 08-2160, 2011 WL

2279423, at \*6 (4th Cir. June 10, 2011) (per curiam), the Fourth Circuit recently addressed the

concept of "good faith" in the context of a section 550(b)(1) affirmative defense.[52]  Without

specifically mentioning the good faith defense under section 548(c), the court determined that

"[t]he good faith standard applicable to immediate and mediate transferees should be the same as

the good faith standard for initial transferees," which is the defense in section 548(c).  *Id.*

Consistent with previous Fourth Circuit precedent, the court "appl[ied] an objective good faith

standard for the defense available to immediate and mediate transferees in § 550(b)(1)."  *Id.* at

*6–9.  Transferees asserting an affirmative defense under section 550(b)(1) "do not take in good

faith if they remain willfully ignorant in the fact of facts which cry out for investigation."  *Id.*

(citation and internal quotation marks omitted).  The court also recognized that an "objective"

analysis of the good faith standard "comports with other areas of commercial law."  *Id.*

> The Uniform Commercial Code, for instance, uses a similar good
> faith standard in two commercial settings: determining holders in
> due course, *see* U.C.C. § 3–302 (2002), and the implied duty of
> good faith in contracts, *see* U.C.C. § 1–304 (2001).  Where it
> applies, "good faith" generally means "honesty in fact and
> observance of reasonable commercial standards of fair dealing *in
> the trade.*"  *See* U.C.C. § 1–201(b)(20) (emphasis added); *see also*
> Black's Law Dictionary (9th ed. 2009) (defining "good faith" as
> "honesty in belief," "faithfulness to one's duty or obligation," and
> "observance of reasonable commercial standards of fair dealing in
> a given trade or business").

*Id.*  The court concluded that good faith "contains both subjective ('honesty in fact') and

objective ('observance of reasonable commercial standards') components."  *Id.*

> Under the subjective prong, a court looks to "the honesty" and
> "state of mind" of the party acquiring the property. *See, e.g. Triffin
> v. Pomerantz Staffing Servs., LLC*, 370 N.J.Super. 301, 851 A.2d
> 100, 104 (N.J. Super. Ct. App. Div.).  Under the objective prong, a
> party acts without good faith by failing to abide by routine
> business practices.  *See Rudiger Charolais Ranches v. Van de
> Graaf Ranches,* 994 F.2d 670, 672–73 (9th Cir. 1993) (reasonable

---

[52]        Section 550(b)(1) provides an affirmative defense to an "immediate or mediate transferee" of the initial
transfer if such transferee "takes for value, . . . in good faith, and without knowledge of the voidability of the transfer
avoided."  11 U.S.C. § 550(b)(1).

> commercial practice includes a "custom or practice" unless in
> conflict with a statute); *see also* Grant Gilmore, *The Commercial
> Doctrine of Good Faith Purchase,* 63 Yale L.J. 1057, 1122 n.22
> (1954) (good faith standard captures routine business practices of
> industry). We therefore arrive at the conclusion that the objective
> good-faith standard probes what the transferee knew or should
> have known, *see Laines,* 352 B.R. at 406, taking into consideration
> the customary practices of the industry in which the transferee
> operates.

*Id.* (footnotes omitted).

At least one recent court has jettisoned the objective approach in favor of a subjective approach that considers the actual knowledge of the transferee at the time of the transfer. *See Meoli v. The Huntington Nat'l Bank (In re Teleservices Grp., Inc.)*, 444 B.R. 767, 815 (Bankr. W.D. Mich. 2011) ("The test is not, as Trustee would have it, how well Huntington measured up against what others in the community might have done in its stead. Rather, Huntington's conduct is to be tested based upon its own honesty and integrity—i.e., its good faith—as it became aware of more and more indicators of Teleservices' fraud upon its creditors.").

The Second Circuit does not appear to have resolved the issue in this Circuit. Lower courts in this Circuit that have considered the § 548(c) good faith issue in Ponzi scheme cases have applied a two-part test to determine if the transferee took the transfers in good faith. *See Bayou Grp., LLC*, 439 B.R. at 312 ("Once a transferee has been put on inquiry notice of either the transferor's possible insolvency or of the possibly fraudulent purpose of the transfer, the transferee must satisfy a 'diligent investigation' requirement."); *Manhattan Inv. Fund*, 397 B.R. at 22–23 ("The Bankruptcy Court correctly noted that the good faith question can be broken down into two parts: (1) whether Bear Stearns was on inquiry notice of the Fund's fraud and (2) whether Bear Stearns was diligent in its investigation of the Fund.").

With regard to the "inquiry notice" prong of the good faith analysis, Judge Buchwald in *Manhattan Inv. Fund* considered "whether what [the transferee] knew or should have known *triggered a duty to investigate further* . . . ." *Id.* at 23 (emphasis added).  There, Bear Stearns served as the bankrupt hedge fund's prime broker and "facilitated the Fund's short selling activities by borrowing stocks from third parties, selling them for the Fund, and placing the proceeds in a 'short account' which credited the proceeds to the Fund." *Id.* at 4–5.  Bear Stearns, as the fund's prime broker, had a duty to inquire further based on certain "red flags" that were apparent to Bear Stearns suggesting that the hedge fund was perpetrating a fraud.

The test announced in *Manhattan Inv. Fund* may not be applicable to these Defendants.  Bear Stearns' duty to inquire further, recognized in *Manhattan Inv. Fund*, does not appear to exist here.  The RESTATEMENT (SECOND) OF TORTS § 12(2) (1965), titled "Reason To Know; Should Know," recognizes that

> [t]he words "should know" . . . denote the fact that a person of reasonable prudence and intelligence or of the superior intelligence of the actor would ascertain the fact in question *in the performance of his duty to another*, or would govern his conduct upon the assumption that such fact exists.

*Id.* (emphasis added).  Comment a to this section provides that the expression "'should know' indicates that the actor is under a duty to another to use reasonable diligence to ascertain the existence or non-existence of the fact in question and that he would ascertain the existence thereof in the proper performance of that duty." *Id.*, cmt. a.  Unlike Bear Stearns in *Manhattan Inv. Fund*, Defendants do not appear to have owed a duty to anyone (other than perhaps their own investors) to investigate Dreier's fraud.  On the record before the Court it is not clear that

the Defendants ever had a duty to investigate further.  But, as explained below, even without a

duty, the Defendants cannot ignore facts of which they are aware.[53]

    To be eligible for the good faith defense under § 548(c) (whether or not the transferee has

a duty to inquire further), a transferee should not be able to "consciously avoid" facts within its

knowledge that would suggest that the transfers were not made in good faith.  The RESTATEMENT

(SECOND) OF TORTS, addresses the issue of recklessness in section 500, titled "Reckless

Disregard of Safety Defined":

> [t]he actor's conduct is in reckless disregard of the safety of
> another if he does an act or intentionally fails to do an act which it
> is his duty to the other to do, knowing or having reason to know of
> facts which would lead a reasonable man to realize, not only that
> his conduct creates an unreasonable risk of physical harm to
> another, but also that such risk is substantially greater than that
> which is necessary to make his conduct negligent.

*Id.* § 500.  This Restatement section deals with liability for physical harm, rather than economic

injury, but a recklessness standard applies to many economic torts as well.  *See Int'l Minerals &*

*Res., S.A. v. Bomar Res., Inc.*, 5 Fed. App'x 5, 9 (2d Cir. 2001) ("[I]n the context of an action

under New York law for tortious interference with contract, 'an injured party can recover

punitive damages when the tortious act complained of involved a wanton or reckless disregard of

---

[53]     Indeed, the definition of "reason to know" in the RESTATEMENT (SECOND) OF TORTS is analogous to the "inquiry notice" concept that courts have developed in the context of fraudulent conveyances:

> The words "reason to know" are used throughout the Restatement of this Subject
> to denote the fact that the actor has information from which a person of
> reasonable intelligence or of the superior intelligence of the actor would infer
> that the fact in question exists, or that such person would govern his conduct
> upon the assumption that such fact exists.

*Id.* § 12(1).  *See also Wasserman v. Bressman (In re Bressman)*, 327 F.3d 229, 237 (3d Cir. 2003) ("Some facts strongly suggest the presence of others; a recipient that closes its eyes to the remaining facts may not deny knowledge.  But this is not the same as a duty to investigate, to be a monitor for creditors' benefit when nothing known so far suggests that there is a fraudulent conveyance in the chain.  'Knowledge' is a stronger term than 'notice', . . .  A transferee that lacks the information necessary to support an inference of knowledge need not start investigating on his own.") (quoting *Bonded Fin. Servs. v. European Am. Bank*, 838 F.2d 890, 898 (7th Cir. 1988)).

the plaintiff's rights.'" (quoting *Universal City Studios, Inc. v. Nintendo Co.*, 797 F.2d 70, 77 (2d Cir. 1986)).

A standard of "conscious turning away" was referenced by Judge Newman in *HBE Leasing*, 48 F.3d at 637. It appears akin to "conscious avoidance," "conscious ignorance," or an "ostrich defense," most often applied in criminal cases, *see, e.g.*, *United States v. Feroz*, 848 F.2d 359, 360 (2d Cir. 1988) (per curiam) ("This court has repeatedly emphasized that, in giving the conscious avoidance charge, the district judge should instruct the jury that knowledge of the existence of a particular fact is established (1) if a person is aware of a high probability of its existence, (2) unless he actually believes that it does not exist.") (citations omitted), but also approved by the Second Circuit in civil cases. *See Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 84–85 n.14 ("[A] party's knowledge of a disputed fact may also be proved through evidence that he consciously avoided knowledge of what would otherwise have been obvious to him. As we have explained in the criminal context, [t]he rationale for the conscious avoidance doctrine is that a defendant's affirmative efforts to 'see no evil' and 'hear no evil' no not somehow magically invest him with the ability to 'do no evil.' . . . [The law] does not tolerate a person shutting his eyes to a fact . . . *after* realizing its high probability with requisite knowledge and intent to discriminate.") (citations and internal quotation marks omitted); *see also* 3B FED. JURY PRAC. & INSTR. 161.58 (5th ed. 2011) ("To be held responsible for conscious avoidance or failure to investigate, defendant _____ must either be under a duty to investigate *or* have consciously avoided knowledge knowing the consequences of such avoidance.") (emphasis added). Based on these principles, if it is proved that the Defendants "consciously avoided" facts that would suggest that the transfers were made with a lack of good faith, the Defendants may not retain the otherwise avoidable transfers based on the § 548(c) defense. *See also* 1 Garrard

Glenn, *Fraudulent Conveyances and Preferences* § 304, at 532 (1940) ("It comes always to a question of the grantee's good faith as distinct from mere negligence. There must, indeed, be more than negligence. There must be a conscious turning away from the subject, if the writer may be allowed to put it that way. As put by the Supreme Court, the grantee must take the consequences if he 'chooses to remain ignorant of what the necessities of the case require him to know.'") (footnotes omitted).[54]

In any event, determining the proper legal standard for the good faith affirmative defense will have to await further development in these cases.

### F.   Equitable Subordination

The Trustee also seeks equitable subordination under § 510(c) of the Bankruptcy Code (Count VII) of any claims that may be filed by Defendants. Defendants are correct when they assert that it was premature at this stage for the Trustee to bring an equitable subordination claim. *See Tronox Inc. v. Andarko Petroleum Corp. (In re Tronox, Inc.)*, 429 B.R. 73, 109 (Bankr. S.D.N.Y. 2010) (stating that "it was premature for Plaintiffs to raise the issue at a time when Defendants had not yet filed proofs of claim"). "The great weight of authority is that 'Section 510(c) does not permit subordination absent an allowed claim.'" *Id.* (citing *In re Fox Hill Office Investors, Ltd.*, 101 B.R. 1007, 1022 (Bankr. W.D. Mo. 1989)). The issue of equitable subordination is more properly raised if and when Defendants file a proof of claim under section 502(h) of the Bankruptcy Code. Thus, the Motion to Dismiss Count VII is granted.

---

[54]    Judge Buchwald in *Manhattan Inv. Fund* also referenced "willful ignorance": "Given what Bear Stearns learned, taking no steps at all would have amounted to 'willful ignorance,' which would have defeated the good faith defense." 397 B.R. at 25 n.39. The Supreme Court recently applied the doctrine of "willful blindness" in a patent infringement action. *See Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S.Ct. 2060, 2069 (2011) ("Given the long history of willful blindness and its wide acceptance in the Federal Judiciary, we can see no reason why the doctrine should not apply in civil lawsuits for induced patent infringement.").

### III.    CONCLUSION

For the reasons discussed above, the Court concludes that the Preliminary Forfeiture Order did not divest the Dreier LLP estate of any interest it had in the funds.  The Court also cannot conclude, as a matter of law, that the defendants deposited funds with Dreier LLP in an express trust, or that the transfers they received were trust funds.

In addition, the Defendants' Motion to Dismiss is denied as to Counts I and III, the actual fraudulent conveyance provisions under the Bankruptcy Code and NYDCL § 276.  The Defendants' Motion to Dismiss is also denied with regard to NYDCL § 276-a, seeking recovery of attorneys fees.  The Motion to Dismiss Counts II, IV, V and VI brought under the Bankruptcy Code and the NYDCL for constructive fraudulent transfers is granted with prejudice to the extent of avoidance of principal, but denied as to payments in excess of principal.  The motion to dismiss Count VII for equitable subordination is granted without prejudice.

**IT IS SO ORDERED.**

DATED:        June 16, 2010
                    New York, New York

                                    _____/s/Martin Glenn_____
                                    MARTIN GLENN
                                    United States Bankruptcy Judge